EXHIBIT B

NEITHER THESE SECURITIES NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THESE SECURITIES AND THE SECURITIES ISSUABLE UPON CONVERSION OF THESE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The indebtedness evidenced by this instrument is subordinated to the prior payment in full of the Senior Debt (as defined in the Subordination Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Subordination Agreement, dated as of August 22, 2011, by and among the maker hereof, GR Match, LLC, and _____.

Original Issue Date: August 22, 2011

Conversion Price (subject to adjustment herein): **$0.7223 USD**

$_____

## 9% SUBORDINATED CONVERTIBLE PROMISSORY NOTE
## DUE THIRTEEN MONTHS FROM ORIGINAL ISSUE DATE

THIS 9% SUBORDINATED CONVERTIBLE PROMISSORY NOTE (this "Note") is one of a series of duly authorized and issued 9% Subordinated Convertible Promissory Notes of **CyberDefender Corporation**, a Delaware corporation, having a principal place of business at 617 West 7th Street, Suite 1000, Los Angeles, CA 90017 (the "Company"), designated as its 9% Subordinated Convertible Promissory Notes due thirteen months from the Original Issue Date (the "Notes").

      FOR VALUE RECEIVED, the Company promises to pay to _____ or its registered assigns (the "Holder"), the principal sum of $_____ on the date that is thirteen months from the Original Issue Date set forth above or such earlier date as this Note is required or permitted to be repaid as provided

1

hereunder (the "<u>Maturity Date</u>"), and to pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note in accordance with the provisions hereof. This Note is subject to the following additional provisions:

Section 1.    Definitions.   For the purposes hereof, in addition to the terms defined elsewhere in this Note: (a) capitalized terms not otherwise defined herein have the meanings given to such terms in the Purchase Agreement, and (b) the following terms shall have the following meanings:

"<u>Bankruptcy Event</u>" means any of the following events: (i) the Company or any Significant Subsidiary (as such term is defined in Rule 1.02(s) of Regulation S-X) thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary thereof; (ii) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement; (iii) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (iv) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 days; (v) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors; (vi) the Company or any Significant Subsidiary thereof calls a meeting of substantially all of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (vii) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"<u>Business Day</u>" means any day except Saturday, Sunday and any day which shall be a federal legal holiday in the United States or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"<u>Change of Control Transaction</u>" means the occurrence after the date hereof of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 50% of the voting securities of the Company, or (ii) a replacement at one time or within a one year period of more than one-half of the members of the Company's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), or (iii) the execution by

the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth above in (i) or (ii).

"Conversion Date" shall have the meaning set forth in Section 4(a) hereof.

"Conversion Price" shall have the meaning set forth in Section 4(b) hereof.

"Event of Default" shall have the meaning set forth in Section 6 hereof.

"Exempt Issuance" means the issuance of (a) shares of Common Stock, options or warrants to employees, officers, directors or consultants of the Company, (b) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date of this Agreement, (c) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors, provided any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Company and in which the Company receives benefits in addition to the investment of funds.

"Fundamental Transaction" shall have the meaning set forth in Section 5(c)(iii) hereof.

"Late Fee" shall have the meaning set forth in Section 2(c) hereof.

"Original Issue Date" shall mean the date of the first issuance of this Note as provided on the cover page hereof, regardless of the number of transfers of this Note and regardless of the number of instruments which may be issued to evidence this Note.

"Person" means a corporation, an association, a partnership, an organization, a business, an individual, a government or political subdivision thereof or a governmental agency.

"Purchase Agreement" means the Securities Purchase Agreement between the Holder and the Company, pursuant to which this Note is initially purchased, as amended, modified or supplemented from time to time in accordance with its terms.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Secured Parties" means any Federal, state or local governmental or quasi-governmental agencies or divisions and any lender or creditor holding a security interest under the Uniform Commercial Code in assets and other property of the Company.

3

"<u>Subordination Agreement</u>" means that certain Subordination Agreement dated as of _____ ____, 2011, by and among the Company, GR Match, LLC, and _____.

"<u>Senior Debt</u>" shall have the meaning set forth in the Subordination Agreement.

Section 2.    <u>Interest</u>.

a)    <u>Payment of Interest</u>. The Company shall pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note at the rate of 9% per annum payable on the Maturity Date (except that, if any such date is not a Business Day, then such payment shall be due on the next succeeding Business Day) (the "<u>Interest Payment Date</u>") and on each Conversion Date (as to that principal amount then being converted), in (a) the number of Note Shares equal to the aggregate unpaid and accrued interest divided by the Conversion Price, or (b) if this Note is in default, then the payment shall be made in cash.

b)    <u>Interest Calculations</u>. Interest shall be calculated on the basis of a 360-day year and shall accrue commencing on the Original Issue Date until payment in full of the principal sum, together with all accrued and unpaid interest and other amounts which may become due hereunder, has been made. Interest shall cease to accrue with respect to any principal amount converted, provided that the Company in fact delivers the Note Shares within the time period required by Section 4(c). Interest hereunder will be paid to the Person in whose name this Note is registered on the records of the Company regarding registration and transfers of Notes (the "<u>Note Register</u>").

c)    <u>Late Fee</u>. All overdue accrued and unpaid interest to be paid hereunder shall entail a late fee at the rate of 10.00% per annum (or such lower maximum amount of interest permitted to be charged under applicable law) ("<u>Late Fee</u>"), which will accrue from the date such interest is due hereunder through and including the date of payment and shall be in lieu of interest rate set forth in this Section 2.

d)    <u>Prepayment</u>. The Company has the right to prepay this Note any time with 14 days notice (the "<u>Prepayment Notice Period</u>"). The right to convert by the Holder remains active during the Prepayment Notice Period.

Section 3.    <u>Registration of Transfers and Exchanges</u>.

a)    <u>Different Denominations</u>. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same. No service charge will be made for such registration of transfer or exchange.

b)    <u>Investment Representations</u>. This Note has been issued subject to certain investment representations of the original Holder set forth in the Purchase Agreement and may be transferred or exchanged only in compliance with the Purchase Agreement and applicable federal and state securities laws and regulations.

c)    <u>Reliance on Note Register</u>. Prior to due presentment to the Company for transfer of this Note, the Company and any agent of the Company may treat the Person in whose name this Note is duly registered on the Note Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Note is overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

<u>Section 4.</u>    <u>Conversion</u>.

a)    <u>Voluntary Conversion</u>. At any time after the Original Issue Date and until payment hereof in full (including interest), this Note shall be convertible into Note Shares at the option of the Holder, in whole or in part at any time and from time to time. The Holder shall effect conversions by delivering to the Company the form of Notice of Conversion attached hereto as <u>Annex A</u> (a "<u>Notice of Conversion</u>"), specifying therein the principal amount of Notes and interest thereon to be converted and the date on which such conversion is to be effected (a "<u>Conversion Date</u>"). If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is received hereunder. To effect conversions hereunder, the Holder shall not be required to physically surrender Notes to the Company unless the entire principal amount of this Note plus all accrued and unpaid interest thereon has been so converted. Conversions hereunder shall have the effect of lowering the outstanding principal amount of this Note in an amount equal to the applicable conversion. The Holder and the Company shall maintain records showing the principal amount converted and the date of such conversions. The Company shall deliver any objection to any Notice of Conversion promptly, but in no event later than 2 Business Days of receipt of such notice. In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note may be less than the amount stated on the face hereof. Conversion Notices shall be irrevocable, except as provided in Section 4.21 of the Purchase Agreement.

b)    <u>Conversion Price</u>. The conversion price shall be $0.7223 USD.

c)    <u>Mechanics of Conversion</u>.

i.    <u>Note Shares Issuable Upon Conversion</u>. The number of shares of Note Shares issuable upon a conversion hereunder shall be determined by the

5

quotient obtained by dividing (x) the outstanding principal amount of this Note to be converted plus all accrued and unpaid interest thereon by (y) the Conversion Price.

      ii.      <u>Delivery of Certificate Upon Conversion</u>.  Not later than 7 Business Days after any Conversion Date, the Company will deliver to the Holder a certificate or certificates representing the Note Shares representing the number of shares of Note Shares being acquired upon the conversion of this Note or a portion of this Note.

      iii.      <u>Reservation of Certificates.</u> Certificates for the Note Shares on conversion of this Note shall be made without charge to the Holder for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificate, provided that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of this Note so converted and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

<u>Section 5</u>.    <u>Certain Adjustments</u>.

      a)      <u>Stock Dividends and Stock Splits</u>.  If the Company, at any time while this Note is outstanding: (A) shall pay a stock dividend or otherwise make a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company pursuant to this Note), (B) subdivide outstanding shares of Common Stock into a larger number of shares, (C) combine (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (D) issue by reclassification of shares of the Common Stock any shares of capital stock of the Company, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding before such event and of which the denominator shall be the number of shares of Common Stock outstanding after such event.  Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

      b)      <u>Calculations</u>.  All calculations under this Section 5 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be.  For purposes of this

iii.        <u>Fundamental Transaction</u>. If, at any time while this Note is outstanding, (A) the Company effects any merger or consolidation of the Company with or into another Person where the Company is not the surviving corporation, (B) the Company effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "<u>Fundamental Transaction</u>"), then upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Note Share that would have been issuable upon such conversion absent such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one share of Common Stock (the "<u>Alternate Consideration</u>").  For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration.  If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction.  To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new Note consistent with the foregoing provisions and evidencing the Holder's right to convert such Note into Alternate Consideration. The Company will utilize its best efforts to ensure that terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this paragraph (c) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.  Failure to obtain such terms by the Company shall not cause an Event of Default and the Holder shall then be required to convert in accordance with the terms of the Fundamental Transaction.

iv.        <u>Exempt Issuance</u>. Notwithstanding the foregoing, no adjustment will be made under this Section 5 in respect of an Exempt Issuance.

Section 6.      Events of Default.

a)      "Event of Default", wherever used herein, means any one of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

   i.      any default in the payment of (A) the principal of amount of this Note, or (B) interest (including Late Fees) on, or liquidated damages in respect of, this Note, in each case free of any claim of subordination, as and when the same shall become due and payable (whether on a Conversion Date or the Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, is not cured, within 15 Business Days;

   ii.      the Company shall fail to deliver certificates representing Note Shares issuable upon a conversion or redemption hereunder that comply with the provisions hereof prior to the 15th Business Day after such shares are required to be delivered hereunder, or the Company shall provide written notice to the Holder, including by way of public announcement, at any time, of its intention not to comply with requests for conversion or redemption of this Note in accordance with the terms hereof;

   iii.      the Company shall fail to have available a sufficient number of authorized and unreserved shares of Common Stock to issue to the Holder upon a conversion hereunder;

   iv.      the Company shall materially fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit any breach of the Transaction Documents to which the Holder is a party, and such failure or breach shall not, if subject to the possibility of a cure by the Company, have been remedied within 30 calendar days after the date on which written notice of such failure or breach shall have been given;

   v.      the Company shall purchase more than a de minimis number of Common Stock Equivalents (not including a redemption of this Note hereunder); or

   vi.      there shall have occurred a Bankruptcy Event.

b)      Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the full principal amount of this Note, together with interest and other amounts owing in respect thereof, to the date of acceleration shall become, at the

Holder's election, immediately due and payable in cash. Commencing 5 days after the occurrence of any Event of Default that results in the eventual acceleration of this Note, the interest rate on this Note shall accrue at the rate of 10% per annum, or such lower maximum amount of interest permitted to be charged under applicable law. When this Note shall have been paid in full in accordance herewith, the Holder shall promptly surrender this Note to or as directed by the Company. The Holder need not provide and the Company hereby waives any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such declaration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a Note holder until such time, if any, as the full payment under this Section shall have been received by it. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

Section 7.    <u>Miscellaneous</u>.

    a)    <u>Notices</u>.  Any and all notices or other communications or deliveries to be provided by the Holder hereunder, including, without limitation, any Notice of Conversion, shall be in writing and delivered either personally, by facsimile or sent by a nationally recognized overnight courier service, addressed to the Company at the address set forth above, facsimile number  213.689.8640, Attn: Chief Financial Officer or such other address or facsimile number as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section, with any fax delivery followed up by overnight delivery service. Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by facsimile or sent by a nationally recognized overnight courier service addressed to the Holder at the facsimile telephone number or address of the Holder appearing on the books of the Company, or if no such facsimile telephone number or address appears, then at the principal place of business of the Holder, if any. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section prior to 5:30 p.m. (New York City time), (ii) the date after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section later than 5:30 p.m. (New York City time) on any date and earlier than 11:59 p.m. (New York City time) on such date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iv) if personally delivered, upon actual receipt by the party to whom such notice is required to be given.

    b)    <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal and interest of this Note at the time, place, and rate, and in the coin or currency, herein prescribed. This Note is a direct debt obligation of the

Company.  This Note ranks <u>pari</u> <u>passu</u> with all other Notes now or hereafter issued under the terms set forth herein.

c)    <u>Security Interest</u>.  This Note is a subordinated general obligation of the Company and, pursuant to the terms and conditions of the Subordination Agreement, is specifically subordinate in all ways to any Senior Debt now or hereafter created, issued made or outstanding, to or held by any Secured Parties.  The Holder specifically agrees to provide such additional documentation as any of such Secured Parties shall reasonably believe may be necessary to protect, defend or perfect such secured status.

d)    <u>Lost or Mutilated Note</u>.  If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note (as adjusted for any conversions) so mutilated, lost, stolen or destroyed but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, and indemnity, if requested, all reasonably satisfactory to the Company.

e)    <u>Governing Law</u>.  Any and all actions brought by the Company or Holder under this Note shall be brought in the state or federal courts located in the City of Los Angeles, California  If either party shall commence an action to enforce any provisions of the Transaction Documents, then the prevailing party in such action after obtaining a final, non-appealable judgment shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such proceeding.

f)    <u>Waiver</u>.  Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note.  The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Note.  Any waiver must be in writing.

g)    <u>Severability</u>.   If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates applicable laws governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum permitted rate of interest. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of

or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this indenture, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impeded the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

h)    Next Business Day.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i)    Headings.  The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j)    Amendment.  This Note may be modified or amended or provisions hereof waived with the written consent of the Company and the Holder(s) of at least 51% of the then outstanding principal amount of all of the Notes.

IN WITNESS WHEREOF, the Company has caused this 9% Subordinated Convertible Promissory Note to be duly executed by a duly authorized officer as of the date first above indicated.

CYBERDEFENDER CORPORATION

By: _____
Kevin Harris
Chief Financial Officer and Secretary

## ANNEX A

## NOTICE OF CONVERSION

The undersigned hereby elects to convert principal under the 9% Subordinated Convertible Promissory Note of **CyberDefender Corporation,** a Delaware corporation (the "Company"), due thirteen months from the Original Issue Date thereof, into _____ Note Shares, no par value  per share (the "Note Shares"), of the Company according to the conditions hereof, as of the date written below.  If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as reasonably requested by the Company in accordance therewith.  No fee will be charged to the holder for any conversion, except for such transfer taxes, if any.

Conversion calculations:

Date to Effect Conversion:    _____

Principal Amount of Note(s) to be converted:  $ _____

Note Shares issuable:_____

Interest Payment shares issuable:_____

**Total shares issuable**:_____

Signature:    _____

Name:

Address:

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") is dated and effective as of _____  ____, 2011 by and between CyberDefender Corporation, a Delaware corporation (the "Company"), and the purchaser identified on the signature page hereto (the "Purchaser").

WHEREAS, subject to the terms and conditions set forth in this Agreement and pursuant to Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act") and Rule 506 promulgated thereunder, the board of directors of the Company has authorized the sale and issuance to the Purchaser and other purchasers who are "accredited investors"  within the meaning of Rule 501 under the Securities Act (collectively, the "Other Purchasers", and together with the Purchaser, the "Purchasers") of up to $2,000,000 in aggregate principal amount of the Company's  9% Subordinated Convertible Promissory Notes, subject to the terms and conditions of this Agreement, including an over-allotment option of $400,000 of additional principal amount (the "Offering").

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Company and each Purchaser agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1    Definitions.  In addition to the terms defined elsewhere in this Agreement: (a) capitalized terms that are not otherwise defined herein have the meanings given to such terms in the Notes (as defined herein), and (b) the following terms have the meanings indicated in this Section 1.1:

"Action" shall have the meaning ascribed to such term in Section 3.1(j).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 144 under the Securities Act.  With respect to a Purchaser, any investment fund or managed account that is managed on a discretionary basis by the same investment manager as the Purchaser will be deemed to be an Affiliate of the Purchaser.

"Business Day" means any day except Saturday, Sunday, any day which shall be a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close and, upon the Company becoming listed or quoted on a Trading Market, except any day that the Common Stock is not traded on the Trading Market.

1

"<u>Closing</u>" means the closing of the purchase and sale of the Securities pursuant to Section 2.1.

"<u>Closing Date</u>" means the Business Day when all of the Transaction Documents have been executed and delivered by the Company and the Purchaser, and all conditions precedent to (i) the Purchaser's obligations to pay the Subscription Amount and (ii) the Company's obligations to deliver the Securities have been satisfied or waived.

"<u>Commission</u>" means the Securities and Exchange Commission.

"<u>Common Stock</u>" means the common stock of the Company, no par value per share, and any other class of securities into which such securities may hereafter be reclassified or changed into.

"<u>Common Stock Equivalents</u>" means any securities of the Company which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

"<u>Conversion Price</u>" shall have the meaning ascribed to such term in the Notes.

"<u>Escrow Agreement</u>" means that certain agreement by and among the Company, Purchaser and Richardson & Patel, LLP ("<u>R&P</u>"), attorneys for the Company, into which the Subscription Amount will be paid.

"<u>Escrow Account</u>" means the escrow account described in the Escrow Agreement.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"<u>GAAP</u>" shall have the meaning ascribed to such term in Section 3.1(h).

"<u>Incentive Shares</u>" means the shares of Common Stock issuable pursuant to Section 2.2(c).

"<u>Liens</u>" means a lien, charge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"<u>Material Adverse Effect</u>" shall have the meaning assigned to such term in Section 3.1(b).

"<u>Notes</u>" means the 9% Subordinated Convertible Promissory Notes in the form of <u>Exhibit A</u> attached hereto due, subject to the terms therein, thirteen months from the Closing Date, issued by the Company to the Purchasers pursuant to this Agreement.

"Note Shares" means the shares of Common Stock issuable upon conversion of the Notes, including any shares of Common Stock issued in payment of interest thereunder.

"Offering" has the meaning set forth in the recitals hereof, and includes an over-allotment option of $400,000 in additional principal amount, which option may be exercised in the sole discretion of the placement agent.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Required Approvals" shall have the meaning ascribed to such term in Section 3.1(e).

"Required Minimum" means, as of any date, the maximum aggregate number of shares of Common Stock then issued or potentially issuable in the future pursuant to the Transaction Documents, including any Note Shares and Incentive Shares, ignoring any conversion limits set forth therein, and assuming that the Conversion Price is at all times on and after the date of determination 75% of the then Conversion Price on the Business Day immediately prior to the date of determination.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"Security Agreement" means the Security Agreement between the Purchaser and the Company executed on or about even date.

"Securities" means the Notes, the Note Shares, and the Incentive Shares.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated hereunder.

"Subordination Agreement" means that certain Subordination Agreement by and among the Purchaser, GR Match, LLC ("GRM"), and the Company executed on or about even date.

"Subscription Amount" means the aggregate amount to be paid for the Note purchased hereunder as specified below the Purchaser's name on the signature page of

this Agreement and next to the heading "Subscription Amount," in United States Dollars and in immediately available funds.

""Transaction Documents" means this form of Agreement, the Notes, and any other documents or agreements executed by the Purchasers in connection with the transactions contemplated hereby.

"Transfer Agent" means Continental Stock Transfer & Trust Company, with a mailing address of 17 Battery Place, New York, NY 10004 and a facsimile number of (212) 616-7616, and any successor transfer agent of the Company.

## ARTICLE II.
## PURCHASE AND SALE

2.1    <u>Closing</u>.  On the Closing Date, upon the terms and subject to the conditions set forth herein and substantially concurrent with the execution and delivery of this Agreement by the parties hereto, the Company agrees to sell, and the Purchaser agrees to purchase, a Note in principal amount of the Subscription Amount.  The Purchaser shall deliver to the Company immediately available funds via wire transfer in accordance with the provisions of the Escrow Agreement, and the Company shall deliver to the Purchaser the Purchaser's Note and the Company and the Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing. The Closing shall occur upon satisfaction of the conditions set forth in Sections 2.2 and 2.3.

2.2    <u>Deliveries</u>.

(a)    On the Closing Date, the Company shall deliver or cause to be delivered to the Purchaser the following:

(i)    this Agreement duly executed by the Company;

(ii)    a Note in the principal amount equal to the Purchaser's Subscription Amount, registered in the name of the Purchaser;

(iii)    a Security Agreement duly executed by the Company;

(iv)    an Escrow Agreement duly executed by the Company and R&P; and

(v)    a Subordination Agreement duly executed by the Company and GRM.

(b)    On the Closing Date, the Purchaser shall deliver or cause to be delivered to the Company the following:

(i)    this Agreement duly executed by the Purchaser;

(ii)    the Purchaser's deposit of the Subscription Amount in the Escrow Account;

(iii)    a Security Agreement duly executed by the Purchaser;

(iv)    a Subordination Agreement duly executed by the Purchaser; and

5

       (v)     an Escrow Agreement duly executed by the Purchaser; and

       (vi)    an Investor Questionnaire duly executed by the Purchaser.

(c)     Within thirty (30) days of the Closing Date, the Company shall deliver to Purchaser, for each one dollar of direct new cash proceeds to the Company resulting from Purchaser's purchase of a Note, one share of Common Stock ("Incentive Shares"); provided, however, that: (i) only whole Incentive Shares of common stock shall be issued (with the number of Incentive Shares to be issued to be adjusted by rounding up or down to the nearest whole number of Incentive Shares and a half Incentive Share shall be rounded up); and (ii) the Incentive Shares issued shall be subject to applicable restrictions under the federal securities laws.

2.3    Closing Conditions.

(a)     The obligations of the Company hereunder in connection with the Closing are subject to the following conditions being met:

       (i)     the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Purchaser contained herein;

       (ii)    all obligations, covenants and agreements of the Purchaser required to be performed at or prior to the Closing Date shall have been performed in all material respects; and

       (iii)   the delivery by the Purchaser of the items set forth in Section 2.2(b) of this Agreement.

(b)     The respective obligations of the Purchaser hereunder in connection with the Closing are subject to the following conditions being met:

       (i)     the accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company contained herein;

       (ii)    all obligations, covenants and agreements of the Company required to be performed at or prior to the Closing Date shall have been performed in all material respects;

       (iii)   the delivery by the Company of the items set forth in Section

6

2.2(a) of this Agreement;

(iv)    there shall have been no Material Adverse Effect with respect to the Company since the date hereof; and

(v)    from the date hereof to the Closing Date, a banking moratorium shall not have been declared either by the United States or New York State authorities nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity of such magnitude in its effect on, or any material adverse change in, any financial market which, in each case, in the reasonable judgment of each Purchaser, makes it impracticable or inadvisable to purchase the Note at the Closing.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

3.1 <u>Representations and Warranties of the Company</u>.   Except as set forth in the SEC Documents, the Company hereby makes the following representations and warranties to each Purchaser.

(a)  <u>Subsidiaries</u>.  The Company has no subsidiaries, therefore all references in the Transaction Documents to the Subsidiaries or any of them in the Transaction Documents shall be disregarded.

(b)  <u>Organization and Qualification</u>.  The Company is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization (as applicable), with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted.  The Company is not in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents.  The Company is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material adverse effect on the results of operations, assets, business, prospects or condition (financial or otherwise) of the Company, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document (any of (i), (ii) or (iii), a "<u>Material Adverse Effect</u>") and no Proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

(c)  <u>Authorization; Enforcement</u>.  The Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of

7

the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder.  The execution and delivery of each of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby thereby have been duly authorized by all necessary action on the part of the Company and no further action is required by the Company, its board of directors or its stockholders in connection therewith other than in connection with the Required Approvals.  Each Transaction Document has been (or upon delivery will have been) duly executed by the Company and, when delivered in accordance with the terms hereof and thereof, will constitute the valid and binding obligation of the Company enforceable against the Company in accordance with its terms except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(d) <u>No Conflicts</u>.  The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the other transactions contemplated hereby and thereby do not and will not: (i) conflict with or violate any provision of the Company's  certificate or articles of incorporation, bylaws or other organizational or charter documents, or (ii) subject to the Required Approvals, conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of the Company, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company debt or otherwise) or other understanding to which the Company is a party or by which any property or asset of the Company is bound or affected, or (iii) subject to the Required Approvals, conflict with or result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Company is subject (including federal and state securities laws and regulations), or by which any property or asset of the Company is bound or affected; except in the case of each of clauses (ii) and (iii), such as could not have or reasonably be expected to result in a Material Adverse Effect.

(e) <u>Filings, Consents and Approvals</u>.  The Company is not required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than the filing of Form D with the Commission and such filings as are required to be made under applicable state securities laws (the "<u>Required Approvals</u>").

(f) <u>Issuance of the Securities</u>.   The Securities are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and non-assessable, free and clear of all Liens imposed by the Company other than restrictions on transfer provided for in the Transaction Documents.   The Note Shares and the Incentive Shares, when issued in accordance with the terms of the Transaction Documents, will be validly issued, fully paid and non-assessable, free and clear of all Liens imposed by the Company.   The Company has reserved from its duly authorized capital stock a number of shares of Common Stock for issuance of the Note Shares and Incentive Shares at least equal to the Required Minimum on the date hereof.

(g) <u>Capitalization</u>.   The capitalization of the Company is as disclosed in its Quarterly Report on Form 10-Q for the period ended June 30, 2011 ("<u>Quarterly Report</u>"). Except as a result of the purchase and sale of the Securities or otherwise as set forth in such Quarterly Report, there are no outstanding options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any Person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Company is or may become bound to issue additional shares of Common Stock. The issuance and sale of the Securities will not obligate the Company to issue shares of Common Stock or other securities to any Person (other than the Purchasers) and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under any of such securities. All of the outstanding shares of capital stock of the Company are validly issued, fully paid and non-assessable, have been issued in compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities.   No further approval or authorization of any stockholder, the board of directors of the Company or others is required for the issuance and sale of the Securities. There are no stockholders agreements, voting agreements or other similar agreements with respect to the Company's capital stock to which the Company is a party or, to the knowledge of the Company, between or among any of the Company's stockholders.   The Company has at least 40 stockholders of Common Stock of record prior to the date hereof.

(h) <u>SEC Documents</u>.      The Company hereby makes reference to the following documents filed by the Company with the Commission, which are available for review on the Commission's website, www.sec.gov (collectively, the "<u>SEC Documents</u>"): (a) the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2010; (b) the Company's Quarterly Report on Form 10-Q for the period ended March 31, 2011; and (c) the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011; and any amendments thereto.   As of their respective dates, the SEC Documents complied in all material respects with the requirements of the Exchange Act and none of the SEC Documents contained an untrue statement of a material fact or omitted to state a

material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Documents comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with generally accepted accounting principles in the United States ("GAAP") (except, in the case of unaudited statements, as permitted by the applicable form under the Exchange Act) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present the financial position of the Company as of the dates thereof and its consolidated statements of operations, stockholders' equity and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal and recurring year-end audit adjustments which were and are not expected to have a material adverse effect on the Company, its business, financial condition or results of operations).  Except as and to the extent set forth on the balance sheet of the Company as of March 31, 2011, including the notes thereto, the Company has no liability or obligation of any nature (whether accrued, absolute, contingent or otherwise and whether required to be reflected on a balance sheet or not).

(i) <u>Material Changes</u>.  Since June 30, 2011, except as disclosed as a subsequent event in the Quarterly Report for the period ended June 30, 2011: (i) there has been no event, occurrence or development that has had or that could reasonably be expected to result in a Material Adverse Effect; (ii) the Company has not incurred any liabilities (contingent or otherwise) other than (A) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and (B) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or disclosed in filings made with the Commission; (iii) the Company has not altered its method of accounting; (iv) the Company has not declared or made any dividend or distribution of cash or other property to its stockholders or purchased, redeemed or made any agreements to purchase or redeem any shares of its capital stock; and (v) the Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company stock option plans. The Company does not have pending before the Commission any request for confidential treatment of information.

(j) <u>Litigation</u>.  Except as disclosed as a subsequent event in the Quarterly Report on form 10-Q, there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company or any of its properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "Action") which (i) adversely affects or challenges the legality, validity or enforceability of any of the Transaction Documents or the Securities or (ii) could, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect.  Neither the Company nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty.

There has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the Commission involving the Company or any current or former director or officer of the Company.

3.2 <u>Representations and Warranties of Purchaser</u>.    Purchaser hereby, for itself and for no other Purchaser, represents and warrants as of the date hereof and as of the Closing Date to the Company as follows:

(a) <u>Organization; Authority</u>.  If the Purchaser is not an individual, the Purchaser is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with full right, corporate or partnership power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations hereunder and thereunder. The execution, delivery and performance by the Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate or similar action on the part of the Purchaser if the Purchaser is not an individual.  Each Transaction Document to which it is a party has been duly executed by the Purchaser, and when delivered by the Purchaser in accordance with the terms hereof, will constitute the valid and legally binding obligation of the Purchaser, enforceable against it in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (iii) insofar as indemnification and contribution provisions may be limited by applicable law.

(b) <u>Own Account</u>.  The Purchaser understands that the Securities are "restricted securities" and have not been registered under the Securities Act or any applicable state securities law and is acquiring the Securities as principal for its own account and not with a view to or for distributing or reselling such Securities or any part thereof in violation of the Securities Act or any applicable state securities law, has no present intention of distributing any of such Securities in violation of the Securities Act or any applicable state securities law and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting the Purchaser's right to sell the Securities in compliance with applicable federal and state securities laws) in violation of the Securities Act or any applicable state securities law.  The Purchaser is acquiring the Securities hereunder in the ordinary course of its business if the Purchaser is an entity.

(c) <u>Purchaser Status</u>.  At the time the Purchaser was offered the Securities, it was, and at the date hereof it is, and on each date on which it converts any Notes it will be either: (i) an "accredited investor" as defined in Rule 501 under the Securities Act or (ii) a "qualified institutional buyer" as defined in Rule 144A(a) under the Securities Act.  The Purchaser is not required to be registered as a broker-dealer under Section 15 of the Exchange Act.

11

(d) <u>Experience of the Purchaser</u>.  The Purchaser, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. The Purchaser is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(e) <u>General Solicitation</u>.  The Purchaser is not purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

(f)     <u>Access to Company Information</u>.  The Purchaser acknowledges that it has been afforded access and the opportunity to obtain all financial and other information concerning the Company that the Purchaser desires (including the opportunity to meet with the Company's executive officers, either in person or telephonically, and to ask questions and receive answers from the Company regarding the business, prospects and financial condition of the Company).  The Purchaser has reviewed (i) copies of the SEC Documents and is familiar with the contents thereof, including, without limitation, the risk factors contained in the Annual Report, and (ii) copies of all other reports, schedules, forms, statements and other documents required to be filed by the Company under the Securities Act and Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, and there is no further information about the Company that the Purchaser desires in determining whether to acquire the Securities.  Purchaser represents that it is aware that the Company is entering into that certain waiver and forbearance agreement (the "<u>Waiver and Forbearance Agreement</u>") with GRM with respect to GRM's agreement to waive the Company's existing defaults under the Company's loan documents and loan modification documents with GRM and forbear from exercising its rights and remedies under such loan documents and loan modification documents.  Purchaser further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the Waiver and Forbearance Agreement.  None of the foregoing, however, limits or modifies the representations and warranties of the Company in Section 3 of this Agreement or the right of the Purchaser to rely thereon.

## ARTICLE IV.
## OTHER AGREEMENTS OF THE PARTIES

4.1 <u>Transfer Restrictions</u>.

(a) The Securities may only be disposed of in compliance with state and federal securities laws.  In connection with any transfer of Securities other than pursuant to an effective registration statement or Rule 144, to the Company or to an Affiliate of a

Purchaser or in connection with a pledge as contemplated in Section 4.1(b), the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor and reasonably acceptable to the Company, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the Securities Act.  As a condition of transfer, any such transferee shall agree in writing to be bound by the terms of this Agreement and shall have the rights of a Purchaser under this Agreement and the Registration Rights Agreement.

(b) The Purchasers agree to the imprinting, so long as is required by this Section 4.1, of a legend on any of the Securities in the following form:

NEITHER THIS SECURITY NOR THE SECURITIES INTO WHICH THIS SECURITY IS CONVERTIBLE HAS BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.  THIS SECURITY AND THE SECURITIES ISSUABLE UPON CONVERSION OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The Company acknowledges and agrees that the Purchaser may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Securities to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and who agrees to be bound by the provisions of this Agreement and, if required under the terms of such arrangement, the Purchaser may transfer pledged or secured Securities to the pledgees or secured parties.  Such a pledge or transfer would not be subject to approval of the Company and no legal opinion of legal counsel of the pledgee, secured party or pledgor shall be required in connection therewith.  Further, no notice shall be required of such pledge.  At the appropriate Purchaser's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Securities may reasonably request in connection with a pledge or transfer of the Securities.

(c)      If at any time following the issuance of the Note Shares and the Incentive Shares there is not an effective registration statement covering all of the Note Shares and Incentive Shares and the Company shall determine to prepare and file with the

13

Commission a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities, other than on Form S-4 or Form S-8 (each as promulgated under the Securities Act) or their then equivalents relating to equity securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with the stock option or other employee benefit plans, then the Company shall send to Purchaser a written notice of such determination and, if within fifteen days after the date of such notice, Purchaser shall so request in writing, the Company shall include in such registration statement all or any part of the Note Shares and Incentive Shares Purchaser requests to be registered; provided that, the Company shall not be required to register any Note Shares or Incentive Shares pursuant to this Section 4(c) that are eligible for resale without restriction pursuant to Rule 144 promulgated under the Securities Act or that are the subject of a then effective registration statement.

(d)     The Company shall cause its counsel to issue a legal opinion to the Transfer Agent after the Effective Date while a registration statement is effective in order to effect the removal of the legend hereunder, provided that such legend removal is in connection with a planned resale of Note Shares or Incentive Shares at or around the time such opinion is requested, and that such opinion may only cover the number of shares planned for sale at such time.  If all or any portion of a Note is converted at a time when the applicable Note Shares and Incentive Shares may be sold under Rule 144(b)(1)(i) or if such legend is not otherwise required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the staff of the Commission) then such Note Shares and Incentive Shares shall be issued free of all legends.  The Company agrees that at such time as such legend is no longer required under this Section 4.1(c), it will, no later than three Business Days following the delivery by a Purchaser to the Company or the Transfer Agent of a certificate representing Note Shares and Incentive Shares, as applicable, issued with a restrictive legend, deliver or cause to be delivered to the Purchaser a certificate representing such shares that is free from all restrictive and other legends.

(e)     Each Purchaser, severally and not jointly with the other Purchasers, agrees that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 4.1 is predicated upon the Company's reliance that the Purchaser will sell any Securities pursuant to either the registration requirements of the Securities Act, including any applicable prospectus delivery requirements, or an exemption therefrom, and that if Securities are sold pursuant to a Registration Statement, they will be sold in compliance with the plan of distribution set forth therein.

4.2 Integration.  The Company shall not sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the Securities Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the Securities Act of the sale of the Securities to the Purchasers or that would

be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Trading Market.

4.3 <u>Conversion Procedures</u>.  The form of Notice of Conversion included in the Notes set forth the totality of the procedures required of the Purchasers in order to convert the Notes.  No additional legal opinion or other information or instructions shall be required of the Purchasers to convert their Notes.  The Company shall honor the conversions of the Notes and shall deliver Note Shares in accordance with the terms, conditions and time periods set forth in the Transaction Documents.

4.4 <u>Securities Laws Disclosure; Publicity</u>.  The Company shall not consult with Purchasers in issuing any public announcements with respect to the transactions contemplated hereby. Notwithstanding the foregoing, the Company shall not disclose publicly the name of any Purchaser, or include the name of any Purchaser in any filing with the Commission or any regulatory agency or Trading Market, without the prior written consent of the Purchaser, except (i) as required by the federal securities laws in connection with the filing of final Transaction Documents (including signature pages thereto) with the Commission and (ii) to the extent such disclosure is required by law or Trading Market regulations.

4.5 <u>Non-Public Information</u>.  Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company covenants and agrees that neither it nor any other Person acting on its behalf will provide any Purchaser or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto the Purchaser shall have executed a written agreement regarding the confidentiality and use of such information.  The Company understands and confirms that each Purchaser shall be relying on the foregoing representations in effecting transactions in securities of the Company.

4.6 <u>Reservation and Listing of Securities</u>.

(a) The Company shall maintain a reserve from its duly authorized shares of Common Stock for issuance pursuant to the Transaction Documents in such amount as may be required to fulfill its obligations in full under the Transaction Documents.

(b) If, on any date, the number of authorized but unissued (and otherwise unreserved) shares of Common Stock is less than the Required Minimum on such date, then the Board of Directors of the Company shall use commercially reasonable efforts to amend the Company's certificate or articles of incorporation to increase the number of authorized but unissued shares of Common Stock to at least the Required Minimum at such time, as soon as possible and in any event not later than the 75th day after such date.

(c) The Company shall, if applicable: (i) in the time and manner required by the principal Trading Market, prepare and file with such Trading Market an additional shares listing application covering a number of shares of Common Stock at least equal to the Required Minimum on the date of such application, (ii) take all steps necessary to cause

such shares of Common Stock to be approved for listing on such Trading Market as soon as possible thereafter, if required, (iii) provide to the Purchasers evidence of such listing, if applicable, and (iv) maintain the listing of such Common Stock on any date at least equal to the Required Minimum on such date on such Trading Market or another Trading Market.

4.7     Form D; Blue Sky Filings.  The Company agrees to timely file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof, promptly upon request of the Purchaser. The Company shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the Securities for, sale to the Purchasers under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of such actions promptly upon request of any Purchaser.

## MISCELLANEOUS

4.8 Fees and Expenses.  Except as expressly set forth in the Transaction Documents to the contrary, each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.  The Company shall pay all Transfer Agent fees, stamp taxes and other taxes and duties levied in connection with the delivery of any Securities to the Purchasers.

4.9 Entire Agreement.  The Transaction Documents, together with the exhibits and schedules thereto, contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

4.10    Notices.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto prior to 5:30 p.m. (New York City time) on a Business Day, (b) the next Business Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile number set forth on the signature pages attached hereto on a day that is not a Business Day or later than 5:30 p.m. (New York City time) on any Business Day, (c) the 2nd Business Day following the date of mailing, if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given.  The address for such notices and communications shall be as set forth on the signature pages attached hereto.

4.11    Amendments; Waivers.  Except as otherwise set forth herein, any provision of this Agreement may be waived, modified, supplemented or amended in a written instrument signed

16

by the Company and Purchasers holding at least 51% in principal amount of the then-outstanding Notes.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right.

      4.12    <u>Headings</u>.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

      4.13    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.  Neither the Company nor the Purchase may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other (other than by merger).

      4.14    <u>No Third-Party Beneficiaries</u>.  This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

      4.15    <u>Governing Law</u>.  All questions concerning the construction, validity, enforcement and interpretation of the Transaction Documents shall be governed by and construed and enforced in accordance with the laws of the State of California, without regard to the principles of conflicts of law thereof.  Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement and any other Transaction Documents (whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of Los Angeles.  Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of Los Angeles for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the enforcement of any of the Transaction Documents), and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The parties hereby waive all rights to a trial by jury.  If either party shall commence an action or proceeding to enforce any provisions of the Transaction Documents, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding.

4.16    <u>Survival</u>.  The representations and, warranties, shall survive the Closing and the delivery, of the Securities, for the applicable statue of limitations.

4.17    <u>Execution</u>.  This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

4.18    <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their commercially reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

4.19    <u>Rescission and Withdrawal Right</u>.  Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) any of the other Transaction Documents, whenever any Purchaser exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then the Purchaser may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights; <u>provided</u>, <u>however</u>, in the case of a rescission of a conversion of a Note, the Purchaser shall be required to return any shares of Common Stock subject to any such rescinded conversion notice.

4.20    <u>Replacement of Securities</u>.  If any certificate or instrument evidencing any Securities is mutilated, lost, stolen or destroyed, the Company shall issue or cause to be issued in exchange and substitution for and upon cancellation thereof (in the case of mutilation), or in lieu of and substitution therefor, a new certificate or instrument, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction.  The applicant for a new certificate or instrument under such circumstances shall also pay any reasonable third-party costs (including customary indemnity) associated with the issuance of such replacement Securities.

4.21    <u>Remedies</u>.  In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, the Purchaser and the Company will be entitled to specific performance under the Transaction Documents.  The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of

18

obligations contained in the Transaction Documents and hereby agrees to waive and not to assert in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

4.22    <u>Payment Set Aside</u>.  To the extent that the Company makes a payment or payments to the Purchaser pursuant to any Transaction Document or the Purchaser enforces or exercises its rights thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

4.23    <u>Usury</u>.  To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any claim, action or proceeding that may be brought by the Purchaser in order to enforce any right or remedy under any Transaction Document to which the Purchaser is a party.  Notwithstanding any provision to the contrary contained in any Transaction Document, it is expressly agreed and provided that the total liability of the Company under the Transaction Documents for payments in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "<u>Maximum Rate</u>"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums in the nature of interest that the Company may be obligated to pay under the Transaction Documents exceed such Maximum Rate.  It is agreed that if the maximum contract rate of interest allowed by law and applicable to the Transaction Documents is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to the Transaction Documents from the effective date forward, unless such application is precluded by applicable law.  If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Purchaser with respect to indebtedness evidenced by the Purchaser's Transaction Documents, such excess shall be applied by the Purchaser to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Purchaser's election.

4.24    <u>Liquidated Damages</u>.  The Company's obligations to pay any partial liquidated damages or other amounts owing under the Transaction Documents is a continuing obligation of the Company and shall not terminate until all unpaid partial liquidated damages and other amounts have been paid notwithstanding the fact that the instrument or security pursuant to which such partial liquidated damages or other amounts are due and payable shall have been canceled.

4.25    <u>Construction</u>. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise the Transaction Documents and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the Transaction Documents or any amendments hereto.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the parties hereto have caused this Securities Purchase Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**CYBERDEFENDER CORPORATION**                    Address for Notice:

By: _____                    617 West 7th Street, Suite 1000
Name:  Kevin Harris                                                     Los Angeles CA 90017
Title:  Chief Financial Officer

With a copy to (which shall not constitute notice):

Richardson & Patel, LLP
152 W. 57th Street, 4th Floor
New York, NY 10019
Attention:  Kevin Friedmann


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]

[PURCHASER SIGNATURE PAGE TO
CYBERDEFENDER SECURITIES PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have caused this Securities Purchase Agreement to be duly executed by its/his/her respective authorized signatories as of the date first indicated above.

Name of Purchaser: _Seneco & Associates, Inc. Profit Sharing Plan_

*Signature of Authorized Signatory of Purchaser:* _Trustee_

Name of Authorized Signatory: _Frank W. Seneco_

Title of Authorized Signatory: _Trustee_

Email Address of Purchaser: _fseneco @ seneco.com_

Facsimile Number of Purchaser: _203 789-1203_

Address for Notice of Purchaser:
64 Mountain Brook Road
North Haven, CT 06473

Address for Delivery of Securities for Purchaser (if not same as above):

Subscription Amount: $ 10,933.60

EIN Number: **[PROVIDE THIS UNDER SEPARATE COVER]**

NEITHER THESE SECURITIES NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY. THESE SECURITIES AND THE SECURITIES ISSUABLE UPON CONVERSION OF THESE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

The indebtedness evidenced by this instrument is subordinated to the prior payment in full of the Senior Debt (as defined in the Subordination Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Subordination Agreement, dated as of August 22, 2011, by and among the maker hereof, GR Match, LLC, and _____.

Original Issue Date: August 22, 2011

Conversion Price (subject to adjustment herein): **$0.7223 USD**

$_____

## 9% SUBORDINATED CONVERTIBLE PROMISSORY NOTE
## DUE THIRTEEN MONTHS FROM ORIGINAL ISSUE DATE

THIS 9% SUBORDINATED CONVERTIBLE PROMISSORY NOTE (this "Note") is one of a series of duly authorized and issued 9% Subordinated Convertible Promissory Notes of **CyberDefender Corporation**, a Delaware corporation, having a principal place of business at 617 West 7th Street, Suite 1000, Los Angeles, CA 90017 (the "Company"), designated as its 9% Subordinated Convertible Promissory Notes due thirteen months from the Original Issue Date (the "Notes").

FOR VALUE RECEIVED, the Company promises to pay to _____ or its registered assigns (the "Holder"), the principal sum of

23

$_____ on the date that is thirteen months from the Original Issue Date set forth above or such earlier date as this Note is required or permitted to be repaid as provided hereunder (the "<u>Maturity Date</u>"), and to pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note in accordance with the provisions hereof. This Note is subject to the following additional provisions:

<u>Section 1</u>.    <u>Definitions</u>.  For the purposes hereof, in addition to the terms defined elsewhere in this Note: (a) capitalized terms not otherwise defined herein have the meanings given to such terms in the Purchase Agreement, and (b) the following terms shall have the following meanings:

"<u>Bankruptcy Event</u>" means any of the following events: (i) the Company or any Significant Subsidiary (as such term is defined in Rule 1.02(s) of Regulation S-X) thereof commences a case or other proceeding under any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction relating to the Company or any Significant Subsidiary thereof; (ii) there is commenced against the Company or any Significant Subsidiary thereof any such case or proceeding that is not dismissed within 60 days after commencement; (iii) the Company or any Significant Subsidiary thereof is adjudicated insolvent or bankrupt or any order of relief or other order approving any such case or proceeding is entered; (iv) the Company or any Significant Subsidiary thereof suffers any appointment of any custodian or the like for it or any substantial part of its property that is not discharged or stayed within 60 days; (v) the Company or any Significant Subsidiary thereof makes a general assignment for the benefit of creditors; (vi) the Company or any Significant Subsidiary thereof calls a meeting of substantially all of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or (vii) the Company or any Significant Subsidiary thereof, by any act or failure to act, expressly indicates its consent to, approval of or acquiescence in any of the foregoing or takes any corporate or other action for the purpose of effecting any of the foregoing.

"<u>Business Day</u>" means any day except Saturday, Sunday and any day which shall be a federal legal holiday in the United States or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"<u>Change of Control Transaction</u>" means the occurrence after the date hereof of any of (i) an acquisition after the date hereof by an individual or legal entity or "group" (as described in Rule 13d5(b)(1) promulgated under the Exchange Act) of effective control (whether through legal or beneficial ownership of capital stock of the Company, by contract or otherwise) of in excess of 50% of the voting securities of the Company, or (ii) a replacement at one time or within a one year period of more than one-half of the members of the Company's board of directors which is not approved by a majority of those individuals who are members of the board of directors on the date hereof (or by

24

those individuals who are serving as members of the board of directors on any date whose nomination to the board of directors was approved by a majority of the members of the board of directors who are members on the date hereof), or (iii) the execution by the Company of an agreement to which the Company is a party or by which it is bound, providing for any of the events set forth above in (i) or (ii).

"Conversion Date" shall have the meaning set forth in Section 4(a) hereof.

"Conversion Price" shall have the meaning set forth in Section 4(b) hereof.

**"Event of Default" shall have the meaning set forth in Section 6 hereof.**

"Exempt Issuance" means the issuance of (a) shares of Common Stock, options or warrants to employees, officers, directors or consultants of the Company, (b) securities upon the exercise or exchange of or conversion of any Securities issued hereunder and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date of this Agreement, (c) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors, provided any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Company and in which the Company receives benefits in addition to the investment of funds.

"Fundamental Transaction" shall have the meaning set forth in Section 5(c)(iii) hereof.

"Late Fee" shall have the meaning set forth in Section 2(c) hereof.

"Original Issue Date" shall mean the date of the first issuance of this Note as provided on the cover page hereof, regardless of the number of transfers of this Note and regardless of the number of instruments which may be issued to evidence this Note.

"Person" means a corporation, an association, a partnership, an organization, a business, an individual, a government or political subdivision thereof or a governmental agency.

"Purchase Agreement" means the Securities Purchase Agreement between the Holder and the Company, pursuant to which this Note is initially purchased, as amended, modified or supplemented from time to time in accordance with its terms.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Secured Parties" means any Federal, state or local governmental or quasi-governmental agencies or divisions and any lender or creditor holding a security interest under the Uniform Commercial Code in assets and other property of the Company.

"Subordination Agreement" means that certain Subordination Agreement dated as of _____ ____, 2011, by and among the Company, GR Match, LLC, and _____.

"Senior Debt" shall have the meaning set forth in the Subordination Agreement.

Section 2.    Interest.

a)    Payment of Interest. The Company shall pay interest to the Holder on the aggregate unconverted and then outstanding principal amount of this Note at the rate of 9% per annum payable on the Maturity Date (except that, if any such date is not a Business Day, then such payment shall be due on the next succeeding Business Day) (the "Interest Payment Date") and on each Conversion Date (as to that principal amount then being converted), in (a) the number of Note Shares equal to the aggregate unpaid and accrued interest divided by the Conversion Price, or (b) if this Note is in default, then the payment shall be made in cash.

b)    Interest Calculations. Interest shall be calculated on the basis of a 360-day year and shall accrue commencing on the Original Issue Date until payment in full of the principal sum, together with all accrued and unpaid interest and other amounts which may become due hereunder, has been made.  Interest shall cease to accrue with respect to any principal amount converted, provided that the Company in fact delivers the Note Shares within the time period required by Section 4(c).  Interest hereunder will be paid to the Person in whose name this Note is registered on the records of the Company regarding registration and transfers of Notes (the "Note Register").

c)    Late Fee.  All overdue accrued and unpaid interest to be paid hereunder shall entail a late fee at the rate of 10.00% per annum (or such lower maximum amount of interest permitted to be charged under applicable law) ("Late Fee"), which will accrue from the date such interest is due hereunder through and including the date of payment and shall be in lieu of interest rate set forth in this Section 2.

d)    Prepayment.  The Company has the right to prepay this Note any time with 14 days notice (the "Prepayment Notice Period"). The right to convert by the Holder remains active during the Prepayment Notice Period.

Section 3.        Registration of Transfers and Exchanges.

26

a) <u>Different Denominations</u>. This Note is exchangeable for an equal aggregate principal amount of Notes of different authorized denominations, as requested by the Holder surrendering the same.  No service charge will be made for such registration of transfer or exchange.

b) <u>Investment Representations</u>. This Note has been issued subject to certain investment representations of the original Holder set forth in the Purchase Agreement and may be transferred or exchanged only in compliance with the Purchase Agreement and applicable federal and state securities laws and regulations.

c) <u>Reliance on Note Register</u>. Prior to due presentment to the Company for transfer of this Note, the Company and any agent of the Company may treat the Person in whose name this Note is duly registered on the Note Register as the owner hereof for the purpose of receiving payment as herein provided and for all other purposes, whether or not this Note is overdue, and neither the Company nor any such agent shall be affected by notice to the contrary.

<u>Section 4.</u>        <u>Conversion</u>.

a) <u>Voluntary Conversion</u>. At any time after the Original Issue Date and until payment hereof in full (including interest), this Note shall be convertible into Note Shares at the option of the Holder, in whole or in part at any time and from time to time.  The Holder shall effect conversions by delivering to the Company the form of Notice of Conversion attached hereto as <u>Annex A</u> (a "<u>Notice of Conversion</u>"), specifying therein the principal amount of Notes and interest thereon to be converted and the date on which such conversion is to be effected (a "<u>Conversion Date</u>").  If no Conversion Date is specified in a Notice of Conversion, the Conversion Date shall be the date that such Notice of Conversion is received hereunder.  To effect conversions hereunder, the Holder shall not be required to physically surrender Notes to the Company unless the entire principal amount of this Note plus all accrued and unpaid interest thereon has been so converted. Conversions hereunder shall have the effect of lowering the outstanding principal amount of this Note in an amount equal to the applicable conversion.  The Holder and the Company shall maintain records showing the principal amount converted and the date of such conversions.  The Company shall deliver any objection to any Notice of Conversion promptly, but in no event later than 2 Business Days of receipt of such notice.  In the event of any dispute or discrepancy, the records of the Holder shall be controlling and determinative in the absence of manifest error. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note may be less than the amount stated on the face hereof.  Conversion Notices shall be irrevocable, except as provided in Section 4.21 of the Purchase Agreement.

b)      Conversion Price.  The conversion price shall be $0.7223 USD.

c)   Mechanics of Conversion.

i.      Note Shares Issuable Upon Conversion.  The number of shares of Note Shares issuable upon a conversion hereunder shall be determined by the quotient obtained by dividing (x) the outstanding principal amount of this Note to be converted plus all accrued and unpaid interest thereon by (y) the Conversion Price.

ii.      Delivery of Certificate Upon Conversion.   Not later than 7 Business Days after any Conversion Date, the Company will deliver to the Holder a certificate or certificates representing the Note Shares representing the number of shares of Note Shares being acquired upon the conversion of this Note or a portion of this Note.

iii.      Reservation of Certificates. Certificates for the Note Shares on conversion of this Note shall be made without charge to the Holder for any documentary stamp or similar taxes that may be payable in respect of the issue or delivery of such certificate, provided that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such certificate upon conversion in a name other than that of the Holder of this Note so converted and the Company shall not be required to issue or deliver such certificates unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 5.      Certain Adjustments.

a)      Stock Dividends and Stock Splits.  If the Company, at any time while this Note is outstanding: (A) shall pay a stock dividend or otherwise make a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company pursuant to this Note), (B) subdivide outstanding shares of Common Stock into a larger number of shares, (C) combine (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (D) issue by reclassification of shares of the Common Stock any shares of capital stock of the Company, then the Conversion Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding before such event and of which the denominator shall be the number of shares of Common Stock outstanding after such event.   Any adjustment made pursuant to this Section shall become effective immediately after the record date for the determination of stockholders entitled to receive

28

such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b)      Calculations.  All calculations under this Section 5 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be.  For purposes of this Section 5, the number of shares of Common Stock outstanding as of a given date shall be the sum of the aggregate number of issued and to be converted shares of Common Stock (excluding treasury shares, if any) outstanding.

c)      Notice to Holders.

i.      Adjustment to Conversion Price.  Whenever the Conversion Price is adjusted pursuant to any of this Section 5, the Company shall promptly mail to the Holder a notice setting forth the Conversion Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

ii.      Notice to Allow Conversion by Holder.  If (A) the Company shall declare a dividend (or any other distribution) on the Common Stock; (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock; (C) the Company shall authorize the granting to all holders of the Common Stock rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights; (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company is a party, any sale or transfer of all or substantially all of the assets of the Company, of any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property; or (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company; then, in each case, the Company shall cause to be filed at each office or agency maintained for the purpose of conversion of this Note, and shall cause to be mailed to the Holder at the Holder's last address appearing on the  stock books of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; provided, that the failure to mail such notice or any defect therein or in the mailing thereof

29

shall not affect the validity of the corporate action required to be specified in such notice.  The Holder is entitled to convert this Note during the 20-day period commencing the date of such notice to the effective date of the event triggering such notice.

       iii.       <u>Fundamental Transaction</u>. If, at any time while this Note is outstanding, (A) the Company effects any merger or consolidation of the Company with or into another Person where the Company is not the surviving corporation, (B) the Company effects any sale of all or substantially all of its assets in one or a series of related transactions, (C) any tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities, cash or property, or (D) the Company effects any reclassification of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property (in any such case, a "<u>Fundamental Transaction</u>"), then upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Note Share that would have been issuable upon such conversion absent such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one share of Common Stock (the "<u>Alternate Consideration</u>").  For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration.  If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction.  To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new Note consistent with the foregoing provisions and evidencing the Holder's right to convert such Note into Alternate Consideration. The Company will utilize its best efforts to ensure that terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this paragraph (c) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.  Failure to obtain such terms by the Company shall not cause an Event of Default and the Holder shall then be required to convert in accordance with the terms of the Fundamental Transaction.

iv.        Exempt Issuance. Notwithstanding the foregoing, no adjustment will be made under this Section 5 in respect of an Exempt Issuance.

Section 6.        Events of Default.

a)        "Event of Default", wherever used herein, means any one of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

i.        **any default in the payment of (A) the principal of amount of this Note, or (B) interest (including Late Fees) on, or liquidated damages in respect of, this Note, in each case free of any claim of subordination, as and when the same shall become due and payable (whether on a Conversion Date or the Maturity Date or by acceleration or otherwise) which default, solely in the case of an interest payment or other default under clause (B) above, is not cured, within 15 Business Days;**

ii.        the Company shall fail to deliver certificates representing Note Shares issuable upon a conversion or redemption hereunder that comply with the provisions hereof prior to the 15th Business Day after such shares are required to be delivered hereunder, or the Company shall provide written notice to the Holder, including by way of public announcement, at any time, of its intention not to comply with requests for conversion or redemption of this Note  in accordance with the terms hereof;

iii.        the Company shall fail to have available a sufficient number of authorized and unreserved shares of Common Stock to issue to the Holder upon a conversion hereunder;

iv.        the Company shall materially fail to observe or perform any other covenant, agreement or warranty contained in, or otherwise commit any breach of the Transaction Documents to which the Holder is a party, and such failure or breach shall not, if subject to the possibility of a cure by the Company, have been remedied within 30 calendar days after the date on which written notice of such failure or breach shall have been given;

31

v.       the Company shall purchase more than a de minimis number of Common Stock Equivalents (not including a redemption of this Note hereunder); or

vi.       there shall have occurred a Bankruptcy Event.

b)      <u>Remedies Upon Event of Default</u>. If any Event of Default occurs and is continuing, the full principal amount of this Note, together with interest and other amounts owing in respect thereof, to the date of acceleration shall become, at the Holder's election, immediately due and payable in cash. Commencing 5 days after the occurrence of any Event of Default that results in the eventual acceleration of this Note, the interest rate on this Note shall accrue at the rate of 10% per annum, or such lower maximum amount of interest permitted to be charged under applicable law. When this Note shall have been paid in full in accordance herewith, the Holder shall promptly surrender this Note to or as directed by the Company. The Holder need not provide and the Company hereby waives any presentment, demand, protest or other notice of any kind, and the Holder may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law. Such declaration may be rescinded and annulled by Holder at any time prior to payment hereunder and the Holder shall have all rights as a Note holder until such time, if any, as the full payment under this Section shall have been received by it. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

<u>Section 7</u>.      <u>Miscellaneous</u>.

a)      <u>Notices</u>. Any and all notices or other communications or deliveries to be provided by the Holder hereunder, including, without limitation, any Notice of Conversion, shall be in writing and delivered either personally, by facsimile or sent by a nationally recognized overnight courier service, addressed to the Company at the address set forth above, facsimile number  213.689.8640, Attn: Chief Financial Officer or such other address or facsimile number as the Company may specify for such purposes by notice to the Holder delivered in accordance with this Section, with any fax delivery followed up by overnight delivery service. Any and all notices or other communications or deliveries to be provided by the Company hereunder shall be in writing and delivered personally, by facsimile or sent by a nationally recognized overnight courier service addressed to the Holder at the facsimile telephone number or address of the Holder appearing on the books of the Company, or if no such facsimile telephone number or address appears, then at the principal place of business of the Holder, if any. Any notice or other communication or deliveries hereunder shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered

via facsimile at the facsimile telephone number specified in this Section prior to 5:30 p.m. (New York City time), (ii) the date after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this Section later than 5:30 p.m. (New York City time) on any date and earlier than 11:59 p.m. (New York City time) on such date, (iii) the second Business Day following the date of mailing, if sent by nationally recognized overnight courier service, or (iv) if personally delivered, upon actual receipt by the party to whom such notice is required to be given.

b)     <u>Absolute Obligation</u>. Except as expressly provided herein, no provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal and interest of this Note at the time, place, and rate, and in the coin or currency, herein prescribed.  This Note is a direct debt obligation of the Company.  This Note ranks <u>pari passu</u> with all other Notes now or hereafter issued under the terms set forth herein.

c)     <u>Security Interest</u>.  This Note is a subordinated general obligation of the Company and, pursuant to the terms and conditions of the Subordination Agreement, is specifically subordinate in all ways to any Senior Debt now or hereafter created, issued made or outstanding, to or held by any Secured Parties.  The Holder specifically agrees to provide such additional documentation as any of such Secured Parties shall reasonably believe may be necessary to protect, defend or perfect such secured status.

d)     <u>Lost or Mutilated Note</u>.  If this Note shall be mutilated, lost, stolen or destroyed, the Company shall execute and deliver, in exchange and substitution for and upon cancellation of a mutilated Note, or in lieu of or in substitution for a lost, stolen or destroyed Note, a new Note for the principal amount of this Note (as adjusted for any conversions) so mutilated, lost, stolen or destroyed but only upon receipt of evidence of such loss, theft or destruction of such Note, and of the ownership hereof, and indemnity, if requested, all reasonably satisfactory to the Company.

e)     <u>Governing Law</u>.  Any and all actions brought by the Company or Holder under this Note shall be brought in the state or federal courts located in the City of Los Angeles, California  If either party shall commence an action to enforce any provisions of the Transaction Documents, then the prevailing party in such action after obtaining a final, non-appealable judgment shall be reimbursed by the other party for its attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such proceeding.

f)     <u>Waiver</u>.  Any waiver by the Company or the Holder of a breach of any provision of this Note shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Note.  The failure of the Company or the Holder to insist upon strict adherence to any term of this Note on one or more occasions shall not be considered a waiver or deprive that party of the right

33

thereafter to insist upon strict adherence to that term or any other term of this Note.  Any waiver must be in writing.

g)      Severability.   If any provision of this Note is invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.  If it shall be found that any interest or other amount deemed interest due hereunder violates applicable laws governing usury, the applicable rate of interest due hereunder shall automatically be lowered to equal the maximum permitted rate of interest. The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law which would prohibit or forgive the Company from paying all or any portion of the principal of or interest on this Note as contemplated herein, wherever enacted, now or at any time hereafter in force, or which may affect the covenants or the performance of this indenture, and the Company (to the extent it may lawfully do so) hereby expressly waives all benefits or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impeded the execution of any power herein granted to the Holder, but will suffer and permit the execution of every such as though no such law has been enacted.

h)      Next Business Day.  Whenever any payment or other obligation hereunder shall be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day.

i)      Headings.  The headings contained herein are for convenience only, do not constitute a part of this Note and shall not be deemed to limit or affect any of the provisions hereof.

j)      Amendment.  This Note may be modified or amended or provisions hereof waived with the written consent of the Company and the Holder(s) of at least 51% of the then outstanding principal amount of all of the Notes.

IN WITNESS WHEREOF, the Company has caused this 9% Subordinated Convertible Promissory Note to be duly executed by a duly authorized officer as of the date first above indicated.

CYBERDEFENDER CORPORATION


By:_____
      Kevin Harris
      Chief Financial Officer and Secretary

34

## ANNEX A

## NOTICE OF CONVERSION

The undersigned hereby elects to convert principal under the 9% Subordinated Convertible Promissory Note of **CyberDefender Corporation,** a Delaware corporation (the "Company"), due thirteen months from the Original Issue Date thereof, into _____ Note Shares, no par value  per share (the "Note Shares"), of the Company according to the conditions hereof, as of the date written below.  If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as reasonably requested by the Company in accordance therewith.  No fee will be charged to the holder for any conversion, except for such transfer taxes, if any.

Conversion calculations:

Date to Effect Conversion:    _____

Principal Amount of Note(s) to be converted:  $  _____

Note Shares issuable:_____

Interest Payment shares issuable:_____

**Total shares issuable**:_____


Signature:    _____

Name:

Address:

35

# SUBORDINATION AGREEMENT

**THIS SUBORDINATION AGREEMENT** (this "Agreement"), dated as of _____ ___, 2011, is made by and among CYBERDEFENDER CORPORATION, a Delaware corporation (the "Borrower"), GR MATCH LLC, a Delaware limited liability company (the "Senior Lender") and _____(the "Subordinated Party").

WHEREAS, the Borrower and Senior Lender are parties to that certain Loan and Securities Purchase Agreement dated as of March 31, 2010 (the "Loan Agreement") pursuant to which the Senior Lender has loaned certain funds to the Borrower;

WHEREAS, the Borrower and Senior Lender are parties to that certain Revolving Credit Agreement dated December 7, 2010 and effective December 3, 2010 (the "Revolving Credit Loan Agreement") pursuant to which the Senior Lender has advanced certain funds to the Borrower;

WHEREAS, the Borrower and Senior Lender entered into that certain Loan Modification Agreement dated February 25, 2011 (the "Loan Modification Agreement") pursuant to which the Borrower and Senior Lender agreed to modify the indebtedness of Borrower pursuant to the Revolving Credit Loan Agreement;

WHEREAS, the Borrower and Senior Lender entered into that certain Media and Marketing Services Agreement dated July 19, 2011 (the "Media Services Agreement") pursuant to which the Senior Lender has made and will make certain financial accommodations to the Borrower;

WHEREAS, pursuant to the terms of the Securities Purchase Agreement dated July 22, 2011 (the "Securities Purchase Agreement") the Subordinated Party has made or will make certain loans to the Borrower on the terms set forth in the Securities Purchase Agreement; and

WHEREAS, the Subordinated Party has agreed to the subordination of such indebtedness of the Borrower to the Subordinated Party to the indebtedness of the Borrower to the Senior Lender, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants, conditions, representations, and warranties set forth herein and for other good and valuable consideration, the parties hereto agree as follows:

SECTION 1    Definitions; Interpretation.

(a) Terms Defined in Senior Lender Loan Documents.  All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings assigned to them in the Senior Lender Loan Documents (as defined below).

(b) Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

1

"Agreement" has the meaning set forth in the preamble hereto.

"Borrower" has the meaning set forth in the preamble hereto.

"Insolvency Events" has the meaning set forth in Section 3.

"Permitted Junior Securities" means (i) debt securities that are subordinated to all of the Senior Debt to at least as great an extent as the Subordinated Debt is subordinated to the Senior Debt or (ii) equity interests.  Such debt securities and equity interests may be issued only to the Subordinated Party, while the Borrower is in bankruptcy, in a manner consistent with the Bankruptcy Code requirements governing plan confirmation, in an amount not to exceed the amount raised pursuant to the Subordinated Loan Agreement (up to a maximum of $2,400,000) plus accrued interest.

"Permitted Junior Securities Payment(s)" means any payment or distribution by or on behalf of the Borrower, directly or indirectly, of assets of the Borrower of any kind or character for or on account of the Permitted Junior Securities.

"Senior Debt" means the obligations of the Borrower to Senior Lender under or in connection with the Senior Lender Loan Documents.

"Senior Lender" has the meaning set forth in the recitals hereto.

"Senior Lender Loan Documents" shall mean the Loan Agreement, the Revolving Credit Loan Agreement, the Loan Modification Agreement, the Media Services Agreement and all promissory notes, security agreements and other loan documents related to the foregoing.

"Subordinated Debt" means, with respect to the Subordinated Party, all indebtedness of Borrower owing to the Subordinated Party in respect of any and all loans made by the Subordinated Party to the Borrower whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including all fees and all other amounts payable by Borrower to the Subordinated Party, under or in connection with the Securities Purchase Agreement and any documents or instruments related thereto.

"Subordinated Debt Payment(s)" means any payment or distribution by or on behalf of the Borrower, directly or indirectly, of assets of the Borrower of any kind or character for or on account of the Subordinated Debt (excluding distribution of Permitted Junior Securities).

(c) Interpretation.  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Section, subsection, clause, schedule, and exhibit references are to this Agreement unless otherwise specified.  References to agreements and other contractual instruments shall be deemed to include all subsequent

amendments and other modifications thereto.  References to statutes or regulations are to be construed as including all statutory and regulatory provisions consolidating, amending, or replacing the statute or regulation referred to.  The captions and headings are for convenience of reference only and shall not affect the construction of this Agreement.

SECTION 2   Subordination to Payment of Senior Debt.  All Subordinated Debt Payments and Permitted Junior Securities Payments shall be subject, subordinate and junior, in right of payment and exercise of remedies, to the extent and in the manner set forth herein, to the prior payment in full in cash or cash equivalents of the Senior Debt.

SECTION 3   Subordination Upon Any Distribution of Assets of the Borrower. In the event of any payment or distribution of assets of the Borrower of any kind or character, whether in cash, property, or securities, upon the dissolution, winding up, or total or partial liquidation or reorganization, readjustment, arrangement, or similar proceeding relating to the Borrower or its property, whether voluntary or involuntary, or in bankruptcy, insolvency, receivership, arrangement, or similar proceedings or upon an assignment for the benefit of creditors, or upon any other marshaling or composition of the assets and liabilities of the Borrower, or otherwise (such events, collectively, the "Insolvency Events"):  (i) all amounts owing on account of the Senior Debt shall first be paid in full in cash or payment provided for in cash or in cash equivalents, before any Subordinated Debt Payment is made; and (ii) to the extent permitted by applicable law, any Subordinated Debt Payment to which a Subordinated Party would be entitled except for the provisions hereof, shall be paid or delivered by the trustee in bankruptcy, receiver, assignee for the benefit of creditors, or other liquidating agent making such payment or distribution directly to Senior Lender for application to the payment of the Senior Debt in accordance with clause (i), after giving effect to any concurrent payment or distribution or provision therefor to the Senior Lender in respect of such Senior Debt; provided however, notwithstanding an Insolvency Event, the holders of Subordinated Debt may receive Permitted Junior Securities.

SECTION 4   Payments on Subordinated Debt.

(a) Permitted Payments.  So long as no unwaived Event of Default has occurred and is continuing with respect to the Senior Debt, Borrower may make, and the Subordinated Party shall be entitled to accept and receive, any payments on account of the Subordinated Debt in the ordinary course of business in accordance with the terms of the Securities Purchase Agreement provided, however, that in no event shall Borrower make any prepayment of the Subordinated Debt, in any amount, without the prior written consent of Senior Lender.

(b) No Payment Upon Senior Debt Defaults.  Upon the occurrence and during the continuance of any unwaived Event of Default with respect to any Senior Debt and the receipt by the Borrower and the Subordinated Party of written notice from Senior Lender of an Event of Default, the Borrower shall not make, and the Subordinated Party shall not accept or receive, any Subordinated Debt Payment or Permitted Junior Securities Payments.

SECTION 5   Subordination of Remedies.  As long as any portion of the Senior Debt shall remain outstanding and unpaid, following the occurrence and during the continuance of any Event of Default with respect to the Senior Debt and the receipt by the Borrower and the

Subordinated Party of written notice from Senior Lender, the Subordinated Party shall not, without the prior written consent of Senior Lender:

(a) accelerate, make demand, or otherwise make due and payable prior to the original due date thereof any Subordinated Debt or bring suit or institute any other actions or proceedings to enforce its rights or interests in respect of the obligations of Borrower owing to the Subordinated Party;

(b) exercise any rights under or with respect to guaranties of the Subordinated Debt, if any;

(c) exercise any rights to set-offs and counterclaims in respect of any indebtedness, liabilities, or obligations of Borrower to any Subordinated Party; or

(d) commence, or cause to be commenced, or join with any creditor other than Senior Lender in commencing, any bankruptcy, insolvency, or receivership proceeding against the Borrower.

SECTION 6   Payment Over to Senior Lender.  In the event that, notwithstanding the provisions of Sections 3, 4, and 5, any Subordinated Debt Payments or Permitted Junior Securities Payments shall be received in contravention of Section 3, 4, or 5 by the Subordinated Party before all Senior Debt is paid in full in cash or cash equivalents, such Subordinated Debt Payments and Permitted Junior Securities Payments shall be held in trust for the benefit of Senior Lender and shall be paid over or delivered to Senior Lender for application to the payment, in full, in cash or cash equivalents of all Senior Debt remaining unpaid to the extent necessary to give effect to such Sections 3, 4, and 5, after giving effect to any concurrent payments or distributions to Senior Lender in respect of the Senior Debt.

SECTION 7   Authorization to Senior Lender.  If, while any Subordinated Debt is outstanding, any Insolvency Event shall occur and be continuing with respect to the Borrower or its property that constitutes an Event of Default under the Senior Debt:  (i) Senior Lender hereby is irrevocably authorized and empowered (in the name of the Subordinated Party or otherwise), to demand, sue for, collect, and receive every payment or distribution in respect of the Subordinated Debt on the terms and conditions provided herein and give acquittance therefor and to file claims and proofs of claim and take such other action (including voting the Subordinated Debt) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of Senior Lender hereunder but in no event shall Senior Lender have any obligation to take any such actions; and (ii) the Subordinated Party shall promptly take such action as Senior Lender reasonably may request to effectuate the provisions of this Agreement (A) to collect the Subordinated Debt for the account of Senior Lender and to file appropriate claims or proofs of claim in respect of the Subordinated Debt, (B) to execute and deliver to Senior Lender such powers of attorney, assignments, and other instruments as it may request to enable it to enforce any and all claims with respect to the Subordinated Debt consistent with the terms of this Agreement, and (C) to collect and receive any and all Subordinated Debt Payments as provided herein until the Senior Debt is paid in full.

4

SECTION 8    <u>Certain Agreements of Subordinated Party</u>.

(a) <u>Acknowledgment of the Risks</u>.   The Subordinated Party acknowledges and agrees that:

1.  either alone or together with its representatives, it has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Subordinated Debt;

2.  it is able to bear the economic risk of an investment in the Subordinated Debt and, at the present time, is able to afford a complete loss of such investment;

3.  it has so evaluated the merits and risks of such investment, and acknowledges that the Senior Lender has not made any representations or warranties regarding any future actions it may take pursuant to its rights under the Senior Lender Loan Documents;

4.  it has been afforded access and the opportunity to obtain all financial and other information concerning the Borrower that the Subordinated Party desires (including the opportunity to meet with the Borrower's executive officers, either in person or telephonically); and

5.  it has had the opportunity to review copies of the SEC Documents and the contents thereof, including, without limitation, the risk factors contained in the Annual Report, and there is no further information about the Borrower that the Subordinated Party desires in determining whether to acquire the Subordinated Debt.

(b) <u>No Benefits</u>.   The Subordinated Party understands that there are various agreements between Senior Lender and the Borrower evidencing and governing the Senior Debt, and the Subordinated Party acknowledges and agrees that such agreements are not intended to confer any benefits on the Subordinated Party (other than as expressly set forth therein) and that Senior Lender shall not have any obligation to the Subordinated Party or any other Person to exercise such rights, enforce any remedies, or take any actions which may be available to them under such agreements.

(c) <u>No Interference</u>.   The Subordinated Party acknowledges that Borrower has granted to Senior Lender, security interests in all of such Borrower's assets, and agrees not to interfere with or in any manner oppose a disposition of any Collateral by Senior Lender in accordance with applicable law and the terms of the Senior Lender Loan Documents.

(d) <u>Reliance by Senior Lender</u>.   The Subordinated Party acknowledges and agrees that Senior Lender has relied upon and will continue to rely upon the subordination provisions provided for herein and the other provisions hereof in consenting to the loans by the Subordinated Party to Borrower entering under the Securities Purchase Agreement or other financial accommodations thereunder.

(e) <u>Obligations of Borrower Not Affected</u>.   The Subordinated Party hereby agrees that at any time and from time to time, without notice to or the consent of the Subordinated

Party, without incurring responsibility to the Subordinated Party, and without impairing or releasing the subordination provided for herein or otherwise impairing the rights of Senior Lender hereunder: (i) the time for Borrower's performance of or compliance with any of its agreements contained in the Loan Documents may be extended or such performance or compliance may be waived by Senior Lender; (ii) the agreements of Borrower, under the Loan Documents may from time to time be modified by Borrower and Senior Lender for the purpose of adding any requirements thereto or changing in any manner the rights and obligations of the Borrower and Senior Lender thereunder; (iii) the manner, place, or terms for payment of Senior Debt or any portion thereof may be altered or the terms for payment extended, or the Senior Debt may be renewed in whole or in part, all in accordance with the terms of the Loan Documents; (iv) the maturity of the Senior Debt may be accelerated in accordance with the terms of any present or future agreement by the Borrower and Senior Lender; (v) any Collateral may be sold, exchanged, released, or substituted and any Lien in favor of Senior Lender may be terminated, subordinated, or fail to be perfected or become unperfected; (vi) any Person liable in any manner for Senior Debt may be discharged, released, or substituted; and (vii) all other rights against the Borrower, any other Person, or with respect to any Collateral may be exercised by Senior Lender (or Senior Lender may waive or refrain from exercising such rights).

(f) <u>Rights of Senior Lender Not to Be Impaired</u>.  No right of Senior Lender to enforce the subordination provided for herein or to exercise its other rights hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act by the Borrower or Senior Lender hereunder or under or in connection with the Senior Lender Loan Documents or by any noncompliance by the Borrower with the terms and provisions and covenants herein or in any other Loan Document, regardless of any knowledge thereof Senior Lender may have or otherwise be charged with.

(g) <u>Financial Condition of the Borrowers</u>.  The Subordinated Party shall not have any right to require Senior Lender to obtain or disclose any information with respect to:  (i) the financial condition or assets or liabilities of the Borrower or the ability of the Borrower to pay the Senior Debt or perform its obligations under the Senior Lender Loan Documents; (ii) the Senior Debt; (iii) the Collateral or other security for any or all of the Senior Debt; (iv) the existence or nonexistence of any guarantees of, or any other subordination agreements with respect to, all or any part of the Senior Debt; (v) any action or inaction on the part of Senior Lender or any other Person; or (vi) any other matter, fact, or occurrence whatsoever.

SECTION 9   <u>Subrogation</u>.

(a) <u>Subrogation</u>.  The Subordinated Party hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Senior Debt, it shall waive any claims and shall not exercise any right or remedy, direct or indirect, arising by way of subrogation or otherwise under this Agreement, against the Borrower.

(b) <u>Payments Over to the Subordinated Party</u>.  If any payment or distribution to which the Subordinated Party would otherwise have been entitled but for the provisions of Section 3, 4, or 5 shall have been applied pursuant to the provisions of Section 3, 4, or 5 to the payment of all amounts payable under the Senior Debt, the Subordinated Party shall be entitled to receive from Senior Lender the Subordinated Party's share of any payments or distributions

received by Senior Lender in excess of the amount sufficient to pay in full in cash all amounts payable under or in respect of the Senior Debt.  If any such excess payment is made to Senior Lender, Senior Lender shall promptly remit such excess to the Subordinated Party and until so remitted shall hold such excess payment for the benefit of the Subordinated Party.

SECTION 10  Continuing Agreement; Reinstatement.

(a) Continuing Agreement.    This Agreement is a continuing agreement of subordination and shall continue in effect and be binding upon the Borrower and the Subordinated Party until payment and performance in full in cash of the Senior Debt.  The subordinations, agreements, and priorities set forth herein shall remain in full force and effect regardless of whether any party hereto in the future seeks to rescind, amend, terminate, or reform, by litigation or otherwise, its respective agreements with the Borrower.

(b) Reinstatement.    This Agreement shall continue to be effective or shall be reinstated, as the case may be, if, for any reason, any payment of the Senior Debt by or on behalf of the Borrower shall be rescinded or must otherwise be restored by Senior Lender, whether as a result of an Insolvency Event or otherwise.

SECTION 11  Obligations of the Borrower Not Affected.  The provisions of this Agreement are intended solely for the purpose of defining the relative rights of the Subordinated Party, on the one hand, and of the Senior Lender, on the other hand, with respect to the obligations of the Borrower to the Senior Lender and the Subordinated Party.  Nothing contained in this Agreement shall (i) impair, as between the Subordinated Party and the Borrower, the obligation of the Borrower to pay its respective obligations with respect to the Subordinated Debt as and when the same shall become due and payable, or (ii) otherwise affect the relative rights of the Subordinated Party against the Borrower, on the one hand, and of the other creditors (other than Senior Lender) of the Borrower against the Borrower, on the other hand.

SECTION 12  Further Assurances and Additional Acts.  The Subordinated Party shall execute, acknowledge, deliver, file, notarize, and register at its own expense all such further agreements, instruments, certificates, financing statements, documents, and assurances, and perform such acts as Senior Lender reasonably shall deem necessary to effectuate the purposes of this Agreement, and promptly provide Senior Lender with evidence of the foregoing reasonably satisfactory to Senior Lender.

SECTION 13  Notices.    All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including by facsimile transmission or electronic mail) and shall be mailed, sent, or delivered to the addresses of the Senior Lender or the Subordinated Party (as set forth on the records of the Borrower) and to the Borrower at its principal office.

SECTION 14  No Waiver; Cumulative Remedies.  No failure on the part of Senior Lender to exercise, and no delay by Senior Lender in exercising, any right, remedy, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  The rights and remedies

of the Senior Lender under this Agreement and the Senior Lender Loan Documents are cumulative and not exclusive of any rights, remedies, powers, and privileges that may otherwise be available to Senior Lender provided by law.

SECTION 15 <u>Survival</u>.    All covenants, agreements, representations and warranties made in this Agreement shall, except to the extent otherwise provided herein, survive the execution and delivery of this Agreement and continue in full force and effect so long as any Senior Debt remains unpaid.

SECTION 16 <u>Binding Effect</u>.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by the Subordinated Party, Senior Lender and the Borrower and their respective successors and assigns.

SECTION 17 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE; <u>PROVIDED</u> THAT SENIOR LENDER AND THE SUBORDINATED PARTY SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF CALIFORNIA SITTING IN LOS ANGELES OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, SENIOR LENDER, THE BORROWER AND THE SUBORDINATED PARTY CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN THOSE COURTS SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  SENIOR LENDER, THE BORROWER AND THE SUBORDINATED PARTY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS,* WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  SENIOR LENDER, THE BORROWER AND THE SUBORDINATED PARTY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS, WHICH MAY BE MADE BY ANY OTHER MEANS PERMITTED BY THE LAW OF SUCH STATE.

SECTION 18 <u>Waiver of Right to Trial by Jury</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER

FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 19 <u>Specific Performance</u>.  Senior Lender is hereby authorized to demand specific performance of this Agreement, whether or not the Borrower shall have complied with any of the provisions hereof applicable to it, at any time when any Subordinated Party shall have failed to comply with any of the provisions of this Agreement applicable to it. The Subordinated Party hereby irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

SECTION 20 <u>Subordination Legend</u>.  The Subordinated Party and the Borrower shall cause any instrument or note evidencing the Subordinated Debt to be endorsed with the following legend:

> "The indebtedness evidenced by this instrument is subordinated to the prior payment in full of the Senior Debt (as defined in the Subordination Agreement hereinafter referred to) pursuant to, and to the extent provided in, the Subordination Agreement dated as of _____ __, 2011, by and among the maker hereof, and _____."

The Subordinated Party and the Borrower shall each further mark its books of account in such manner as shall be effective to give proper notice of the effect of this Agreement.

SECTION 21 <u>Conflicts</u>.  In case of any conflict or inconsistency between any terms of this Agreement, on the one hand, and any documents or instruments in respect of the Subordinated Debt, on the other hand, then the terms of this Agreement shall control.

SECTION 22 <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 23  <u>Expenses</u>.  The Subordinated Party and the Borrower severally (but not jointly) agrees to pay, upon demand, to Senior Lender the amount of any and all reasonable expenses, including without limitation reasonable attorneys' fees, expenses, and disbursements, which Senior Lender may incur in connection with the exercise or enforcement of any of its rights or interests hereunder with respect to the Subordinated Party or the Borrower.

SECTION 24  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of shall be deemed an original and all of which taken together shall constitute one and the same agreement.

SECTION 25  <u>Termination of Agreement</u>.  Upon payment and performance in full in cash of the Senior Debt, including the full and final termination of any commitment to extend any financial accommodations under the Media Services Agreement, this Agreement shall terminate and Senior Lender shall promptly execute and deliver to the Subordinated Party such documents and instruments as shall be reasonably necessary to evidence such termination.

SECTION 27  <u>Consent to Subordinated Debt</u>.  Subject to the terms of this Agreement, but notwithstanding anything to the contrary in the other Senior Lender Loan Documents, the Senior Lender (on behalf of itself and its affiliates) consents to the Subordinated Debt and the entry and performance by the Borrower and its affiliates of the Securities Purchase Agreement (and related documents), and no default or Event of Default under the Senior Debt shall be deemed to have occurred as a result thereof. To the extent of any inconsistency between this Agreement and the Securities Purchase Agreement (and any related agreements including amendments and modifications), the terms of this Agreement shall control and the Securities Purchase Agreement and related agreements shall be deemed to have been amended to be consistent with this Agreement.

[Signature page follows]

10

[Subordination]

[Signature Page to Subordination Agreement]

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Agreement as of the date first written above.

**BORROWER:**

**CYBERDEFENDER CORPORATION**
a Delaware corporation

By: _____
Name: _Kevin Harris_
Title: _CEO_

**SUBORDINATED PARTY**

_____

By: _____
Name: _____
Title: _____

**SENIOR LENDER**

**GR MATCH LLC**

By: _Guthy-Renker, the managing member_
Name: _B. Hunt_
Title: _Co. CEO, G/R_

1

[Signature Page to Subordination Agreement]

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Agreement as of the date first written above.

**BORROWER:**

**CYBERDEFENDER CORPORATION**
a Delaware corporation

By:_____
Name:_____
Title:_____

**SUBORDINATED PARTY**

Seneco & Associates, Inc. Profit Sharing Plan

By: _____ Trustee
Name: Frank W. Seneco
Title: Trustee

**SENIOR LENDER**

**GR MATCH LLC**

By: _____
Name: _____
Title: _____

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (as amended, modified or otherwise supplemented from time to time, this "Agreement"), dated and effective as of the _____ day of _____, 2011, is given by CyberDefender Corporation, a Delaware corporation ("Debtor"), in favor of _____ ("Secured Party").

## RECITALS

A.      Secured Party has agreed to make available to Debtor a loan in the principal amount of [INSERT] Dollars ($[INSERT]) (the "Loan") pursuant to the terms and conditions of that certain Loan Agreement, dated as of even date herewith, by and between Secured Party and Debtor (the "Loan Agreement"), as evidenced by that certain Subordinated Convertible Promissory Note in the amount of [INSERT] Dollars ($[INSERT]), dated as of even date herewith, issued by Debtor in favor of Secured Party (the "Note" and, together with the Loan Agreement and this Agreement, collectively, the "Loan Documents").

B.      As a condition to making the Loan available to Debtor, Secured Party requires that it be granted, and Debtor has agreed to grant to Secured Party, a subordinated security interest in the property described in Exhibit "A" attached hereto, whether now existing or hereafter from time to time acquired (collectively, the "Collateral"), which subordinated security interest is subject to the terms and conditions of that certain Subordination Agreement between Secured Party and GR Match, LLC, dated on or about even date herewith, (the "Subordination Agreement").

NOW, THEREFORE, in order to induce Secured Party to make the Facility available to Debtor, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtor hereby represents, warrants, covenants, grants and agrees as follows:

## AGREEMENT

1.      Incorporation of Recitals; Capitalized Terms.  The recitals set forth hereinabove are incorporated herein by this reference.  All capitalized terms not otherwise defined herein have the meanings ascribed to them in the Loan Agreement.  Unless otherwise defined herein, all terms defined in the UCC have the respective meanings given to those terms in the UCC.

2.      Definitions.

(a)      "Collateral" has the meaning given to that term in the Recital B hereof.

(b)      "Lien" means any mortgage, deed of trust, lien, pledge, security interest or other charge or encumbrance, of any kind whatsoever, including but not limited to the interest of the lessor or titleholder under any capitalized lease, title retention contract or similar agreement.

(c)      "Obligation" means the Loan.

(d)    "UCC" means the Uniform Commercial Code as in effect in the State of California from time to time.

(e)    "Senior Security Interests" means the security interests previously granted by the Company to GR Match, LLC ("GRM") in connection with: (i) the 9% Secured Convertible Promissory Note issued by the Company to GRM payable March 31, 2012; (ii) the Amended and Restated 9% Secured Convertible Promissory Note issued by the Company to GRM and payable March 31, 2012; and (iii) the Media and Marketing Services Agreement between GRM and the Debtor dated and effective as of July 19, 2011.

3.    Security Interest.

(a)    Debtor hereby grants to Secured Party a subordinated security interest (subject to the terms and conditions of the Subordination Agreement ): (a) in all of the Collateral, whether now owned or hereafter acquired, wherever located, whether or not such Collateral is or has been purchased, financed or otherwise acquired by the use of the Loan proceeds, whether such Collateral is related to the business conducted by Debtor under any fictitious business name referred to herein or under any other name, and whether or not the creation of a security interest therein is subject to the UCC or the Uniform Commercial Code as in effect in any other jurisdiction; and (b) in all proceeds and products thereof.

(b)    Debtor hereby authorizes Secured Party to file appropriate UCC or other financing statements, all continuation, amendments and modification filings related thereto and any other filings or recordings Secured Party deems necessary or appropriate with respect to the Collateral and Secured Party's interest therein.  Secured Party may, in its discretion, describe the Collateral as "all assets" or "all personal property."

(c)    The security interest granted to Secured Party hereunder shall secure the Obligation.

4.    Debtor's Representations, Warranties, Covenants and Agreements.  Debtor hereby represents and warrants to Secured Party, and covenants and agrees, that:

(a)    Debtor is the owner of (or, in the case of after-acquired Collateral, at the time Debtor acquires rights in the Collateral, will be the owner thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time Debtor acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than the Senior Security Interests.

(b)    Upon the filing of UCC-l financing statements in the appropriate filing offices, Secured Party has (or in the case of after-acquired Collateral, at the time Debtor acquires rights therein, will have) a subordinated perfected security interest in the Collateral to the extent that a security interest in the Collateral can be perfected by such filing.

(c)    This Agreement (i) has been duly authorized by all necessary corporate action of Debtor, (ii) has been duly executed by Debtor, and (iii) constitutes the legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms.

(d)     Debtor's place of business (or, if Debtor has more than one place of business, its chief executive office) is located at 617 West 7th Street, Suite 1000, Los Angeles, California 90017. Debtor's true legal name is, and has been for the five (5) year period preceding the date hereof, as set forth in the preamble to this Agreement.  Debtor's jurisdiction of formation is, and since May 19, 2010 has been, as set forth in the preamble to this Agreement.  Prior to May 19, 2010, Debtor's jurisdiction of formation was the State of California.  Debtor does not do business under any trade name or fictitious business name and has never used any other trade name or fictitious business name.  Debtor will notify Secured Party, in writing, at least thirty (30) days prior to any change in its place of business or jurisdiction of formation or the adoption or change of its legal name, any trade name or fictitious business name, and will upon request of Secured Party, execute or authenticate any additional financing statements or other certificates or records necessary to reflect any change in its place of business or jurisdiction of formation or the adoption or change in its legal name, trade names or fictitious business name.

5.     Protection of Collateral by Debtor.

(a)     Debtor will not, without the prior written consent of Secured Party, sell, transfer or dispose of any Collateral except for sales of inventory, licenses or sublicenses of intellectual property to customers in the ordinary course of Debtor's business.  Debtor shall keep the Collateral free from any and all liens other than the Senior Security Interests.   Debtor shall, at its own expense, appear in and defend any and all actions and proceedings which purport to affect title to the Collateral, or any part thereof, or which purport to affect the security interest of Secured Party therein under this Agreement.

(b)     Debtor will keep the Collateral current, collected and/or in good condition and repair, and will not misuse, abuse, allow to deteriorate, waste or destroy the Collateral or any part thereof, except for ordinary wear and tear resulting from its normal and expected use in Debtor's business and will not use or permit any Collateral to be used in violation in any material respect of any applicable law, rule or regulation, or in violation of any policy of insurance covering the Collateral.  Secured Party may examine and inspect the Collateral at any reasonable time, wherever located.  Debtor shall perform, observe, and comply in all material respects with all of the material terms and provisions to be performed, observed or complied with by it under each contract, agreement or obligation relating to the Collateral.

(c)     Debtor, in a timely manner, will execute or otherwise authenticate, or obtain, any document or other record, give any notices, do all other acts, and pay all costs associated with the foregoing, that Secured Party determines is reasonably necessary to protect the Collateral against rights, claims or interests of third parties, or otherwise to preserve the Collateral as security hereunder.

(d)     Debtor shall immediately notify Secured Party of any claim against the Collateral adverse to the interest of Secured Party therein.

(e) Debtor shall, at its own expense, maintain insurance with respect to the Collateral in such amounts, against such risks, in such form and with such insurers, as is commonly maintained by prudent persons engaged in businesses similar to the business engaged in by Debtor.  Each policy of liability insurance shall provide for all losses to be paid on behalf of Secured Party and Debtor as

their respective interests may appear; and each policy of property damage insurance shall provide for all losses to be paid directly to Secured Party. Each such policy shall name Secured Party as an insured party thereunder (without any representation or warranty by or obligation upon Secured Party) as its interest may appear.

(f)    Debtor shall promptly pay when due all taxes and other governmental charges, all Liens and all other charges now or hereafter imposed upon or affecting any Collateral.

6.    <u>Further Acts of Debtor</u>.  Debtor shall, at the request of Secured Party, execute or otherwise authenticate and deliver to Secured Party any financing statements, financing statement changes and any and all additional instruments, documents and other records, and Debtor shall perform all actions, that from time to time Secured Party may reasonably deem necessary or desirable to carry into effect the provisions of this Agreement or to establish or maintain a perfected security interest in the Collateral having the priority provided for herein or otherwise to protect Secured Party's interest in the Collateral.

7.    <u>Effect of Additional Security</u>.  If the performance of all or any portion of the Obligation shall at any time be secured by any other collateral, the exercise by Secured Party, in the event of a default in the performance of any such obligation, of any right or remedy under any agreement or other record granting a lien on or security interest in such collateral shall not be construed as or deemed to be a waiver of, or limitation upon, the right of Secured Party to exercise, at any time and from time to time thereafter, any right or remedy under this Agreement or under any other such agreement or record.

8.    <u>Default</u>.  Upon the occurrence of a Default or Event of Default under any Loan Document and the continuance thereof beyond any applicable cure periods under the Loan Documents (a "<u>Default</u>"), subject to the terms and conditions of the Subordination Agreement, Secured Party shall have all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) or, to the extent required by applicable law, the Uniform Commercial Code as in effect in the jurisdiction where Secured Party enforces such rights and remedies.

9.    <u>No Implied Waivers</u>.  No delay or omission on the part of Secured Party in exercising any right or remedy created by, connected with or provided for in this Agreement or arising from any default by Debtor or by any other person or entity the performance of whose obligations is secured hereby, shall be construed as or be deemed to be an acquiescence in or a waiver of such default or a waiver of or limitation upon the right of Secured Party to exercise, at any time and from time to time thereafter, any right or remedy under this Agreement.  No waiver of any breach of any of the covenants or conditions in this Agreement shall be deemed to be a waiver of or acquiescence in or consent to any previous or subsequent breach of the same or any other covenant or condition.

10.    <u>Entire Agreement</u>.  This Agreement, together with each of the Loan Documents, contains the entire understanding and agreement of Debtor and Secured Party with respect to the subject matter hereof and may not be altered or amended in any way except by a written agreement signed by the parties.  No provision of this Agreement or right of Secured Party hereunder can be waived, nor shall Debtor be released from its obligations hereunder, except by a writing duly executed by Secured Party.

11.     <u>Transfer of Indebtedness</u>.  Upon the transfer by Secured Party of all or any portion of the indebtedness secured hereby, Secured Party may transfer therewith all or any portion of the security interest created hereunder, but Secured Party shall retain all of its rights hereunder with respect to any part of such indebtedness and any part of its security interest hereunder not so transferred.

12.     <u>Term; Binding Effect</u>.  This Agreement shall be and remain in full force and effect until the Obligation has been fully performed and paid.  Upon expiration and payment in full of the Obligation, this Agreement shall automatically terminate and Secured Party shall cause UCC termination statements to be filed with respect to the Collateral.  Each of the provisions hereof shall be binding upon Debtor and its legal representatives, successors and assigns and shall inure to the benefit of Secured Party and its legal representatives, successors and assigns.

13.     <u>Rules of Construction</u>.  Terms used in the singular shall apply to the plural, and vice versa, as the context requires; likewise masculine, feminine and neuter genders shall be interchangeable as the context requires.  The use of the disjunctive term "or" does not imply an exclusion of the conjunctive, i.e., "or" shall have the same meaning as the expression "and/or." "Including" shall not be limiting.  Headings and section titles are for convenience of reference only and are not substantive parts of this Agreement, and shall not be given effect in construing the provisions of this Agreement.  Each reference to a Loan Document shall mean such Loan Document as from time to time extended, modified, renewed, restated, reaffirmed, supplemented or amended.

14.     <u>Severability</u>.  If any provision of this Agreement, or the application thereof to any person or circumstance, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

15.     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

16.     <u>Governing Law and Jurisdiction</u>.  This Agreement shall be deemed to be executed and delivered in the State of California.  Each of Debtor and Secured Party: (i) agrees that this Agreement shall be construed according to and governed by the laws of the State of California, without regard to principles of conflicts of law (except to the extent governed by the UCC); (ii) consents to personal jurisdiction in the State of California in the state and United States courts in the City of Los Angeles, California; and (iii) consents to venue in Los Angeles County, California, for all actions and proceedings with respect to this Agreement and the Loan Documents, and waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent any proceeding is brought in accordance with this Section 16.

[SIGNATURES FOLLOW ON NEXT PAGE]



IN WITNESS WHEREOF, the undersigned has executed this Security Agreement as of the day and year first hereinabove written.

CYBERDEFENDER CORPORATION,
a Delaware corporation

By: _____
Kevin Harris
Chief Financial  Officer and Secretary

EXHIBIT "A"

COLLATERAL DESCRIPTION

All property of Debtor, whether now owned or hereafter acquired, wherever located, including, without limitation, all right, title and interest of Debtor in, to and under the following:

(a)     All Accounts;

(b)     All Chattel Paper;

(c)     All Commercial Tort Claims and other claims or causes of action;

(d)     All Deposit Accounts and cash; provided, however, that Purchaser acknowledges that the Company's deposit accounts are subject to a pre-existing control agreement and will not require the Company to provide a control agreement to Purchaser over deposit accounts until satisfaction of the Senior Debt or other written consent by the holders of the Senior Debt;

(e)     All Documents;

(f)     All Equipment;

(g)     All General Intangibles;

(h)     All Goods;

(i)     All Instruments;

(j)     All Intellectual Property;

(k)     All Inventory;

(l)     All Investment Property;

(m)     All Letter-of-Credit Rights;

(n)     All contract rights;

(o)     All financial assets;

(p)     All payment intangibles;

(q)     To the extent not otherwise described above:

(i)     all insurance policies, including the proceeds thereof, and water stock;

(ii)     All architectural, structural, mechanical and engineering plans and specifications prepared for construction of improvements or extraction of minerals from any real property now or hereafter owned or leased by Debtor and all studies, data and drawings related

thereto; and also all contracts and agreements of the Debtor relating to the foregoing plans and specifications or to the foregoing studies, data and drawings or to the construction of improvements on or extraction of minerals or gravel from any real property now or hereafter owned or leased by Debtor;

(iii)     All refunds, rebates, reimbursements, reserves, deferred payments, deposits, cost savings, governmental subsidy payments, governmentally registered credits (such as, by way of example and not as limitation, emissions reduction credits), other credits, waivers and payments, whether in cash or kind, due from or payable by any governmental authority or any insurance or utility company relating to any or all of the personal property or real property now or hereafter owned or leased by Debtor or to any improvements thereon or any of the other collateral described herein or arising out of the satisfaction of any condition imposed upon or the obtaining of any approvals for the development of the any real property now or hereafter owned by Debtor or the improvements thereon;

(iv)     All refunds, rebates, reimbursements, credits and payments of any kind due from or payable by any governmental authority or other entity for any taxes, special taxes, assessments, or similar governmental or quasi-governmental charges or levies imposed upon Debtor with respect to the any personal property or real property now or hereafter owned or leased by Debtor and with respect to any improvements thereon or to any of the other collateral described herein, or arising out of the satisfaction of any condition imposed upon or the obtaining of any approvals for the development of any real property now or hereafter owned or leased by Debtor or the improvements thereon;

(v)     All supporting obligations with respect to any other collateral; and

(vi)     All proceeds and products of any of the foregoing (and proceeds and products of proceeds and products).

The term "Intellectual Property" means all intellectual and similar property of every kind and nature now owned or hereafter acquired by Company and its subsidiaries, including inventions, designs, patents (whether registered or unregistered), copyrights (whether registered or unregistered), trademarks (whether registered or unregistered), trade secrets, domain names, confidential or proprietary technical and business information, know-how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, software and databases and all embodiments or fixations thereof whether in tangible or intangible form or contained on magnetic media readable by machine together with all such magnetic media and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

All terms used herein which are defined in the UCC shall have the same meanings when used herein, unless the context requires otherwise and except that (i) for purposes of this Agreement, the meaning of such terms will not be limited by reason of any limitation on the scope of the UCC, whether under Section 9-109 of the UCC, by reason of federal preemption or otherwise, and (ii) to the extent the definition of any category or type of Collateral is expanded by any amendment, modification or

revision to the UCC, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

**ESCROW AGREEMENT**

This ESCROW AGREEMENT (this "Agreement") is entered into by and between CyberDefender Corporation, a Delaware corporation (the "Company"), each of the persons who has executed a signature page to this Agreement (each an "Investor," and together, the "Investors"), and Richardson & Patel, LLP, with an address at 10900 Wilshire Blvd., Suite 500, Los Angeles, CA 90024 (the "Escrow Agent").  Capitalized terms used but not defined herein shall have the meaning set forth in the Securities Purchase Agreement referred to in the recitals below.

RECITALS

WHEREAS, the Investor is purchasing from the Company a 9% subordinated convertible promissory note as set forth in the Securities Purchase Agreement dated the date hereof between the Investor and the Company (the "SPA").

WHEREAS, the Company has requested that the Escrow Agent hold the Subscription Amounts with respect to the Closings in escrow until the Escrow Agent has received a Release Notice in the form attached hereto as <u>Exhibit A</u> for each of the Closings.

NOW, THEREFORE, in consideration of the covenants and mutual promises contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties agree as follows:

**1.    TERMS OF ESCROW**

1.1    <u>Escrow</u>.  The parties hereby agree to establish an escrow account with the Escrow Agent whereby the Escrow Agent shall hold the funds for the purchase of the Common Stock (collectively, the "Escrow Funds") at each of the Closings as contemplated by the SPA.

1.2    <u>Delivery of Escrow Funds</u>.  The Investors shall deliver their respective portion of the Escrow Funds to the Escrow Agent as follows:

1.2.1    <u>By Check</u>.  If by check, the check shall be made payable to "Richardson & Patel LLP Client Trust Account f/b/o CyberDefender Corporation" and mailed to the following address:

> Richardson & Patel LLP
> Attn: Douglas Gold, CFO
> 10900 Wilshire Blvd., Suite 500
> Los Angeles, California 90024

1.2.2    <u>By Wire</u>.  If by wire transfer, the wire transfer shall be made by using the following instructions making sure to indicate "CyberDefender Corporation" on the wire transfer comment or "Re" line:

> BANK NAME:  COMERICA BANK OF CALIFORNIA
> WESTWOOD OFFICE
> 10900 WILSHIRE BLVD.
> LOS ANGELES, CALIF. 90024
> PHONE NUMBER 800-888-3595
> ABA NUMBER:  121137522

1

SWIFT CODE:  MNBDUS33
ACCT. NUMBER:  1894338035
BENEFICIARY:  RICHARDSON & PATEL LLP
CLIENT TRUST ACCT.
Re:  Client Name:        CyberDefender Corporation

1.3     Release of Funds.  Once the Escrow Agent receives a Release Notice in the form attached hereto as Exhibit A (the "Release Notice") executed by the Company and each Investor for each of the Closings, it shall wire the Escrow Funds per the written instructions of the Company.

1.4     Return of Funds.  If the Escrow Agent does not receive a Release Notice with respect to the Closing by _____ ____, 2011, the Escrow Agent shall immediately return the Escrow Funds to each respective Investor, without accrual of interest and with deduction of any wire transfer or other bank charges.

## 2.     OTHER TERMS REGARDING THE ESCROW AGENT

2.1     Escrow Agent's Duties.  The Escrow Agent shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by the Escrow Agent to be genuine and to have been signed or presented by the proper party or parties.

2.2     Liability.  The Escrow Agent shall not be personally liable for any act the Escrow Agent may do or omit to do hereunder as the Escrow Agent while acting in good faith and in the absence of gross negligence, fraud, and willful misconduct, and any act done or omitted by the Escrow Agent pursuant to the advice of the Escrow Agent's attorneys-at-law shall be conclusive evidence of such good faith, in the absence of gross negligence, fraud, and willful misconduct.  The Escrow Agent is hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law and is hereby expressly authorized to comply with and obey orders, judgments, or decrees of any court.  In case the Escrow Agent obeys or complies with any such order, judgment, or decree, the Escrow Agent shall not be liable to any of the parties hereto or to any other person, firm, or corporation by reason of such decree being subsequently reversed, modified, annulled, set aside, vacated, or found to have been entered without jurisdiction.

2.3     Escrow Agent's Representation of the Company as Legal Counsel.  The Escrow Agent has acted as legal counsel for the Company, and may continue to act as legal counsel for the Company from time to time, notwithstanding its duties as the Escrow Agent hereunder.  The Company and the Investors consent to the Escrow Agent in such capacity as legal counsel for the Company and waives any claim that such representation represents a conflict of interest on the part of the Escrow Agent.  The Investors understand that the Company and the Escrow Agent are relying explicitly on the foregoing provision in entering into this Agreement.

2.4     Resignation.  The Escrow Agent's responsibilities as escrow agent hereunder shall terminate if the Escrow Agent shall resign by giving written notice to the Company and the Investors.  In the event of any such resignation, the Investors and the Company shall appoint a successor Escrow Agent, and the Escrow Agent shall deliver to such successor Escrow Agent any Escrow Funds held by the Escrow Agent.

2.5     Disputes as to Escrow Funds.  It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the Escrow Funds, the Escrow

2

Agent is authorized and directed in the Escrow Agent's sole discretion (1) to retain in the Escrow Agent's possession without liability to anyone all or any part of the Escrow Funds until such disputes shall have been settled either by mutual written agreement of the parties concerned by a final order, decree, or judgment or a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but the Escrow Agent shall be under no duty whatsoever to institute or defend any such proceedings or (2) to deliver the Escrow Funds to a state or federal court having competent subject matter jurisdiction and located in the City of Los Angeles, California in accordance with the applicable procedure therefor.

2.6     <u>Indemnification</u>.    The Company and each Investor agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its partners, employees, agents, and representatives from any and all claims, liabilities, costs, or expenses in any way arising from or relating to the duties or performance of the Escrow Agent hereunder or the transactions contemplated hereby or by the Subscription Agreement other than any such claim, liability, cost, or expense to the extent the same shall have been determined by final, unappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, fraud, or willful misconduct of the Escrow Agent.

## 3.     MISCELLANEOUS

3.1     <u>Notices</u>.    All notices or other communications required or permitted hereunder shall be sent as set forth in the Subscription Agreement.

3.2     <u>Successors and Assigns</u>.    This Agreement shall be binding upon and shall inure to the benefit of the permitted successors and permitted assigns of the parties hereto.

3.3     <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement between the parties regarding the subject matter contained herein and supersedes all prior or contemporaneous agreements, representations, and understandings of the parties.

3.4     <u>Waiver; Amendment</u>.    Neither this Agreement nor any provisions hereof shall be amended or waived except by an instrument in writing, signed by the party against whom enforcement of any such amendment or waiver is sought.  Any amendments to the Escrow Agent's duties hereunder shall be made in writing signed by all parties to this Agreement.

3.5     <u>Severability; Assignability</u>.    Should any portion of this Agreement be rendered void, invalid, or unenforceable by a court of law for any reason, such invalidity or unenforceability shall not void or render invalid or unenforceable any other portion of this Agreement.  Neither this Agreement nor any right, remedy, obligation, or liability arising hereunder or by reason hereof shall be assignable by either the Company or the Investor without the prior written consent of the other parties.

3.6     <u>Successors and Assigns</u>.    The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors, and permitted assigns.

3.7     <u>Governing Law; Venue</u>.    This Agreement is to be construed in accordance with and governed by the internal laws of the State of California without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties.    All disputes and controversies arising out of or in connection with this Agreement shall be resolved exclusively by the state and federal courts located in the City and County of Los Angeles in the State of California, and each party hereto agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts.

3

3.8    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

[*Signature Page to the Escrow Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the last date written below on this signature page.

**COMPANY:**

**CYBERDEFENDER CORPORATION**

By: Kevin Harris
Its: Chief Financial Officer

Date: _____9/23/11_____

**ESCROW AGENT:**

**RICHARDSON & PATEL LLP**

_____

By: Peter Hogan
Its: Partner

Date: _____

**INVESTOR:**

Signature: _____

Name of Investor: _____

Name of Signatory: _____

Title of Signatory: _____

Date: _____

5

*[Signature Page to the Escrow Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the last date written below on this signature page.

**COMPANY:**

**CYBERDEFENDER CORPORATION**

By: Kevin Harris
Its: Chief Financial Officer

Date: _____

**ESCROW AGENT:**

**RICHARDSON & PATEL LLP**

By: Peter Hogan
Its: Partner

Date: 9/26/11

**INVESTOR:**

Signature: _____

Name of Investor: _____

Name of Signatory: _____

Title of Signatory: _____

Date: _____

5

*[Signature Page to the Escrow Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the last date written below on this signature page.

**COMPANY:**

**CYBERDEFENDER CORPORATION**

_____

By: Kevin Harris
Its: Chief Financial Officer

Date: _____

**ESCROW AGENT:**

**RICHARDSON & PATEL LLP**

_____

By: Peter Hogan
Its: Partner

Date: _____

**INVESTOR:**

Signature: _____ Trustee

Name of Investor: Seneco & Associates Inc., Profit Sharing Plan

Name of Signatory: Frank W. Seneco

Title of Signatory: Trustee

Date: Sept. 19, 2011

## EXHIBIT A

### RELEASE NOTICE

The undersigned, pursuant to that certain Escrow Agreement entered into by and between CyberDefender Corporation (the "Company"), the Investors signatory thereto, and Richardson & Patel LLP, as Escrow Agent, relating to the Securities Purchase Agreement ("SPA") for the purchase and sale of Common Stock of the Company hereby notifies the Escrow Agent of the following, as appropriate:

(1)     Each of the conditions precedent set forth in the SPA have been satisfied or have been waived; and

(2)     All of the respective representations and warranties contained in the SPA remain true and correct; and

(3)     The undersigned authorizes the release by the Escrow Agent of the Escrow Funds (as defined in the Escrow Agreement) to be released in connection with Closing:

This Release Notice shall not be effective until executed by the Company and the Investors.  This Release Notice may be signed in one or more counterparts, each of which shall be deemed an original, and may be delivered to the Escrow Agent by facsimile transmission.

IN WITNESS WHEREOF, the undersigned has caused this Release Notice to be duly executed and delivered as of the date set forth next to its signature below.

CYBERDEFENDER CORPORATION

By: Kevin Harris
Its: Chief Financial Officer

Date: _____

INVESTOR:  _Frank W. Seneco Trustee_
_Seneco & Associates Inc,_
_Profit Sharing Plan_
Name:  _Frank W. Seneco_
Title:  _Trustee_

Date:  _Sept. 19, 2011_