IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CyberDefender Corporation,[1] | ) | Case No.: 12-10633 (BLS) |
| | ) | |
| Debtor. | ) | Related to D.I. 10, 153, 159, 160 |
| | ) | |

**GR MATCH, LLC'S REPLY TO (1) OBJECTION OF CERTAIN HOLDERS OF 9% SUBORDINATED CONVERTIBLE PROMISSORY NOTES TO DEBTOR'S MOTION FOR APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS; AND (2) SEAN P. DOWNES' OBJECTION AND RESERVATION OF RIGHTS IN CONNECTION WITH THE DEBTOR'S PROPOSED SALE OF ASSETS TO GR MATCH, LLC**

GR Match, LLC ("GRM") hereby submits its reply to (1) the *Objection of Certain Holders of 9% Subordinated Convertible Promissory Notes to Debtor's Motion for Approval of the Sale of Substantially All of its Assets* [D.I. 153] (the "9% Noteholder Objection") filed by the noteholders listed on Exhibit A thereto (the "Objecting 9% Noteholders") who purchased 9% Subordinated Convertible Promissory Notes (the "9% Subordinated Notes") issued by the above-captioned debtor and debtor-in-possession (the "Debtor") on September 28, 2011; and (2) *Sean P. Downes' Objection and Reservation of Rights in Connection With the Debtor's Proposed Sale of Assets to GR Match, LLC* [D.I. 159] (the "Downes Objection" and together with the 9% Noteholder Objection, the "Noteholder Objections") filed by Sean P. Downes (together with the Objecting 9% Noteholders, the "Objecting Noteholders") who purchased 10.5% Subordinated Convertible Promissory Notes (the "10.5% Subordinated Notes") issued by the Debtor in December 2011. In support thereof, GRM respectfully represents as follows:

[1] The last four digits of the Debtor's federal tax identification number are (5833). The Debtor's address is: 617 West 7th Street, Suite 1000, Los Angeles, CA 90017.

## INTRODUCTION

1. Not only do the Noteholder Objections lack merit, but the Objecting Noteholders lack standing to bring them. Indeed, the Objecting Noteholders are barred from asserting any objections to the proposed sale of substantially all of the Debtor's assets to GRM (the "Sale"). Each of Downes and the other Objecting Noteholders entered into subordination agreements with GRM and the Debtor pursuant to which they agreed to subordinate their liens on the Debtor's assets to the pre-existing liens of GRM. They further agreed to refrain from taking any actions to enforce their rights against the Debtor and from exercising any remedies to which they might otherwise be entitled until GRM's senior loans are paid in full.

2. Wholeheartedly ignoring the contractual obligations to which they are bound, the Objecting Noteholders filed the Noteholder Objections requesting that the Court deny the Debtor's motion to sell its assets to GRM, but providing no viable alternative to the sale that could provide greater value to the Debtor's estate. Flaunting their disregard for the provisions of their subordination agreements with the Debtor and GRM, the Objecting Noteholders now file their sale objections in a desperate effort to delay the sale process to gain leverage over the Debtor and GRM so that they might enhance their recovery even though it is clear that GRM, as senior secured lender, is woefully undersecured.

## DISCUSSION

3. Prior to the filing of the above-captioned chapter 11 case (the "Chapter 11 Case") on February 23, 2012 (the "Petition Date"), the Debtor was indebted and liable to

GRM[2] under various loan documents (collectively, the "Prepetition Loan Documents") in the aggregate principal amount of $15,732,080 plus fees, expenses and other obligations chargeable or reimbursable under the Prepetition Loan Documents (collectively, the "Prepetition Loan Obligations"). In addition, pursuant to the Court's *Final Order Pursuant To Sections 361, 362, 363 and 364 Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing the Debtor To (I) Use Cash Collateral, (II) Obtain Post-Petition Financing And (III) Provide Adequate Protection To Secured Creditors* [D.I. 108] (the "Final DIP Order"), GRM agreed to lend to the Debtor up to an aggregate principal amount of $4,610,000 (together with the Prepetition Loan Obligations, the "Loan Obligations") pursuant to a post-petition debtor-in-possession financing.

4. The Prepetition Loan Obligations arise from three separate loan agreements:

a. Media and Marketing Services Agreement. On July 19, 2011, GRM and the Debtor entered into that certain Media and Marketing Services Agreement (as amended or modified, the "Media Services Agreement" and together with any related loan documents, including the Special Deposit Account Control Agreement dated March 10, 2010 by and among GRM, CyberDefender Corporation, a California

---

[2] In addition to granting prepetition loans to the Debtor, GRM also held 1,142,860 shares of the Debtor's common stock (totaling only 4% of the total number of shares outstanding) as of the Petition Date. Contrary to the Objecting 9% Noteholders' assertion in footnote 1 of the 9% Noteholder Objection, GRM's affiliate, Guthy-Renker Partners, Inc. does *not* hold 60% of the Debtor's stock. As disclosed by the Debtor in the *Debtor's Motion for Interim and Final Order Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtor to (I) Use Cash Collateral, (II) Obtain Post-Petition Financing and (III) Provide Adequate Protection to Secured Creditors, and (B) Providing Notice and Scheduling Final Hearing* [D.I. 9], the largest holders of the Debtor's common stock are individuals Gary Guss (13%) and Downes (5%).

corporation (as predecessor in interest to the Debtor, "CyberDefender California"), and Union Bank, N.A., the "Media Services Agreements"). Pursuant to Section 2.3 of the Media Services Agreement, as security for the Debtor's prompt payment of all amounts due and performance of all obligations thereunder, the Debtor granted GRM a security interest and lien in the collateral described therein.

b. March 2010 Loan and Securities Purchase Agreement: On March 31, 2010, GRM and CyberDefender California entered into that certain Loan and Securities Purchase Agreement (as amended or modified, the "Prepetition Loan Agreement"). As part of the loan transaction the Debtor entered into: (i) that certain Security Agreement, dated March 31, 2010 (the "Prepetition Security Agreement"), which granted GRM a security interest in all of the Debtor's assets; and (ii) that certain 9% Secured Convertible Promissory Note dated March 31, 2010 in the original principal amount of $5,300,000 issued by CyberDefender California in favor of GRM.

c. Revolving Credit Facility. GRM and the Debtor entered into that certain Revolving Credit Loan Agreement dated December 7, 2010, effective December 3, 2010, in the principal amount not to exceed $5,000,000 (as amended or modified, the "Prepetition Revolving Credit Loan Agreement"). The Prepetition Revolving Credit Loan Agreement was entered into on the terms and conditions set forth therein, in the Revolving Credit Note dated December 3, 2010 (the "Prepetition Revolving Credit Note") and the Security Agreement, dated December 7, 2010, by and between GRM and the Debtor (as amended or modified, the "Prepetition Revolving Credit Security Agreement" and together with the Prepetition Security Agreement, the "Prepetition Security Agreements"). GRM and the Debtor also entered into that certain



01:12057526.1

Loan Modification Agreement dated February 25, 2011 (as amended or modified, the "Loan Modification Agreement"), pursuant to which GRM and the Debtor agreed to modify the indebtedness evidenced by the Prepetition Revolving Credit Loan Agreement, the Prepetition Revolving Credit Note and the Prepetition Revolving Credit Security Agreement on the terms and conditions of the Amended and Restated 9% Secured Convertible Promissory Note dated February 25, 2011.

5. The Debtor is a party to the following documents and agreements, which provide for pledges and grants by the Debtor of liens on and security interests in its assets and property (to the extent described therein) as security for the repayment of the Prepetition Loan Obligations: (a) the Control Agreement; (b) the Media Services Agreement, (c) the Prepetition Security Agreement, and (d) the Prepetition Revolving Credit Security Agreement.

6. In September 2011, the Debtor completed the private sale of $2,240,412 in aggregate principal amount of 9% Subordinated Notes to 33 accredited investors (the "9% Noteholders"), including the Objecting 9% Noteholders, pursuant to Securities Purchase Agreements (the "Securities Purchase Agreements").

7. Both tranches of the 9% Subordinated Notes are secured by *pari passu* subordinated security interests in substantially all of the Debtor's assets pursuant to certain Security Agreements in favor of the 9% Noteholders. The 9% Noteholders' subordinated security interests are subject to the terms and conditions of Subordination Agreements (the "9% Noteholder Subordination Agreements") by and among the Debtor, GRM and the 9% Noteholders. Pursuant to the 9% Noteholder Subordination Agreements, all Subordinated Debt Payments (as defined therein) and Permitted Junior

Securities Payments (as defined therein) were made expressly subject, subordinate and junior, in right of payment and exercise of remedies to the prior payment in full in cash or cash equivalents of the obligations of the Debtor to GRM under or in connection with the Prepetition Loan Agreement, the Prepetition Revolving Credit Loan Agreement, the Prepetition Loan Modification Agreement, the Media Services Agreement and all promissory notes, security agreements and other loan documents related to the foregoing.

8. In December 2011, the Debtor completed the private sale of $2,950,000 in aggregate principal amount of 10.5% Subordinated Notes to Downes pursuant to a Securities Purchase Agreement (the "Downes Securities Purchase Agreement") by and among the Debtor and Downes. The 10.5% Subordinated Notes are secured by security interests in substantially all of the Debtor's assets pursuant to a Security Agreement (the "Downes Security Agreement") in favor of Downes.[3] Downes' subordinated security interest is subject to the terms and conditions of a Subordination Agreement (the "Downes Subordination Agreement" and together with the 9% Noteholder Subordination Agreements, the "Subordination Agreements") by and among the Debtor, GRM and Downes. Pursuant to the Downes Subordination Agreement, all Subordinated Debt Payments (as defined therein) and Permitted Junior Securities Payments (as defined therein) were made expressly subject, subordinate and junior, in right of payment and exercise of remedies to the prior payment in full in cash or cash equivalents of the obligations of the Debtor to GRM under or in connection with the Prepetition Loan Agreement, the Prepetition Revolving Credit Loan Agreement, the Prepetition Loan

3 The Downes Security Agreement also secures the Debtor's obligations to Downes as holder of 9% Subordinated Notes.

Modification Agreement, the Media Services Agreement and all promissory notes, security agreements and other loan documents related to the foregoing.

9. The 9% Noteholder Subordination Agreements provide, in pertinent part, as follows:[4]

a. "As long as any portion of the Senior Debt shall remain outstanding and unpaid, following the occurrence and during the continuance of any Event of Default with respect to the Senior Debt and the receipt by the Borrower and the Subordinated Party of written notice from Senior Lender, *the Subordinated Party shall not,* without the prior written consent of Senior Lender: (a) . . . *bring suit or initiate any other actions or proceedings to enforce its rights or interests in respect of the obligations of Borrower owing to the Subordinated Party.*" Representative Subordination Agreement, § 5(a) (emphasis added).

b. "The *Subordinated Party* acknowledges that Borrower has granted to Senior Lender, security interests in all of such Borrower's assets, and *agrees not to interfere with or in any manner oppose a disposition of any Collateral by Senior Lender* in accordance with applicable law and the terms of the Senior Lender Loan Documents." Representative Subordination Agreement, § 8(c) (emphasis added).

c. "The *Subordinated Party hereby agrees* that at any time and from time to time, without notice to or the consent of the Subordinated Party, without incurring responsibility to the Subordinated Party, and without impairing or releasing the subordination provided for herein or otherwise impairing the rights of Senior Lender hereunder: . . . (v) *any Collateral may be sold*, exchanged, released, or substituted. . ." Representative Subordination Agreement, § 8(e) (emphasis added).

d. "The *Subordinated Party* hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Senior Debt, it shall waive any claims and *shall not exercise any right or remedy, direct*

---

4 All capitalized terms used but not defined herein shall have the definition ascribed to them in the Subordination Agreement attached to the 9% Noteholder Objection at Exhibit B (the "Representative Subordination Agreement"). Although each of Objecting 9% Noteholders entered into separate subordination agreements with GRM and the Debtor, the Objecting 9% Noteholders have represented that the Representative Subordination Agreement is representative of the subordination agreements entered into by each of the 9% Noteholders.

> *or indirect, arising by way of subrogation or otherwise under this Agreement, against the Borrower.*" Representative Subordination Agreement, § 9(a) (emphasis added).

10. These provisions, read individually or in concert, make clear that the Objecting Noteholders are contractually required to refrain from taking any action that would interfere with GRM's rights pursuant to the Prepetition Loan Documents. These provisions were violated by the Objecting Noteholders when they filed the Noteholder Objections objecting to the sale of collateral to GRM.

## ARGUMENT

### I. THE OBJECTING NOTEHOLDERS LACK STANDING TO OBJECT TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS TO GRM

11. Section 510(a) of title 11 of the United States Code (the "Bankruptcy Code") expressly provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a); *see also In re Electrical Components International, Inc., 2010 Bankr. LEXIS 5797, at * 26 (Bankr. D. Del. Apr. 2010); Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 594-95 (Bankr. S.D.N.Y. 2009) (intercreditor agreement was "strictly enforceable in accordance with its terms" and subordinated creditor was prevented from being heard on issues in chapter 11 case in contravention of such agreement). Thus, the Subordination Agreements are fully enforceable in this Chapter 11 Case.

12. The Subordination Agreements prohibit the Objecting Noteholders from filing the Noteholder Objections and asserting objections to the sale.[5] As such, the Objecting Noteholders lack standing to assert their arguments. *See In re Erickson Retirement Communities, LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010) (finding that subordinated creditors subject to subordination agreements lacked standing and/or contractually waived their right to seek an examiner). In *Erickson*, the agent for the senior secured lender argued that the subordinated entities "lack standing and/or have waived their right" to pursue a motion for appointment of an examiner "because they essentially agreed to stand still, be 'silent seconds,' and yield in all respects to the senior, secured lenders until the senior secured lenders are paid in full." *Erickson*, 425 B.R. at 314. The agent further argued that the request for an examiner was "an indirect demand for payment" in violation of the parties' subordination agreement. *Id.* Because "subordination agreements are interpreted and enforced in accordance with general contract principles," the court determined that a reasonable person in the position of the subordinated party would understand the meaning of the subordination agreement to be that, until the senior lenders were paid in full, the subordinated parties must "stand still." *Id.* at 315. The subordination agreement at issue in *Erickson* provided that the subordinated creditors could not "*exercise any rights or remedies or take any action* or proceeding *to collect or enforce* any of the Subordination Obligations" without prior

[5] The Downes Objection includes a joinder in "similar, consistent objections, reservations of rights, and/or other requests that have been filed by other creditors and/or parties in interest in this bankruptcy case in connection with the proposed Sale." Downes Objection, ¶ 22. Although unclear, it appears that Downes has joined in the Objecting 9% Noteholder's objection to the Sale.

written consent from the senior secured lender until the senior loan was satisfied in full. *Id.* at 314 (emphasis added).

13. As parties to the Subordination Agreements, the Objecting Noteholders lack standing and/or have waived their right to object to the Sale. Virtually identical to the *Erickson* provisions, the Subordination Agreements prevent the Objecting Noteholders from initiating any actions or proceedings "to *enforce [their] rights or interests* in respect of the obligations of Borrower owing to the Subordinated Party" and provide that they will "*not exercise any right or remedy*, direct or indirect, arising by way of subrogation or otherwise under this Agreement, against the Borrower" while the Prepetition Loan Obligations remain outstanding. Representative Subordination Agreement, §§ 5(a), 9(a) (emphases added). The Objecting Noteholders are similarly barred from interfering with the "disposition of any Collateral by Senior Lender in accordance with applicable law and the terms of the Senior Lender Loan Documents." Representative Subordination Agreement, § 8(c).

14. Although recognizing the existence of the Subordination Agreements and even attaching a representative copy of the Subordination Agreements to the 9% Noteholder Objection, the Objecting Noteholders nonetheless ignore their contractual obligations thereunder and object to the sale of the Debtor's assets (and GRM's collateral) to GRM without the legal right to do so. There can be little doubt that a reasonable person would understand the Subordination Agreements to categorically prevent the Objecting Noteholders from objecting to the sale as an action to enforce the Debtor's obligations to the Subordinated Noteholders, an attempt to exercise remedies and a prohibited effort to interfere with the disposition of GRM's collateral. *See*

*Erickson*, 425 B.R. at 315 (finding that motion to appoint examiner was "tantamount to both a pursuit of a remedy and the commencement of an action (i.e. a contested matter) that is aimed, ultimately, at collection of [the subordinated creditor's] claims.") At bottom, the Objecting Noteholders' tactics are aimed at slowing down the sale process and "gaining leverage to enhance or create recoveries" for themselves – "the very type of obstructionist behavior that the agreements are intended to suppress." *Id*; *see also Ion Media Networks, Inc.*, 419 B.R. at 595.

15. Having agreed in the Subordination Agreements that the Objecting Noteholders have the knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the subordinated investment (*see* Representative Subordination Agreement, § 8(a)(1)), it is clear that the Objecting Noteholders knowingly waived all legal and statutory rights that would be in conflict with their obligation to stand still until the Prepetition Loan Obligations are paid in full. Because the Subordination Agreements are fully enforceable and the filing of the Noteholder Objections run afoul of such agreements, the Objecting Noteholders lack standing to assert their objections to the sale and the Noteholder Objections should be disregarded and/or overruled.

## II. EVEN IF THE COURT WERE TO CONSIDER THE MERITS OF THE NOTEHOLDER OBJECTIONS, THE OBJECTIONS SHOULD BE OVERRULED[6]

16. First, paragraph 22 of the proposed Sale Order is not intended to provide the type of third party releases described in the Noteholder Objections. *See* 9%

6 GRM understands that responses to the other objections made by the Objecting Noteholders in the Noteholder Objections, including the Objecting 9% Noteholders' argument under 11 U.S.C. § 363(f), will be addressed in the reply to be filed by the Debtor and GRM hereby joins in the Debtor's reply.

Noteholder Objection, ¶¶ 13-17; Downes Objection, ¶¶ 16-21. Instead, paragraph 22, consistent with a sale order that provides for the sale of assets free and clear of liens, claims and encumbrances, provides that any claims *against the assets being sold to GRM* are barred from being asserted against GRM, as the good faith purchaser of the assets. The proposed Sale Order does not bar any direct claims that any third party may have had against GRM prior to the Sale. Regardless, GRM has agreed to add additional language to the proposed Sale Order to resolve this objection.

17. Second, Downes argues that the Sale Motion and Asset Purchase Agreement (the "APA"), dated February 23, 2012, by and between the Debtor and GRM are vague as to whether GRM will release all of its claims against the Debtor's estate. However, the APA is clear that GRM has agreed, upon closing of the Sale, to waive all claims against the Debtor except claims that may arise from GRM's enforcement of its rights under the APA. *See* APA § 9.17(b) ("Releases") ("Effective as of the Closing, Buyer hereby releases any claims it may have against the Debtor's estate except for Claims arising out of or relating to this Agreement.")

## CONCLUSION

For the reasons set forth above, GRM respectfully requests that this Court overrule the Noteholder Objections, confirm the Sale, enter the proposed Sale Order and grant such other relief as may be just and proper.

Dated: April 30, 2012
Wilmington, DE

Respectfully submitted,

Michael Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: 302.571.6600
Facsimile: 302.571.1253
E-mail: mnestor@ycst.com
kcoyle@ycst.com

Peter M. Gilhuly (Admitted Pro Hac Vice)
Kimberly A. Posin (Admitted Pro Hac Vice)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Telephone: 213.485.1234
Facsimile: 213.891.8763
E-mail:peter.gilhuly@lw.com
kim.posin@lw.com

Counsel to GR Match, LLC