IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CyberDefender Corporation,[1] | ) | Case No.: 12-10633 (BLS) |
| | ) | |
| Debtor. | ) | Related to D.I. 10 |
| | ) | |

**DECLARATION OF CHASE BROGAN ON BEHALF OF GR MATCH, LLC IN SUPPORT OF DEBTOR'S MOTION FOR ORDERS (A) ESTABLISHING BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR, (B) APPROVING THE FORM AND MANNER OF NOTICES, (C) SETTING A SALE HEARING, (D) AUTHORIZING THE SALE OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (E) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (F) GRANTING RELATED RELIEF**

I, Chase Brogan, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am over 18 years of age. I have been employed by Guthy-Renker, LLC ("Guthy") since March 2012 and, prior to that time, acted as a consultant to Guthy beginning in March 2009. In that capacity, I am and have been directly involved in the relationship between GR Match, LLC ("GRM"), in which Guthy holds an interest, and CyberDefender Corporation, the above-captioned debtor and debtor-in-possession (the "Debtor"). As such, I have knowledge of the facts set forth below and, if called upon to testify, could and would do so competently thereto. I submit this Declaration in support of the Debtor's *Motion for Orders (A) Establishing Bidding Procedures in Connection With Sale of Substantially All Assets of the Debtor, (B) Approving the Form*

---

[1] The last four digits of the Debtor's federal tax identification number are (5833). The Debtor's address is: 617 West 7th Street, Suite 1000, Los Angeles, CA 90017.

*and Manner of Notices, (C) Setting a Sale Hearing, (D) Authorizing the Sale of the Assets Free and Clear of All Liens, Claims and Encumbrances, (E) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (F) Granting Related Relief* [D.I. 10] (the "Sale Motion").

2. As described below in more detail, GRM's relationship with the Debtor has been in a number of different capacities over the last several years, including as the counterparty to a media services agreement, a prepetition lender, a debtor in possession lender, an equity holder, a board member/observer and the stalking horse bidder for the Debtor's assets.

**Pre-petition Loan Obligations**

3. Prior to the filing of the above-captioned chapter 11 case (the "Chapter 11 Case") on February 23, 2012 (the "Petition Date"), the Debtor was indebted and liable to GRM under various loan documents (collectively, the "Prepetition Loan Documents") in the aggregate principal amount of $15,732,080 plus fees, expenses and other obligations chargeable or reimbursable under the Prepetition Loan Documents (collectively, the "Prepetition Loan Obligations").

4. The Prepetition Loan Obligations arise from three separate loan agreements:

    a. Media and Marketing Services Agreement. On July 19, 2011, GRM and the Debtor entered into that certain Media and Marketing Services Agreement (as amended or modified, the "Media Services Agreement" and together with any related loan documents, including the Special Deposit Account Control Agreement dated March 10, 2010 by and among GRM, CyberDefender Corporation, a California

corporation (as predecessor in interest to the Debtor, "CyberDefender California"), and Union Bank, N.A., the "Media Services Agreements"). Pursuant to Section 2.3 of the Media Services Agreement, as security for the Debtor's prompt payment of all amounts due and performance of all obligations thereunder, the Debtor granted GRM a security interest and lien in the collateral described therein.

        b.    March 2010 Loan and Securities Purchase Agreement: On March 31, 2010, GRM and CyberDefender California entered into that certain Loan and Securities Purchase Agreement (as amended or modified, the "Prepetition Loan Agreement" and the loan made pursuant thereto, the "March 2010 Prepetition Loan"). As part of the loan transaction the Debtor entered into: (i) that certain Security Agreement, dated March 31, 2010 (the "Prepetition Security Agreement"), which granted GRM a security interest in all of the Debtor's assets; and (ii) that certain 9% Secured Convertible Promissory Note dated March 31, 2010 in the original principal amount of $5,300,000 issued by CyberDefender California in favor of GRM (the "Promissory Note"). The Prepetition Loan Agreement, the Prepetition Security Agreement, the Promissory Note and the other loan documents relating to the March 2010 Prepetition Loan are collectively referred herein as the "March 2010 Prepetition Loan Documents."

        c.    Revolving Credit Facility. GRM and the Debtor entered into that certain Revolving Credit Loan Agreement dated December 7, 2010, effective December 3, 2010, in the principal amount not to exceed $5,000,000 (as amended or modified, the "Prepetition Revolving Credit Loan Agreement"). The Prepetition Revolving Credit Loan Agreement was entered into on the terms and conditions set forth therein, in the Revolving Credit Note dated December 3, 2010 (the "Prepetition

Revolving Credit Note") and the Security Agreement, dated December 7, 2010, by and between GRM and the Debtor (as amended or modified, the "Prepetition Revolving Credit Security Agreement"). GRM and the Debtor also entered into that certain Loan Modification Agreement dated February 25, 2011 (as amended or modified, the "Loan Modification Agreement"), pursuant to which GRM and the Debtor agreed to modify the indebtedness evidenced by the Prepetition Revolving Credit Loan Agreement, the Prepetition Revolving Credit Note and the Prepetition Revolving Credit Security Agreement into indebtedness that is convertible to stock in the Debtor on the terms and conditions of the Amended and Restated 9% Secured Convertible Promissory Note dated February 25, 2011 (the "Amended and Restated Note" and together with the Promissory Note, the "Prepetition Notes"). The loans made pursuant to the Prepetition Revolving Credit Loan Agreement and the Loan Modification Agreement are referred to herein as the "Revolving Loans." The Revolving Loans, the March 2010 Prepetition Loan and the indebtedness incurred by the Debtor under the Media Services Agreement are collectively referred to herein as the "GRM Prepetition Loans."

5. The Debtor is a party to the following documents and agreements, which provide for pledges and grants by the Debtor of liens on and security interests in its assets and property (to the extent described therein) as security for the repayment of the Prepetition Loan Obligations: (a) the Control Agreement; (b) the Media Services Agreement, (c) the Prepetition Security Agreement, and (d) the Prepetition Revolving Credit Security Agreement.

6. After the Debtor failed to make the interest payments that were due and payable on July 1, 2011 under the Promissory Note and the Amended and Restated

Note, on July 25, 2011, the Debtor and GRM entered into a Waiver and Forbearance Agreement, pursuant to which the Debtor requested and GRM agreed for a period of sixty days through and including September 23, 2011 to waive its rights and remedies under the Prepetition Loan Agreement and the Loan Modification Agreement and related documents. On September 30, 2011, and effective as of September 23, 2011, the Debtor and GRM entered into a Second Waiver and Forbearance Agreement pursuant to which the Debtor requested and GRM agreed, among other things: (i) to capitalize the unpaid interest payments described above and payable on July 1, 2011, so long as the Debtor paid the interest due and payable on both the Promissory Note and the Amended and Restated Note on October 1, 2011; and (ii) for a period of one hundred and twenty days through and including January 24, 2012, to waive its rights and remedies under the Prepetition Loan Agreement, the Loan Modification Agreement and related documents.

**Debtor-In-Possession Financing**

7.  In addition to the Prepetition Loan Obligations, pursuant to the Court's *Final Order Pursuant To Sections 361, 362, 363 and 364 Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing the Debtor To (I) Use Cash Collateral, (II) Obtain Post-Petition Financing And (III) Provide Adequate Protection To Secured Creditors* [D.I. 108] (the "Final DIP Order"), GRM agreed to lend to the Debtor up to an aggregate principal amount of $4,610,000 (together with the Prepetition Loan Obligations, the "Loan Obligations") pursuant to a post-petition debtor-in-possession financing (the "DIP Financing"). Without the DIP Financing provided by GRM, the Debtor likely would have been unable to raise sufficient funds for an orderly sale of its assets and liquidation of its estate.

01:12064031.1

**Equity Interests**

8.  On June 3, 2009, GRM purchased 1,142,860 shares of the Debtor's common stock (totaling 4% of the total number of shares outstanding as of the Petition Date). In addition, as of the Petition Date, GRM held 10,031,500 warrants (totaling 56.6% of the Debtor's total warrants outstanding as of the Petition Date).

**Board Involvement**

9.  Pursuant to the Media and Marketing Services Agreement, dated March 24, 2009, between CyberDefender California and GRM (the "2009 Media Services Agreement"), the Debtor was required to appoint a designee of GRM to its board of directors. On July 21, 2009, upon GRM's request, Bennet Van de Bunt, a Manager of GRM, was appointed to serve as a director of the Debtor and did so until his resignation on January 1, 2010. Thereafter, Luc Vanhal, Guthy's then Chief Financial Officer and Chief Operating Officer, was appointed to serve as a director of the Debtor to replace Mr. Van de Bunt until his resignation on February 28, 2010. Mr. Van de Bunt was then appointed to the Debtor's board for a second time and again served as a director from March 22, 2010 to October 25, 2010. In October 2010, GRM relinquished its right to have a designee appointed to the Debtor's board. At that point, I was designated as a board observer and I maintained that position to date. As a board observer, I do not hold any voting rights nor have I ever sought to exercise any such rights.

**Asset Purchase Agreement**

10.  On information and belief, due in part to the challenging economic climate, the Debtor incurred net losses for several years prior to the Petition Date. On information and belief, the Debtor's operational losses have been compounded by its

inability to raise capital on the public markets. On information and belief, in 2011 through 2012 prior to the Petition Date, the Debtor engaged in extensive capital raising efforts through two investment banks who reached out to hundreds of institutional investors on the public markets. Such efforts at raising capital on the public markets were ultimately unfruitful.

11. Given the Debtor's financial difficulties, in May 2011, GRM recommended to the Debtor's board that they consider retaining Greg Thomas as a consultant. The board retained Mr. Thomas shortly thereafter and, on information and belief, Mr. Thomas continued to provide some consulting services to the Debtor until the Petition Date. Revenue Frontier, LLC ("Revenue Frontier"), which is primarily a media buying group that purchases media for clients on radio and television, was formed in 2001. Guthy invested in and currently owns 59.14% of Revenue Frontier. Mr. Thomas currently owns 40.86% of Revenue Frontier. Guthy also purchases media time through Revenue Frontier as one of its customers.

12. On information and belief, from May 2011 through September 2011, the Debtor, through its then investment banker, RBC Capital Markets ("RBC"), conducted a marketing process for the sale of the Debtor. On information and belief, RBC reached out to more than 80 potential strategic and private equity investors. Ultimately, I am informed and believe that no bids were received.

13. Then, on information and belief, in the fall of 2011, the Debtor conducted a final effort at a capital restructuring by engaging a smaller investment bank to conduct a reverse stock split through a public offering and raising capital from its current investor base of high net worth investors. Ultimately, the Debtor was not able to

launch its public offering and the Debtor could not raise enough funds to continue to fund operations and repay the Prepetition Loan Obligations.

14. On January 1, 2012, the Debtor missed an interest payment due and owing to GRM on account of the GRM Prepetition Loans and, on January 23, 2012, missed a significant payment due under the Media Services Agreement.

15. Thereafter, the Debtor retained XRoads Solutions Group ("XRoads") to provide financial advisory services and to assist the Debtor in further marketing its assets for sale. On information and belief, the Debtor, with XRoads' assistance, continued to search for investors or purchasers for its business and, in that process, engaged in discussions with GRM. I was directly involved in negotiating on behalf of GRM. Ultimately, after several weeks of diligence and arms-length and good faith negotiations, GRM emerged as the stalking horse bidder. The Debtor and GRM entered into the Asset Purchase Agreement, dated February 23, 2012 (the "APA").

16. GRM and the Debtor negotiated the APA in good faith and at arms' length. Notwithstanding the Debtor's prior relationship with GRM, including my position as a non-voting observer on the Debtor's board, GRM conducted diligence and negotiated the APA just as it would for any unrelated company and the Debtor's restructuring process proceeded as set forth in more detail in the *Declaration of Kevin Harris, Interim Chief Executive Officer and Chief Financial Officer, In Support of First Day Motions* [D.I. 3].

17. I was primarily responsible for negotiating the APA for GRM once it became clear that the Debtor's financial issues could not be resolved outside a sale. The majority of my discussions with the Debtor relating to the APA and the sale process

were with Kevin Harris. I understand and believe that the Debtor had concurrent discussions with at least four other potential purchasers during this time. It took GRM, the Debtor and their counsel approximately one month to negotiate and draft the APA and, ultimately, GRM was selected by the Debtor as the stalking horse bidder because, on information and belief, the Debtor received no other bids for its assets. In addition to agreeing to serve as the stalking horse bidder without any break up fee, GRM also agreed to provide more than $4.6 million in DIP Financing to permit the Debtor every opportunity to locate and engage other potential purchasers. Despite these additional efforts, no bids were submitted to the Debtor prior to the bid deadline and the auction was cancelled.

18.   At no time during the negotiation process did GRM collude with the Debtor in any way or act in any manner with the Debtor other than arms' length. Since entering into the APA, GRM has spoken with certain of the Debtor's employees and suggested that GRM may wish to hire them after the sale closes. However, GRM has not entered into written or binding agreements with any current employees of the Debtor.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Dated: May 1, 2012

                                                                    Chase Brogan