UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .       Case No. 12-10633(BLS)
                                .
                                .       Chapter 11
CYBERDEFENDER CORPORATION, .
                                .       824 North Market Street
                                .       Wilmington, DE 19801
                                .
          Debtors.             .       May 2, 2012
. . . . . . . . . . . . . ..       1:41 p.m.


TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Pachulski, Stang, Ziehl &
                                 Jones, LLP
                                By: JAMES E, O'NEILL, ESQ.
                                     JEFFREY N. POMERANTZ, ESQ.
                                919 North Market Street
                                Wilmington, DE 19899-8705


For U.S. Trustee:               Office of the U.S. Trustee
                                By: TIIARA PATTON, ESQ.
                                J. Caleb Boggs Federal Building
                                844 King Street, Suite 2207
                                Wilmington, DE 19801




Audio Operator:                 Stephen Grant


Proceedings recorded by electronic sound recording, transcript
             produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES: (cont'd)

For the Official Committee          Pepper Hamilton, LLP
of Unsecured Creditors:             By:  DONALD DETWEILER, ESQ.
                                         HENRY JAFFE, ESQ.
                                    1313 Market Street
                                    Wilmington, DE 19899

For GR Match:                       Young, Conaway, Stargatt &
                                         Taylor
                                    By: MICHAEL NESTOR, ESQ.
                                    1000 North King Street
                                    Wilmington, DE 19801

                                    Latham & Watkins, LLP
                                    By: PETER M. GILHULY, ESQ.
                                    355 South Grand Avenue
                                    Los Angeles, CA 90071-7560

For Sean Downes:                    Womble Carlyle
                                    By: THOMAS M. HORAN, ESQ.
                                    222 Delaware Avenue
                                    Wilmington, DE 18901

For Certain Noteholders:            Stevens & Lee
                                    By: JOHN D. DEMMY, ESQ.
                                    1105 North Market Street
                                    Wilmington, DE 19801

TELEPHONIC APPEARANCES:

For the Debtor:                     Pachulski, Stang, Ziehl &
                                         Jones, LLP
                                    By:  SHIRLEY S. CHO, ESQ.
                                    919 North Market Street
                                    Wilmington, DE 19899-8705

                                    Latham & Watkins, LLP
                                    By:  KIMBERLY A. POSIN, ESQ.
                                    355 South Grand Avenue
                                    Los Angeles, CA 90071-7560

                                    Hirschler Fleischer, P.C.
                                    By: SHEILA deLa CRUZ, ESQ.
                                        ROBERT S. WESTERMANN, ESQ.
                                    The Edgeworth Building
                                    2100 East Cary Street
                                    Richmond, VA 23223

For Oracle America:                    Magnozzi & Kye, LLP
                                       By: AMISH R. DOSHI, ESQ.
                                       23 Green Street
                                       Huntington, NY 11743

                              - - -

**I N D E X**

|  | PAGE |
|---|---|
| **EXHIBITS** | **EVD.** |
| Final DIP Financing Order | 58 |
| October 12th UCC-1 Financing Statement | 58 |
| July 19th Financing Statement | 58 |
| December 7th, 2011 Financing Statement | 58 |
| August 23rd, 2011 Financing Statement | 58 |
| October 28th, 2011 Financing Statement | 58 |
| Declaration of Chase Brogan | 59 |

1          COURTROOM DEPUTY:  All rise.

2          THE COURT:  Please be seated.  Counsel.

3          MR. POMERANTZ:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. POMERANTZ:  Jeff Pomerantz of Pachulski, Stang,

6  Ziehl & Jones on behalf of the debtors and -- debtor and

7  debtor-in-possession.  With me is my partner Jamie O'Neill.

8  Also in the courtroom is the debtor's acting CEO and CFO Mr.

9  Kevin Harris and Joseph DeAngelo with XRoads Solutions.

10          THE COURT:  Very good.

11          MR. POMERANTZ:  Your Honor, we're here today to ask

12  that the Court approve a sale of substantially all the debtor's

13  assets to GRM Match.  We're happy to report that the Oracle and

14  the Vindicia objections have been resolved, one pursuant to the

15  terms of the stipulation that we filed with the Court and the

16  other by inclusion in language in the order, and the

17  additional red line copy of which I'll hand up to you later on

18  in the hearing.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  Your Honor, at the first day hearing,

21  I told you that the debtor intended to use the bankruptcy

22  process to conduct a full and thorough sale of the company's

23  assets for benefit of all stakeholders.  I pointed out to Your

24  Honor that we were not under the typical expedited time frame,

25  but actually had a good 70-day process to see if there were

1 overbidders that would come in and offer more consideration

2 than GRM Match was doing.  And, right now, we're here today on

3 the precipice of consummating a sale which will do just that in

4 a market tested sale that will generate the most value for the

5 estate, retain the operations as a going concern, preserve jobs

6 and provide a recovery for creditors other than GRM.

7        Pursuant to the purchase agreement, GRM offered to

8 credit bid $12 million of its debt, waive its remaining claims

9 against the estate which is upwards of $8 million, assume cure

10 claims in connection with the contracts that they were having

11 assigned to it, and also make a cash payment which by the

12 efforts of the Creditors Committee and as we will talk about in

13 connection with our motion was increased from 250,000 to

14 500,000.  In consideration, they are acquiring substantially

15 all the operating assets of the estate and they are obtaining a

16 release of all claims against it.

17        Your Honor, there have been two amendments to the

18 purchase agreement that have been filed with the Court.  The

19 first increased the purchase price –- the cash portion of the

20 purchase price from 250,000 to 500,000 allocating such amounts

21 to the avoidance actions.  And the second identified certain

22 contracts that they have decided to take an assumption and

23 assignment of and also modifying some of the key business

24 partners or people that they were acquiring avoidance actions

25 against.

1      Notwithstanding the objections that remain to the

2 sale, I believe there are several critical facts that are not

3 in dispute.  One -- and each of these facts will be supported

4 by a proffer which I'll make later.

5      THE COURT:  Okay.

6      MR. POMERANTZ:  But first, the negotiations with GRM

7 and the debtor were in good faith and arms length.  Two, XRoads

8 ran a fulsome marketing process.  Three, GRM submitted the

9 highest and best bid for the assets.  GRM has a first lien on

10 substantially all the assets.  No other bids were submitted.

11 GRM's offer retains the company as a going concern preserving

12 jobs.  The bid preserves value for others.  And the noteholders

13 do not have a lien on any commercial torts or other avoidance

14 actions.

15      From day one of this case, the noteholders knew that

16 there was going to be a sale to GRM pursuant to a credit bid.

17 Never did they contact counsel or financial advisors or the

18 company to be brought into the process.  They've laid in wait

19 and are now trying to use 363 of the Bankruptcy Code to derail

20 the process, frustrate the sale, and extort additional payment

21 from GRM in consideration of their consent.

22      Before we get to their objections, however, there is

23 a preliminary issue I think Your Honor has to resolve.  It is

24 whether the noteholders in fact have standing to make arguments

25 to object to the sale.  GRM filed a reply in which the company

1   joined and incorporated into its reply in which they argued

2   that by virtue of the subordination agreement between the

3   company, the noteholders and GRM, that the noteholders have

4   waived their rights to interfere with the exercise of remedies

5   by GRM.

6          THE COURT:  An interesting question and your choice

7   of words.  Do concepts of waiver play into construction of

8   constitutional or prudential standing?

9          MR. POMERANTZ:  Well, you know, my position, and this

10  is something I will at some point defer to Mr. Gilhuly to

11  argue, but it's our view that the subordination agreement is

12  enforceable under 510 and there are certain waivers and release

13  of rights that are appropriate.  They were fully able to

14  evaluate what rights they were waiving.

15         THE COURT:  Well, there's, you know, there's a couple

16  different questions here.  And 510 certainly says what it says

17  as to 510(a) and I get it.  You know, that I understand.  The

18  question is -- it's an interesting one of whether it is

19  standing or how I construe it.  I mean, I've read the

20  subordination agreement and I appreciate both sides giving it

21  to me, and I, you know, I think I understand it and I

22  understand the context in which it was negotiated between

23  sophisticated parties.  But these are creditors of the estate,

24  right?  Everybody agrees, right?  They're creditors.

25         MR. POMERANTZ:  Correct.

1    THE COURT:  Okay.

2    MR. POMERANTZ:  Their relative rights as a creditor

3  may be in dispute --

4    THE COURT:  It may be in dispute.

5    MR. POMERANTZ:  -- compared to the complaint.

6    THE COURT:  And the enforcement of those rights which

7  would limit their remedies is the debtor is not a party to the

8  subordination agreement, right?

9    MR. POMERANTZ:  No.  The debtor is a party to the

10 subordination agreements.

11   THE COURT:  Oh, the debtor is a party.

12   MR. POMERANTZ:  So, this is not an issue of Your

13 Honor being asked to enforce an agreement --

14   THE COURT:  A third party agreement.

15   MR. POMERANTZ:  -- between two third parties.

16   THE COURT:  I understand.

17   MR. POMERANTZ:  And, Your Honor, if you would like to

18 take up the issue of the -- whether it's waiver, whether it's

19 lack of standing, the silencing of the juniors, I would turn it

20 over to Mr. Gilhuly to argue it now or I can finish my

21 presentation going through these developments and --

22   THE COURT:  Why don't you finish your discussion.  I

23 mean, I find the issue interesting, you know, and I understand

24 the thought process that goes beyond that.  I struggle with the

25 concept of whether or not it is -- whether standing is the

1  appropriate analysis.  So I look -- you know, I've read the

2  papers and I've seen the parties' submissions, as well.  So --

3  but I think I'd rather have you sort of set the whole table for

4  me and then I'll hear from Mr. Gilhuly.

5          MR. POMERANTZ:  Certainly.  Other than that, Your

6  Honor, the noteholders -- and I use them collectively, the --

7  Sean Downes and the other juniors, because in large part they

8  serve -- they join in each other's objections.  So in my

9  presentation I'll refer to their objections as noteholders

10  recognizing that they may differ a little, but --

11          THE COURT:  So noted.

12          MR. POMERANTZ:  There are really two basic types of

13  objections.  One goes to the interpretation of the purchase

14  agreement and the order, and what it means and what it says.

15  And the second challenges the Court's authority to approve a

16  sale free and clear of liens under 363(f).  Let me first take

17  the interpretative issues because I think they are largely

18  resolved by our submission and, if not, I think they can easily

19  be resolved by Your Honor by looking at the provisions of the

20  APA in the order.

21          The first issue that both noteholders raise is the

22  argument that Paragraph 22 of the order that was filed as part

23  of the sale motion provided for an unauthorized third party

24  release of GRM which, except under limited circumstances, is

25  frowned upon and it's an uphill battle to approve and obtain

1   third party releases.

2        However, the noteholders are not correct, because

3   that is not what was intended and that is not what the language

4   provided.  In fact, what Paragraph 22 of the original order

5   provided was that parties could not pursue GRM or the assets

6   they're acquiring from the debtor on account of pre-sale claims

7   against the debtor.  That is the very essence of a 363(f) order

8   that any claims that could be asserted against the assets that

9   are being acquired by the buyer do not travel with the assets

10  and cannot be asserted against the buyer.  So, virtually every

11  363 order that I'm aware of that I've seen contains various

12  injunction type provisions and release provisions.

13        But in no way did the debtor intend, and by the

14  comments made, I believe, in the reply brief by GRM no way did

15  they intend, to get a third party release of claims.  To

16  address the concern, we've added language in Paragraph 22 that

17  specifically provides that third party claims are not being

18  waived except to the extent they are derivative or follow

19  through the assets.

20        THE COURT:  I've seen that in the black line.

21  Thanks.

22        MR. POMERANTZ:  And we haven't heard that there's a

23  problem with that language so we assume that that's resolved.

24  I suppose we will hear from counsel if that does not --

25        MR. DEMMY:  Do I have standing to respond to that?

1        THE COURT:  Well, you're standing.

2                    (Laughter)

3        MR. DEMMY:  We appreciate the comments and accept the

4   comments and we do not object -- by the way, John Demmy of

5   Stevens & Lee for the Certain Nine Percent Noteholders.

6        THE COURT:  Good afternoon, Mr. Demmy.

7        MR. DEMMY:  Thank you, Your Honor.  We no longer

8   object on this basis.

9        THE COURT:  Okay.

10        MR. DEMMY:  We're satisfied with the comments that

11   were made in the papers filed, Mr. Pomerantz's just here at the

12   podium, and also the revised order.

13        THE COURT:  Okay.

14        MR. POMERANTZ:  Now, let's try to build some momentum

15   here.  The second comment, Your Honor, was that --

16        THE COURT:  He's thinking the same thing since -- as

17   far as he's concerned he has standing now.

18                    (Laughter)

19        MR. POMERANTZ:  He has standing to make that comment.

20        THE COURT:  He has standing to agree with you.  Is

21   that what this is about?

22        MR. POMERANTZ:  Exactly.

23        THE COURT:  All right.

24        UNIDENTIFIED ATTORNEY:  I would note, Your Honor,

25   he's now sitting down.

1          MR. POMERANTZ:  The second comment, Your Honor, was

2 perceived ambiguity as to whether GRM was waiving or releasing

3 all its claims against the estate.  And while the purchase

4 agreement only provided a credit bid for certain secured

5 claims, in fact, at Paragraph 9.17(b) of the purchase agreement

6 there was clear language which we cite in our reply that said

7 that upon closing GRM would waive all the claims.  And that we

8 saw in connection with the negotiation of the purchase

9 agreement and felt that that was a significant consideration

10 being given to the company that the excess cash, 250 now 500,

11 would not be burdened and diluted by the unsecured deficiency

12 claim by the lenders.

13          The next comment, Your Honor, was that the objectors

14 believed that there was some attempt being made to distribute

15 funds in contravention of the noteholders' lien rights.  We did

16 not seek in the order, we do not seek now the authority to

17 distribute any money in contravention of the lien rights.

18 There obviously are provisions in the First Amendment and also

19 as part of the Committee settlement that proposed to allocate

20 the purchase price which we believe are supportable and which

21 we will -- suspect hear from argument later.  But, we are not

22 sitting here today seeking to distribute money.  We will seek a

23 distribution pursuant to further court order in any one of many

24 ways which is contemplated by the Bankruptcy Code.  All we do

25 is ask the court authority to close the transaction.

1          THE COURT:  Okay.

2          MR. POMERANTZ:  Next, Your Honor, there was an

3   objection that the -- a clarification that the lien attaches to

4   the proceeds.  And again, the language in the sale order

5   provided that the lien attaches to the proceeds with the same

6   validity, priority and amount.  There may be a dispute as to

7   whether there are any proceeds for that lien to attach to, but

8   to the extent that they have a valid lien, and to the extent

9   that there are proceeds of their collateral that are held by

10  the estate, we never intended and the language surely doesn't

11  advocate such rights.

12          So, Your Honor, that leaves us with the real guts of

13  the objection which is whether the Court can authorize the sale

14  under 363(f), in essence, without the noteholders' consent as a

15  undersecured junior lender.  The noteholders are wrong in

16  saying that the Court does not have authority for several

17  reasons.

18          It's hornbook law that 363(f) is -- approval is

19  authorized if one of the five subsections are met.  So, all we

20  have to do is meet one of those subsections and the Court then

21  has the authority to approve a sale free and clear of the

22  liens.  And in fact, in this case four of those subsections

23  apply, any one of which would independently support orders

24  selling the assets free and clear of liens.

25          First, Your Honor, is 363(f)(4).  That authorizes

1  sale free and clear if the liens are in bona fide dispute.  And

2  a bona fide dispute under the Union Planters case from the

3  Eighth Circuit Bankruptcy Appellate Panel 2004 exists when

4  there is an objective basis for either a factual or a legal

5  dispute as to the validity of the debt.  As Your Honor may be

6  aware on -- yesterday, May 1st, the Creditors Committee

7  commenced an adversary proceeding against certain noteholders

8  arguing that the claims and liens can in essence be

9  recharacterized as equity as opposed to secured claims.  We

10  would ask Your Honor to take judicial notice of that.  We

11  understand Mr. Detweiler has those exhibits --

12        THE COURT:  Let me ask you, would the Court's

13  analysis change or would you just have not as strong a case if

14  they hadn't done so yet?  If the Committee said no, we've got

15  problems with their liens?

16        MR. POMERANTZ:  I don't think it's required that an

17  adversary proceeding actually gets filed.  I think it's Your

18  Honor's requirement to listen and determine if there's a bona

19  fide dispute that exists.

20        Obviously, the fact that a complaint was filed, it

21  was filed under Rule 11 as counsel doesn't take -- no counsel

22  takes Rule 11 lightly.  I think that can make as added weight.

23  But the fact that it's filed yesterday I think is of no moment.

24  I think even if it hadn't been filed Mr. Detweiler would stand

25  before Your Honor, would go through the arguments on why

1   there's a -- why it would be recharacterized, and I'm confident

2   that when Your Honor hears further argument on that issue, if

3   necessary, your argument -- Your Honor will conclude that there

4   is at least a colorable claim to recharacterization.  And,

5   again, once Your Honor finds that, it's the end of the story

6   under 363(f) and Your Honor has the authority to approve the

7   sale free and clear.

8          Your Honor, the next provision that we rely on is

9   363(f)(3).  And that authorizes the sale free and clear if the

10  price at which the assets are being sold is greater than the

11  aggregate value of all liens on the property.

12         Now, there's a lot of case law on what 363(f)(3)

13  means and there have been two lines of cases that have

14  generally emerged.  The majority view reflected by Beker

15  Industries which was a case from the Bankruptcy Court from the

16  Southern District of New York, and in fact more recently

17  followed in an extensive opinion --

18         THE COURT:  Is that the Boston Generating?

19         MR. POMERANTZ:  -- by Judge Chapman in Boston

20  Generating.  And the Beker Court believed that the value in

21  (f)(3) means the actual value of the assets, in essence, the

22  economic value not the face amount of the liens.

23         THE COURT:  And that analysis then contemplates some

24  exercise to ascertain the value, right?

25         MR. POMERANTZ:  Correct.

1        THE COURT:  Where a Court would have either done a

2   valuation trial and pegged a number or gone through a sale

3   process and again --

4        MR. POMERANTZ:  Correct.  And I will have an

5   extensive proffer that I will put on to support that the actual

6   value is being realized and the special circumstances that the

7   Court in Beker indicated would be necessary for a finding under

8   (f)(3) and Judge Chapman followed in the Boston Generating case

9   is met in this case.

10       So, in determining that value in (f)(3) meant

11  economic value and not face value, the Court relied heavily on

12  Section 506 which talks about secured claims being secured to

13  the value of such creditor's interest and that the value is

14  determined in light of the purpose of the valuation and the

15  proposed disposition or use of such property.  So, the Court

16  determined that valuation, that concept, requires a Court

17  determination by actual value under 506 and similarly is the

18  way in which Congress intended to use the language under 363.

19       And, in fact, that's consistent with other provisions

20  of the Code where the Bankruptcy Code protects the value of a

21  secured creditor's claim.  In an adequate protection analysis,

22  you're protecting the value of the security, not the face

23  amount of the claim.  If -- in a plan the secured creditors

24  allow a secured claim is protected.  If the secured creditor

25  doesn't like a plan valuation, it has the right for an 1111(b)

1  election.   If a secured creditor doesn't like a sale price

2  under 363, it has the ability to credit bid under 363(k).   The

3  noteholders have not sought to do so.

4           Nowhere in the Bankruptcy Code is there a veto right

5  provided to secured creditors if the face amount of their claim

6  is not paid.   I'd like to read a quote from Judge Chapman from

7  the <u>Boston Generating</u> case which I believe is spot-on and

8  reflects the problem with accepting the noteholders' argument.

9  In determining that the 363 value meant economic value, the

10 Judge went on to say, "To hold otherwise would effectively mean

11 that most 363 sales of unencumbered assets could no longer

12 occur either (a) absent the consent of all lienholders,

13 including those demonstrably out of the money, or (b) unless

14 the proceeds of the first post-sale were sufficient to pay the

15 face amount of all secured claims in full.   If 363(f)(3) and

16 (f)(5) are read in this manner suggested by the second lien

17 lenders," --

18           THE COURT:   I read the quote on Page 14 of your

19 papers.

20           MR. POMERANTZ:   Okay.

21           THE COURT:   But thanks.   I'm not busting your chops.

22 But --

23           MR. POMERANTZ:   No problem.   We believe that's

24 spot-on.   That as a practical matter that Congress must have

25 meant that the sale under 363(f)(3) would be actual value.

1  Otherwise it would be providing a cart blanche objection to the

2  ability to sell overencumbered assets.

3         So then, the inquiry under <u>Beker</u> is, is the debtor

4  selling for fair value, and do the special circumstances exist

5  warranting approval of the sale?  And the answer to each is,

6  yes.

7         Your Honor, I'd first like to proffer the testimony

8  of Kevin Harris.

9         THE COURT:  Well, hang on.  Before we get to

10  proffers, and I will take proffers or put witnesses on.

11  Obviously, if there are objections, parties have the right to

12  examine the witnesses.  It doesn't seem that most of the facts

13  really are in material dispute, but I'll leave that to the

14  parties right now.

15         I think what I'd like to do is I'd like to hear from

16  Mr. Gilhuly and I'd like to hear at least briefly in terms of

17  opening because I think you've had a pretty substantial

18  opening, and I've had the opportunity to review the papers, you

19  know.  Sometimes I proceed by openings, sometimes I just go

20  right to witnesses.  But you've raised a number of issues.  I

21  think you've laid out pretty clearly where the debtor stands.

22  I'd like to hear from Mr. Gilhuly and then I'd like to give the

23  other folks an opportunity.

24         MR. POMERANTZ:  Very well, Your Honor.

25         THE COURT:  Okay?  Mr. Gilhuly.

1        MR. GILHULY:  Good afternoon, Your Honor, Peter

2   Gilhuly of Latham & Watkins on behalf of the prospective buyer

3   GRM -- GR Match, LLC.

4        Your Honor, I would point you to actually two cases

5   that my firm was heavily involved in on this issue.  One is the

6   Erickson case which I was in the courtroom when it was decided,

7   and the other is the Boston Generating case.  There's a

8   decision that was entered on the 3rd of December of 2010.  And

9   we did not cite it, but Judge Chapman actually deals with this

10  issue, as well.  Your Honor, there is, actually, to be frank,

11  not a lot of description about the constitutional standing

12  issue that you raise.  I think that judges --

13       THE COURT:  Well, yes, I mean, and, I mean, we can

14  think about whichever -- whatever flavor of standing you want.

15  I mean, you know, for our purposes it's bankruptcy standing.

16  And I guess what I'm struggling with is, you know, I understand

17  the contractual relationship and the argument of waiver that

18  you've identified.  Okay.  I get that.  Which may mean you

19  lose, all right, to the other side.  I think that's your

20  argument.  But is that decision by this Court predicated upon a

21  finding of no standing for an entity that is a creditor?

22       MR. GILHULY:  Well, I think it's a waiver, Your

23  Honor.  I mean, the -- if you read those cases, both in the

24  Erickson case and the lack of this in the Boston Gen case, the

25  first lien stipulated that the seconds were not exercising a

1  quote, unquote, remedy, and they also didn't have -- the judge

2  remarks on this, it's not a well drafted agreement -- didn't

3  have language that we have here that had -- that was in

4  _Erickson_ which is -- it's in -- on Page 7 of our reply brief at

5  the bottom.  I'm just quoting the agreement.

6          THE COURT:  Sure.

7          MR. GILHULY:  But I think the words are very

8  important here.  "The subordinated party hereby agrees that

9  until the indefeasible payment and satisfaction in full in cash

10  of all senior debt, it shall waive any claims and shall not

11  exercise any right or remedy direct or indirect," and, you

12  know, it goes on.

13          THE COURT:  Right.

14          MR. GILHULY:  My point, Your Honor, is I think

15  standing is grounded.  You have to be an aggrieved party.  You

16  have to have the -- to have some loss.  That is part of the

17  definition of all the standing definitions that I've ever seen.

18  I would submit to Your Honor that the junior subordinated

19  creditors here have waived, quote, unquote, waived their

20  claims.  You remarked, and it's noted in both the cases I

21  mentioned, 510(a) says subordination agreements are enforceable

22  in accordance with applicable nonbankruptcy law.

23          I think there's no argument that these things cannot

24  be waived, Your Honor.  Because you know the situation here.

25  We have sophisticated parties.  These folks are coming in to

1 put in money.  We made them acknowledge very specifically in

2 the subordination agreement.  To be honest, Your Honor, we

3 thought they were crazy.  Why are you putting money into this

4 company?  It's going to fail.  Okay?  So, we made them

5 acknowledge all those risks and we made them waive their

6 rights.  And we have a turnover provision, as Your Honor is

7 aware, and this has got to mean what it says.

8 　　　　　And I think it fits right into the definition of

9 standing.  They are not an aggrieved party.  They have waived

10 their rights.  If you find that this is enforceable, as I think

11 it has to be, and that they waived their rights they are not an

12 aggrieved party.  They have no damages.  They can have no

13 damages.  And therefore, Your Honor -- and you -- if you read

14 those two cases they are interesting.  In <u>Erickson</u>, it's a

15 pretty straightforward application and the words are almost

16 identical to our words.  It happens to be in the context of an

17 examiner motion, Your Honor, but I don't think it makes any

18 difference.

19 　　　　　In the <u>Boston Gen</u> case, Judge Chapman is struggling

20 with -- she really wants to rule that they have no standing, is

21 my interpretation, but she says it's a very poorly drafted

22 agreement, and that they stipulated that this wasn't an

23 exercise of a remedy here.  I think we clearly fit within the

24 contract.  Any right or remedy.  This is a right they are

25 exercising, okay?  You could say it's not a remedy, I think

1  that's a closer call.  But I think the "any right," this is

2  clearly a right to object they are exercising.

3         I think they have clearly contractually waived it.

4  It's direct or indirect which I think would actually bring in

5  the remedy if you wanted to have that as an additional ground.

6  But I think this has to mean what it says, and I think once you

7  conclude that there was a waiver of their rights under this

8  agreement, it's enforceable in accordance with 510(a), then

9  they are not an aggrieved party.  Therefore, they do not meet

10  the definition that's necessary to have standing.

11         THE COURT:  Let me ask you a question.  Would the

12  Court's analysis or approach be different if the debtor were

13  not a party to this agreement?

14         MR. GILHULY:  Your Honor, it's funny you said that.

15  I said this to Mr. Pomerantz in our meeting before this that I

16  think that if the debtor were not a party to this agreement,

17  Your Honor could look at it and say, these are two non-debtor

18  parties, you know, go fight it out in state court.  I think the

19  fact that the debtor is a party -- and, Your Honor, I would

20  note to you the language that I'm citing to you talks about not

21  exercising any right or remedy direct or indirect rising by way

22  of subrogation or otherwise under this agreement against the

23  borrower.  The borrower is a party to this agreement.

24         The borrower's not, you know, not a third party

25  beneficiary which would be an argument we, you know, we might

1  have to talk to if the borrower were not a party.  But the fact

2  that they're a party, Your Honor, I think, puts this directly

3  before you, takes away the two non-debtor squabble issue.  And

4  I think it becomes a standing issue before you.  I actually --

5  when we saw these second lien cases were coming down, I

6  actually had this thought right away with these intercreditor

7  agreements.  What are the judges going to do with two

8  non-debtors agreeing to something?  But I do think -- I think

9  that's an important fact here, Your Honor.

10         THE COURT:  I mean, it's -- you know, I have dealt

11 with this issue and I've been thinking about this since I got

12 these papers.  I've dealt with this issue, I've never written

13 on it.  Not a lot of people write on this.  But the context in

14 which I've dealt with it almost every time has been at the

15 outset of a case at an interim DIP hearing and I've managed to

16 dodge it every time.

17         But it raised -- but the issue has always been, from

18 the Court's point of view -- I haven't had one, I think, where

19 the debtor has been a party to it except in the Tower Records

20 case and that was its own separate set of issues.

21         But you're right, I mean, the Court's instincts are

22 often, hey, you guys are parties to your own separate contract.

23 If you think he or she is breaching it, go sue him somewhere

24 else, and tell him to stop, which has its own merit.  But it is

25 a more direct issue, if indeed it is the debtor that is a party

1   to an agreement that is seeking to enforce its rights in this

2   court.

3         MR. GILHULY:  Your Honor, I will tell you it's not a

4   mistake the debtor's a party to this.  We draft these for this

5   reason.  And one of the reasons is the practical situation we

6   are now in which is, you may say, you know, the debtor is not

7   harmed, why are they a party?  Well, the truth is they are

8   harmed.  We have a DIP credit agreement that finances the

9   debtor through, you know, now and we can't afford for the

10  seconds to be able to exercise rights which they have waived.

11  And there's a reason it's drafted that way.

12        And these are sophisticated parties, and I would say,

13  Your Honor, that this really needs to be enforced in accordance

14  with its terms, because the debtor is a party.  And it is a

15  benefit to the party -- to the debtor to enforce it in this

16  case.

17        THE COURT:  I understand.  Okay.  Mr. Detweiler.

18        MR. DETWEILER:  May it please the Court, Donald

19  Detweiler of Pepper Hamilton along with my partner Henry Jaffe

20  on behalf of the Official Committee of Unsecured Creditors.

21        Your Honor, you questioned about the Court's

22  analysis.  I think the Court need look no further than your

23  final DIP order that's before the Court.  And if I may, I'd

24  like to approach Your Honor with exhibits that we'll be

25  tendering.  But we believe that the issue is fully addressed

1   and brought to Your Honor through the stipulations made by the

2   debtors and the parties in the final DIP order.

3            And, specifically, there is a recital in the DIP

4   order that says clear and unequivocally -- and this is a final

5   DIP order, it's not an interim, but it's a final.  And it says

6   on Page 9 Recital Number 3 -- and how about if I approach first

7   and then I'll do it?

8            THE COURT:  Sure.

9            MR. DETWEILER:  May I approach, Your Honor?

10           THE COURT:  Yes.  Thanks.

11           MR. DETWEILER:  This DIP order has been of public

12  record for now two months.  There was the opportunity to rise

13  and object to it.  The noteholders did not make any objection.

14  If Your Honor turns to Exhibit Number 1, Page Number 9, and

15  we're talking about the recitals here, starting at the second

16  line down, purchaser subordination agreements.  That's

17  referring to the noteholders.  It says, "By and among the

18  debtor GRM and the purchasers, pursuant to the purchaser's

19  subordination agreement, all subordinated debt payments as

20  defined therein and permitted junior security payments as

21  defined therein were made expressly subject, subordinate and

22  junior in right of payment and exercise of remedies to the

23  prior payment in full in cash or cash equivalents of the

24  obligations of the debtor to GRM."

25           It's clear.  The final DIP order which means law of

1 | the case is clear.  It said there was notice out to them,

2 | you're subordinate, the debtor stipulated to it, they didn't

3 | challenge it, they referenced the remedies provision in there,

4 | and we believe that that's the law of the case.  So when Your

5 | Honor gets concerned about the analysis and you look to -- the

6 | question it seems to us that your final DIP order specifically

7 | referenced and made -- it said you're subordinate.  And it

8 | includes the exercise of remedies, and we believe through the

9 | DIP order that that's enforceable.  Thank you, Your Honor.

10 | THE COURT:  Okay.  Thank you.  All right, Mr. Demmy?

11 | MR. DEMMY:  Your Honor, my assumption is you would

12 | like us to limit our remarks to the standing waiver issue at

13 | this moment?

14 | THE COURT:  Well, I want to start with that.

15 | MR. DEMMY:  I will.

16 | THE COURT:  But, obviously, Mr. Pomerantz raised a

17 | number of other issues.  But standing is a gating concern.

18 | MR. DEMMY:  And, Your Honor, I will start by saying

19 | that -- well, two things.  One, I think that Mr. Gilhuly

20 | referred to a provision of the agreement which is not apt here.

21 | And two, I will be relying on the Boston Generating case

22 | although frankly the second half of the decision I don't like.

23 | But, nevertheless, in terms of the standing issue I like the

24 | first half of the case.

25 | THE COURT:  Okay.

1          MR. DEMMY:  Your Honor, with respect to the part of

2   the subordination agreement that was read to the Court which

3   was Section 9(a), it deals with subrogation.  It deals with an

4   issue that really isn't before the Court.  And Mr. Gilhuly read

5   part of it, but not all of it and it talks about a waiver of

6   claims and remedies, direct or indirect, but then it goes on to

7   say, "arising by way of subrogation or otherwise under this

8   agreement against the borrower."  And that's just not what

9   we're talking about here, Your Honor.

10          What we are talking about when it comes to the guts

11   of this subordination agreement are Paragraphs 2 through 7.

12   Paragraph 2 deals with subordination of payment.  And these are

13   all commonplace notions in connection with an intercreditor

14   subordination agreement.  Paragraph 2 deals with subordination

15   of payment.  Paragraph 3 deals with subordination in connection

16   with any distribution of assets.  Paragraph 4 deals with

17   payments that are actually made on subordinated debt and the

18   obligation to pay them over to the senior lender.

19          Paragraph 5 deals with subordination of remedies, but

20   it does not -- it is not drafted in as broad of a fashion as

21   might be suggested under Paragraph 9 which, as I said, is not

22   applicable here.  Section 6 again deals with payments over to

23   the senior lender if there has been a payment made to

24   subordinated lenders.  And Paragraph 7 deals with rights

25   granted to the senior lender which do not deal with this

1  situation.

2          And now I'm going to turn to the <u>Boston Generating</u>

3  case.  Because what that case says, Your Honor, is if you're

4  going to subordinate somebody pursuant to one of these

5  agreements which can be enforced according to its terms, it has

6  to be crystal clear that the action you are trying to prevent

7  the subordinated creditor from taking is prevented by the

8  agreement that was reached between the parties.

9          And in the <u>Boston Generating</u> case which I think is

10  actually tougher, more restrictive of the subordinated lenders

11  with respect to the remedies that they could not exercise

12  because it talks specifically about disposition of assets and

13  more specifically about this kind of situation although not

14  quite this kind of situation as that Court recognized.  But it

15  is much stronger and more specific than the subordination

16  agreement that's before the Court which only makes reference

17  to, in Paragraph 3, subordination upon any distribution of

18  assets.

19          If you read that section -- and I'm not going to

20  belabor the record or the Court, you have the papers, I believe

21  you've read them.  But it does not deal with a 363 sale which

22  is what we're dealing with now.

23          And ultimately at the end of the day the <u>Boston</u>

24  <u>Generating</u> decision agrees -- or it doesn't agree with our

25  position, but it supports our position in the sense that what

1  it held -- what the Court there held was if you want to prevent

2  somebody from participating as a party in interest in a

3  bankruptcy case in connection with a 363 sale you'd better say

4  it clearly in the agreement because it would otherwise be

5  completely onerous and burdensome if it was not really in there

6  specifically.  You can canvas our agreement.  It is not in

7  there, Your Honor.

8          The ability to challenge or raise issues with respect

9  to a 363 sale in the context of a party in interest or a

10  creditor of a bankruptcy estate is not in the subordination

11  agreement.  And as I said I believe our situation is apt with

12  the <u>Boston Generating</u> decision.  And, in fact, the

13  subordination there was more restrictive than it is here.

14          So, I think the standing issue or waiver issue I

15  suppose is what Your Honor wants to frame it as and I would

16  accept that, is one that we prevail on.  That under these

17  circumstances we have not waived our right to challenge this

18  sale especially in the context that the senior lender is the

19  proposed buyer and is getting paid in full, in effect.  So,

20  that's the situation -- well, they're being paid and they're

21  waiving the claim.  So, in effect, the senior debt is being

22  discharged by the sale.

23          THE COURT:  Well, there's a difference between being

24  discharged and being paid in full.  I mean, that's why I have a

25  job.

1          MR. DEMMY:  But they're voluntarily waiving their

2    claim and ending up with no claim at the end of the process.

3    So in a moment's notice they have no claim, but they're also

4    preventing creditors, maybe the only ones that have a real

5    interest in raising these kinds of issues, from raising the

6    issue.  And I think that's where there's more -- seems to more

7    of a standing issue whether it's constitutional or prudential.

8    We are -- Your Honor, correctly recognize we are a creditor,

9    there's been a challenge made and we'll get to that, to the

10   question raised.  We'll get to that in due course.

11         But the noteholders clearly are creditors of the

12   estate, clearly are parties in interest.  And unless we have

13   specifically -- and we don't believe we have, specifically

14   agreed not to raise this issue we believe we have the standing

15   to raise the issue, and certainly as a constitutional or

16   prudential matter as a party in interest have that standing to

17   challenge the sale.

18         THE COURT:  Let me do this, because I'm going to give

19   you an opportunity to respond to the other points that were

20   made by Mr. Pomerantz, but I'd like to hear from Mr. Gilhuly on

21   the specific issues that you've raised as to the subordination

22   agreement.  And once I'm done with him, remind me that I want

23   to hear the balance of your response to Mr. Pomerantz.  Okay.

24         MR. DEMMY:  Thank you, Your Honor.

25         THE COURT:  Sure.

1          MR. GILHULY:  Your Honor, if you look at Section 9, I

2  don't understand Mr. Demmy's argument.  He has written out the

3  word, "or otherwise," which I think are just critical to this.

4          THE COURT:  But they're not acting in a subrogation

5  capacity.  And I realize there's probably a headings provision

6  in here, too.

7          MR. GILHULY:  Yes, there is.

8          THE COURT:  Yes, there is.  But how do I deal with

9  that, because I mean, --

10          MR. GILHULY:  Well, I think -- let me just point --

11  there are other provisions, Your Honor, that make this clear.

12  I think you could read this together and --

13          THE COURT:  Well, if we look at Paragraph 8, for

14  example, we have a no interference provision --

15          MR. DEMMY:  Right.

16          THE COURT:  -- right?

17          MR. DEMMY:  Right.  And including if 8(e) -- you will

18  see, and you have to go down on the next -- on Page 6.  You

19  will see Romanette (v) under that that they -- that, you know,

20  they basically -- it says, a subordinated party hereby agrees

21  from at anytime and from time to time without notice or the

22  consent of the subordinated party without incurring

23  responsibility of the subordinated party and without impairing

24  or releasing the subordination provided for here and otherwise

25  impairing the right to the senior lender hereunder.

1          Number 5 says any collateral may be sold, exchanged,

2   released or substituted.  We are selling the collateral here,

3   Your Honor.  That's what's happening precisely.  And I would

4   also say, Your Honor, we cited a number of provisions in the

5   brief.  I mean, it is clear that -- and you -- if you read

6   Erickson, you get a sense of this.  The judge does exactly

7   that.  She puts together the various provisions.  She said

8   look, it's obvious what the parties meant overall in the

9   agreement.  And I would submit to you that this is very

10  specific, that any collateral may be sold.

11         I would also submit, Your Honor, that,

12  notwithstanding the heading, it does say by way of subrogation

13  or otherwise which I think is important language here.  As you

14  know, Your Honor, parties try to say the same things five

15  different ways in these agreements, and I think it's for you to

16  interpret what they meant, but it was very clear to us what was

17  meant here.  And I would submit here the specific reference to

18  collateral being sold is clear.

19         THE COURT:  Okay.  Here's what I want to do.  With

20  respect to the standing issue, I've heard from the parties on

21  it.  I don't think I need anything further.  I want the

22  opportunity to think about it, and I may take a break and take

23  a closer look at the subordination agreement to understand.

24  But I believe consistent with whatever I've learned from Judge

25  Walsh I will decide at the end of the hearing whether or not

1  the party that's participating has standing.

2          So that -- and I'm being a little bit flip, but I

3  want the opportunity to think about it.  And, again, there are

4  a number of issues that have been raised that I think are

5  important.  There's obviously the debtor's point, and your

6  point, Mr. Gilhuly, is that if this is dispositive it is a

7  gating issue and that's basically the end of the exercise

8  because then you have an uncontested hearing.  I understand.

9  But we are where we are.

10          All right.  So I want to proceed.  I'd like to hear

11  from Mr. Demmy on the issues we're -- yes?

12          MR. DEMMY:  I believe, Your Honor -- John Demmy.  Mr.

13  Detweiler would like to make a point perhaps on this issue, but

14  then I would, as well.

15          THE COURT:  Okay.

16          MR. DEMMY:  I apologize.  I neglected to make, but it

17  doesn't really relate to Mr. Gilhuly's argument.

18          THE COURT:  That's fine.  And I don't need anything

19  further.  I mean, I'm happy to hear from anybody that wishes to

20  be heard.  I mean, I think I understand the standing argument.

21  It's an interesting question, and I want the opportunity to

22  think about it throughout the course of this.  I'm not delaying

23  this hearing or anything else, but I'm not closing that door

24  right now, because I want to understand it.  Mr. Detweiler?

25          MR. DETWEILER:  Your Honor, may it please the Court.

1          THE COURT:  Yes.

2          MR. DETWEILER:  Just briefly.  The Committee supports

3 the sale.  The Committee has a settlement motion that's being

4 presented to Your Honor today as part of the sale.  It's

5 Amendment Number 1 to the proposed asset purchase agreement.

6          Big picture, the debtor is going to meet its burden

7 of proof today on every element.  At the end of the day the

8 issue is going to be, do we have to escrow $500,000 into the

9 estate?  And the answer is no, it shouldn't be.

10          And very simply, Your Honor, first -- the first

11 $250,000 that's coming in common sense tells you that this GRM

12 secured lender was not paying for assets that they already had

13 a lien on.  And why would they pay $250,000 for assets they

14 already had a lien on?  What Your Honor will see in the

15 presentation that we provide to you today through the UCC

16 filings that the noteholders' collateral that they -- they did

17 file a valid and perfected UCC-1 financing statement, but that

18 collateral description is identical to and basically they

19 copied the collateral description of GRM.  So they had the same

20 collateral that GRM had.

21          So first, when you look at the $250,000 that's the

22 first tranche of this that came in, it was not for assets that

23 GRM already held an interest in.  It doesn't make any sense

24 otherwise.

25          Secondly, Your Honor, with regard to the second

1  $250,000, the Committee through the DIP order will show you

2  that the Committee had the right to challenge the liens and

3  claims.  The UCCs are going to lay out very clearly to you that

4  there were valid perfected liens, and the only way that we had

5  claims against them was through bankruptcy causes of actions

6  and avoidance.  The noteholders don't have any lien or claim to

7  bankruptcy avoidance claims and actions, and they're not

8  entitled to the 250,000 that we negotiated to have it as -- not

9  entitled in the sense of having it escrowed.

10        The fight will be on with regard to the

11 recharacterization.  We don't need to get into all that today.

12 But really, at the end of the day, the evidence will come in, I

13 think, relatively smoothly.  Debtor meets its burden of proof.

14 Your Honor's going to have to decide whether or not to escrow

15 $500,000 or some part of that.  Certainly, the 250 that the

16 Committee had, the evidence will be clear, it was for

17 bankruptcy avoidance actions, no lien on.  The first 250 -- why

18 would you pay $250,000, the evidence will show, for assets you

19 already had a lien on?  We just put the 500 into the estate,

20 we'll move on to the exit part of the case, and that's where we

21 need to be.  Thank you, Your Honor.

22        THE COURT:  Okay.  I understand.  Mr. Demmy?

23        MR. DEMMY:  Somehow I knew he was going to raise that

24 issue.  Because what I was going to say about standing was, I

25 think it's a different question, and I didn't address it.  But

1   I think it's a different question whether or not we have -- the

2   noteholders have the ability to -- regardless of what Your

3   Honor rules on the subordination agreement as to the merits of

4   the sale, but the 250,000/$500,000 issue we believe is a

5   different issue, and there is no subordination or standing

6   issue there, because, of course, that is a, in our view, a

7   post-sale matter.  So, we don't think it's a standing issue or

8   a waiver issue with regard to that.  We should be heard to

9   challenge that.  That was my one point on standing.  I'll move

10  on to more of the merits now.

11         With respect to that issue, since I ended there on

12  the standing issue I'll start there again.  Mr. Detweiler can

13  make whatever representations he wants, but the facts before

14  the Court at this point are these.  The sale agreement says

15  that GR was going to put in certain things as its bid for these

16  assets.  It was going to credit bid part of its claim.  It was

17  going to assume certain liabilities.  It was going to waive

18  certain of its claims, and it was going to pay $250,000 in

19  cash.  The sale agreement and the sale motion are completely

20  silent, Your Honor, as to what that $250,000 was for.

21         So to the extent that there's an argument that, well,

22  obviously that 250,000 is earmarked or allocated to any

23  particular thing in the asset purchase agreement is just not

24  supported by the record.  There are 14 -- if you look at the

25  sale agreement and the sale motion, there are 14 separate

1 categories of assets that are listed as being bought for the

2 purchase price which again was the credit bid, waiver,

3 assumption and the cash.   There's no allocation among those.

4         The fourteenth and last item was these avoidance

5 claims that Guthy-Renker wanted to have waived or not pursued

6 because they want to deal with those business partners

7 post-sale.   There was no analysis, no undertaking as to what

8 the value of those claims were, and certainly no tying of the

9 250.

10         So our view is that you cannot now by parol evidence

11 or representations to the Court, logical or illogical, do

12 anything different than what's in the sale agreement which is

13 to show that this was a consideration for the sale of the

14 assets so therefore whatever's left in the estate, to the

15 extent there is a tangible component of the sale consideration,

16 are proceeds to which our liens would attach.

17         As to the increase, Your Honor, I don't think at this

18 point in time the Court needs to make any decision about that.

19 I think that especially on an expedited -- and we put this into

20 our papers that we filed in response to the Committee

21 settlement motion, it is very expedited.   And we understood

22 that the Court was going to grant, you know, notice -- shorten

23 notice to hear the issues today, but we don't think that the

24 Court needs to decide those issues today especially if there's

25 going to be factual representations made about what it is or

1    what it isn't.  We should be entitled to due diligence in

2    discovery, an investigation about those issues and they can be

3    teed up in the ordinary course in the exit game whatever that

4    may be, whether it's a plan of liquidation or other

5    distribution.

6              Anyway, getting back now to what Mr. Pomerantz was

7    dealing with.  I don't have that much more to say.  We dealt

8    with the release issue --

9              THE COURT:  It's basically the 363(f) issues.

10             MR. DEMMY:  Exactly, Your Honor.  And what I will say

11   there is we've briefed those issues.  The new one that came up

12   just very recently obviously is the bona fide dispute under

13   363(f)(4) --

14             THE COURT:  Right.

15             MR. DEMMY:  -- pursuant to the Committee complaint.

16   What I will say about that, Your Honor, is that the case law is

17   clear that you need to have objective factors from which the

18   Court can determine whether or not the dispute that's alleged

19   -- anybody can allege a dispute -- but whether or not that

20   dispute is really bona fide, and we can't just take allegations

21   in a complaint, whether the complaint's filed or just averred

22   at oral argument.

23             Here's what we have in terms of the objective factors

24   in connection with the noteholders' claims and liens.  First of

25   all, Your Honor, Schedule D, the debtor's Schedule D, includes

1  the noteholders' claims.  They're also, I believe, indicated as

2  being secured claims.  The sale motion and pretty much all of

3  the pleadings that have been filed by the debtor in this case

4  have recited the capital structure of the debtors and have

5  indicated the noteholders' claims and liens and have also noted

6  the subordination that applies.

7         So, the objective facts there in terms of the

8  pleadings filed with this Court have all set forth that these

9  are claims, not equity interests, Your Honor.  If you look at

10 the documents which we supplied to the Court, I believe it was

11 Exhibit B to our objection, they are denominated as debt

12 instruments and they are convertible promissory notes.  There's

13 liens attached.  There's a security agreement.

14        THE COURT:  All right.  But doesn't Submicron and the

15 other Courts to the other cases that consider this -- I haven't

16 seen the complaint.  You give me a heads up it was coming, and

17 I accept, and we'll take judicial notice that there's been a

18 complaint filed.  But, they tell me that that's -- you know,

19 how it's -- obviously, how the financial relationship or the

20 input of the funds is characterized is probative, but certainly

21 not dispositive.

22        MR. DEMMY:  That may be, but we're talking about a

23 point in time where a complaint has just been filed --

24        THE COURT:  Yes.

25        MR. DEMMY:  -- just before a sale hearing in which

1    the argument, under 363(f)(4), wanted to be made, and I think

2    the Court can take those considerations into factor and that

3    the real objective criteria here all suggest that these are

4    claims, not equity.

5         THE COURT:  Mr. Pomerantz also argued 363(f)(5),

6    which is about whether or not you could be compelled as a

7    junior creditor to accept a money satisfaction of your

8    interest.  Clearly, in the absence of a bankruptcy, GRM has

9    whatever rights it has.  They could have moved for a

10   foreclosure and you would have gotten -- you know, you get what

11   you get, right?

12        MR. DEMMY:  But, what GR -- that's correct, to a

13   certain extent, Your Honor.  But, what GR Match could not have

14   done in a foreclosure is added on all the things that you would

15   typically see in a sale motion like this, assumption of

16   liabilities, waiver of claims, buying avoidance claims, and

17   things like that.  In a straight foreclosure, that's a

18   different aspect --

19        THE COURT:  That's apples and oranges, I think.  I

20   mean, I understand that they're doing things they couldn't do

21   in a foreclosure, which again, not to be flip, is why -- you

22   know, is why cases like this come here.  Not just here, but,

23   you know, to the bankruptcy courts, to accomplish things that

24   you can't accomplish otherwise through a foreclosure, taking

25   possession, you know, assignment.  You're right.  They're

1  getting a lot of things out of that.

2          But, the question here is, whether or not -- not

3  whether or not this deal could be done -- and if I have this

4  wrong, if I'm misconstruing it, then stop me, but the question

5  is not under 363(f)(5) whether this deal could be done in a

6  sheriff's sale.  No.  Okay?  That's not in dispute.  You

7  couldn't do all of this.  You wouldn't get the bells and

8  whistles of -- but, whether or not you, as a junior creditor,

9  could be forced to accept whatever the results of a foreclosure

10 proceeding under state law would be, and I -- is that in

11 dispute?

12         MR. DEMMY:  If this was a foreclosure, but it's not.

13 So, we have to accept the reality that we are in bankruptcy,

14 and what the Courts -- many Courts have said on this issue is,

15 you should not do this kind of a sale if you're trying to

16 justify them under 363(f)(5) unless you have the protections

17 that go along with it, plan protections, and disclosure and so

18 forth, that that is the -- I know that sales are liberally

19 granted --

20         THE COURT:  Sure.

21         MR. DEMMY:  -- in bankruptcy.  That's the practice.

22 I get that.  I'm not making the argument that the Court should

23 reverse the last 20 years of its history.  What I'm suggesting

24 is, when you parse through the sections of 363(f) they have --

25         THE COURT:  They're clearly protections that are

1  intended to be assured --

2           MR. DEMMY:  That is --

3           THE COURT:  -- so that the rights of secured

4  creditors and, you know, junior secured creditors, as well,

5  aren't freely vitiated.

6           MR. DEMMY:  Exactly, Your Honor, and what you can do

7  in a plan process may very well be a lot more than you can do

8  under 363 -- a 363 sale.  And I would suggest to the Court that

9  the classic use of 363(f)(5) is represented by the TWA case

10 where in that case flight attendants opposed the sale saying

11 that they had certain interests or claims relating to ability

12 to fly on the airline, but the assets were sold.  The flight

13 attendants said, we still get to fly on the buyer --

14          THE COURT:  On the new airline.

15          MR. DEMMY:  -- the buyer's airline --

16          THE COURT:  Right.

17          MR. DEMMY:  -- and the Court, the Bankruptcy Court --

18 and, eventually, that was affirmed on appeal -- said, well, you

19 have, whether it's a claim or an interest, we're going to,

20 under the broad definition of a claim, it's a claim that can be

21 reduced to a money judgment, so therefore you can be forced to

22 accept a money satisfaction under the Bankruptcy Code

23 distribution scheme --

24          THE COURT:  Right.

25          MR. DEMMY:  -- pursuant to 363(f)(5).  That's really

1  what 363(f)(5) gets to, Your Honor.

2          THE COURT:  Okay.

3          MR. DEMMY:  And, as to 363(f)(3), as I've said, we've

4  briefed that issue.  I heard Mr. Pomerantz's argument.  There

5  are two schools of thought.  He takes the one.  I take the

6  other.  I don't really have that much more to say on that

7  point.

8          THE COURT:  Well, I think I understand.  Mr. Horan,

9  did you wish to be heard?  Good afternoon, sir.

10          MR. HORAN:  Good afternoon, Your Honor, Thomas Horan

11  from Womble, Carlyle, Sandridge & Rice for Sean Downes.  Mr.

12  Downes's objections have largely been resolved either through

13  clarifications or amendatory language in the APA and the order.

14  But, there's the central issue about the disposition of the

15  $500,000.

16          I join in the comments that Mr. Demmy made but also

17  would like to emphasize that we're here with respect to this

18  issue about the $500,000 on an expedited basis.  This was --

19  the motion to approve settlement was filed very late, and I

20  understand why we're here dealing with it today.  But, it

21  raises an awful lot of issues, Your Honor.

22          I think, primary of which is that the APA as

23  initially filed in the order said nothing about any allocation

24  of the initial $250,000 to a compromise of avoidance actions

25  and that it certainly has the feel of a post hoc argument as to

1  why all that money should be allocated in a manner that simply

2  wasn't contemplated under the APA in the order.

3      And if we're going to forward on that issue, and this

4  is a new argument that they're making, I think that we need

5  time to look at it, take discovery as necessary.  It just

6  doesn't feel like it has to be decided today, Your Honor.  The

7  sale can close and the money can be escrowed and we can deal

8  with it with the benefit of all the inquiry that needs to be

9  made and a full record for the Court to consider.

10      To the extent that the Committee would intend to put

11  on any evidence today to suggest that, well, look, of course,

12  that was what the $250,000 was about in the APA -- well, the

13  APA doesn't say that.  The order doesn't say that, as initially

14  presented.  So, require parol evidence.  And, frankly, Your

15  Honor, we would object to any evidence that they would attempt

16  to put on to try to put a gloss on what that language was

17  about.

18      So, I -- you know, I think, Your Honor, that the best

19  solution here is simply to put that money into escrow.  We'll

20  deal with that at another time, and that would just seem to

21  make a whole lot more sense.

22      And one other point, Your Honor, that I want to add.

23  There's new schedules in Amendment 2 to the APA, which provide

24  for -- now there are different parties that are not going to be

25  subject to avoidance actions because the contracts are assumed.

1 Yet, there's no discussion about any adjustments in the sale

2 price or anything like that, so I think it -- to the extent

3 that that could be considered as evidence of what the original

4 intent was as to the $250,000, I think it speaks loud and clear

5 that the parties didn't contemplate any relationship between

6 avoidance actions and the payment of the additional $250,000.

7           THE COURT:  Okay, I understand.

8           MR. HORAN:  Thank you, Your Honor.

9           THE COURT:  All right, Mr. Pomerantz, I think where

10 we're at is proceeding by way of proffer.

11          MR. POMERANTZ:  Sure, and just a couple of comments,

12 Your Honor, to arguments that were just made.

13          THE COURT:  Sure.

14          MR. POMERANTZ:  I think, in large respect the

15 arguments by the objectors as to allegations sort of missed the

16 mark.  The APA, which was approved as a stalking horse,

17 contains a provision that is typical of most APAs that you see.

18 The buyer has the right to control the allocation.

19          Mr. Demmy said that some of the assets that are being

20 required were assets avoidance actions.  He does not claim to

21 have a lien on them.  If nothing had happened and there hadn't

22 been any settlement, the buyer, under the terms of the APA,

23 could have come back, post-closing, and allocated in any way it

24 wanted and the debtor would be bound by it.

25          So, this argument that this is somehow a ruse at the

1 last minute to come in, that's what buyers do.  Buyers, for a

2 number of reasons, want to allocate value in certain ways.

3 They had the right to do that.  There wasn't an objection to

4 the allocation provision in the agreement, and the fact that it

5 was a settlement that came up at the end of the day and the

6 buyer is doing now what it could have done under the agreement,

7 I think, is really where the inquiry starts and stops.

8          Your Honor, I think Your Honor had it right with

9 respect to (f)(5).  Mr. Demmy said that it's not -- the

10 foreclosure proceeding is not what we have here.  We have to

11 look at the case before the Court.  But, that's not really what

12 (f)(5) says; (f)(5) says, if you can be compelled to accept a

13 monetary satisfaction and that's exactly what a foreclosure is,

14 and whether you're under (f)(5) or under (f)(1).

15          Mr. Demmy talked about all the procedural

16 protections.  Well, we also argue that a cram down satisfies

17 (f)(5).  Then maybe Mr. Demmy can argue, well, a cram down has

18 all the procedural protections under 1129.  But, if you're just

19 looking at a foreclosure, a foreclosure is done a lot quicker

20 than a sale in bankruptcy, and if you can extinguish a junior

21 claim in a foreclosure, which nobody could really challenge,

22 then I'm not really sure what the argument is, even if there is

23 an argument under (f)(3) and (f)(4).

24          THE COURT:  Okay.  All right, before we turn to the

25 proffers, just so that the record is clear, I think, I did get

1  a declaration in that I've had an opportunity to review, but I

2  think, you know, the argument today has been helpful in

3  crystalizing the issues.  As I said, I think, at outset, I

4  don't think -- as it relates to the sale, I don't think most of

5  the facts about the history, and how we got here, and the

6  exercise, are in dispute.  The question is, some of the legal

7  construction of an application of the Bankruptcy Code.  I'm

8  prepared to take a proffer.  Does anyone object to the use of

9  proffer?

10                    (No audible response)

11           THE COURT:  Okay.  I will give parties an opportunity

12 to cross examine, to the extent that they wish to do so.  Mr.

13 Pomerantz, you may proceed.

14           MR. POMERANTZ:  Thank you, Your Honor, and I

15 understand that a lot of the facts about the sale process,

16 about the sale process that occurred before bankruptcy, the

17 process that occurred post-bankruptcy, are not in dispute.

18 However, I think I need to put in a descriptive proffer for a

19 couple of reasons.  One, to support Your Honor's findings that

20 it's an exercise of the debtor's business judgment --

21           THE COURT:  I agree.

22           MR. POMERANTZ:  -- and, also, because I think it is

23 relevant to (f)(3).

24           THE COURT:  Yes, I was -- I wasn't, you know, short

25 circuiting the process.  I just wanted to make sure that my

1   assessment was clear that I understood, you know, what the bid

2   and the ask are as it relates to the issues that are in -- that

3   are -- that you're asking me to decide, because often, you

4   know, we've seen plenty of these, and often, you know, the

5   mechanics of it, frankly, are in dispute, the fairness and

6   sufficiency of the sale process, the mechanics of that

7   exercise.  And, again, you know, here we have, I believe,

8   different issues that we're wrestling with.  Okay.

9           MR. POMERANTZ:  Thank you, Your Honor.  Kevin Harris

10  is in the courtroom, and if called to testify, Kevin Harris

11  would testify that he is the chief financial officer and acting

12  chief executive officer of the debtor, and he was the principal

13  person responsible for overseeing the raise of capital for the

14  company over the last couple of years.

15          Mr. Harris would also testify that he was directly

16  involved in the negotiation over the debtor-in-possession

17  financing of GRM and he was also directly involved in the

18  negotiation of the purchase agreement with GRM.

19          Mr. Harris would testify that beginning in 2010 the

20  company hired an investment banker who reached out to hundreds

21  of institutional investors to raise money through the public

22  markets or otherwise.  And he would testify that efforts in

23  raising capital on the public markets were ultimately

24  unfruitful and that beginning in May 2011 and continuing

25  through September 2011 the company, through its investment

1  banker at the time, RBC Capital Markets, conducted a thorough

2  marketing process for the company.

3         Mr. Harris would testify that that process involved

4  RBC reaching out to 83 potential strategic and equity

5  investors.  And, during the time, Mr. Harris and the company

6  criss-crossed the country to attend meetings, give management

7  presentations, hold conference calls with over -- with dozens

8  of potential bidders.

9         Mr. Harris would testify that ultimately no bids were

10  received for the company by the bid deadline, and that in the

11  late fall of 2011 the company was facing a liquidity crisis,

12  had already received extensions of credit from GRM, who

13  indicated that no more extensions would be forthcoming, and

14  that through the raise of the junior subordinated debt, $5

15  million was raised to bridge the company through the end of the

16  2011 period and hopefully beyond.

17         Mr. Harris would testify that the book value of the

18  company's assets at the time of the equity raise was

19  substantially less than the amount of GRM's debt at that time,

20  and the company was, if not insolvent, definitely in the zone

21  of insolvency.

22         Over the next few months, the end of 2011, the

23  company continued to perform poorly and burn through the cash

24  that had been raised from the junior noteholders.  And in -- by

25  January 2012, a liquidity crisis was looming and the company

1  started to have serious discussions with the only party willing

2  to provide financing, which was GRM.

3         Mr. Harris would testify that he went out to several

4  of the parties to see if he could raise additional financing to

5  keep the company afloat outside of bankruptcy, including the

6  noteholders, and those requests were either denied or the terms

7  were substantially less beneficial to the estate than what

8  ultimately was approved by GRM.

9         At the same time, the company starting having

10  discussions with GRM regarding GRM's acquisition of the

11  company, and GRM indicated to Mr. Harris that that acquisition

12  would have to be done through a bankruptcy filing pursuant to

13  which GRM would be willing to provide debtor-in-possession

14  financing.

15         Mr. Harris would testify that the negotiations with

16  GRM were conducted at arm's length.  That while GRM had a board

17  observer, that board observer was not permitted to observe

18  meetings as soon as it was determined that GRM was a bidder.

19         Mr. Harris would testify that the negotiation

20  involved resolution of numerous issues, some of which were

21  resolved in favor of the debtor and some of which were resolved

22  in favor of GRM, and that the terms of the sale ultimately

23  approved and ultimately subject to the asset purchase agreement

24  were the best available under the circumstances.

25         Mr. Harris would further testify that while there had

1  been discussions with senior management regarding continued

2  employment, there are no agreements between management and GRM

3  regarding post-sale employment or otherwise.

4          Mr. Harris would testify that at the end of January

5  he hired XRoads to render advisory services to the company and

6  to market the company for sale through a Court-approved process

7  to seek overbids in excess of the offer that came in from GRM.

8          Mr. Harris will testify that had GRM not stepped up

9  to provide DIP financing and fund the Chapter 11, the company

10  would have had no choice but to cease operations, and he would

11  testify that now if the sale isn't approved, that given the

12  lack of bids that have come out through the process, the

13  company would have no choice but to shut down, with the result

14  of a loss of jobs and the loss of the current concern.  That

15  concludes my proffer for Mr. Harris.

16          THE COURT:  All right.  Does anyone wish to cross

17  examine, Mr. Harris?

18                    (No audible response)

19          THE COURT:  All right, very well.

20          MR. DEMMY:  I'm sorry, Your Honor, for this delay.

21          THE COURT:  Yes?

22          MR. DEMMY:  I do not want to cross examine Mr.

23  Harris.  However, I would, I suppose, like clarification that

24  if Mr. Harris's testimony were to become necessary later in the

25  case in other proceedings, I wouldn't be foreclosed from cross

1 examining him at that time.  I think that's obvious, but I just

2 want to make that clear.

3          MR. POMERANTZ:  That's correct, Your Honor.

4          THE COURT:  Yes, I agree with that.

5          MR. DEMMY:  Thank you, Your Honor.

6          THE COURT:  Okay, sure.  All right, very well, I'll

7 accept the proffer.  Thank you.

8          MR. POMERANTZ:  Your Honor, in March, the Court

9 approved the bid procedures to govern the sale process with the

10 key dates being the sale objection deadline and the bid

11 deadline of April 26th, the auction date of May 1, and

12 obviously the sale hearing today of May 2.  I would now like to

13 proffer the testimony of Joseph DeAngelo, a principal of

14 XRoads, LLC.

15          THE COURT:  Okay.

16          MR. POMERANTZ:  Your Honor, if called as a witness,

17 Mr. DeAngelo would testify that he is a principal of XRoads

18 Solutions and he has over 20 years of experience in the

19 restructuring industry.  Mr. DeAngelo would testify that he has

20 acted as a financial advisor and investment banker in the sale

21 of numerous businesses, including those in the tech sector and

22 including those to a 363 sale process much that -- much like

23 the one conducted in this case.

24          Mr. DeAngelo would testify that XRoads was hired at

25 the end of January 2012 to provide financial advice and run a

1 sale process and that he was the primary professional of XRoads

2 responsible for the XRoads engagement.

3         Mr. DeAngelo would testify that he oversaw others at

4 XRoads who conducted the sale process and was intimately

5 involved in all aspects of the sale process.  Mr. DeAngelo

6 would testify that the approximately 70 days from commencement

7 of the case to when the bids are due were a sufficient time to

8 market the assets and that had additional time been provided,

9 that would not have resulted in any additional bids made.

10        Mr. DeAngelo would testify that he prepared reports

11 regarding the status of the sale process that were shared with

12 the company and the Creditors Committee on a regular basis, and

13 conducted numerous calls with the Creditors Committee

14 throughout the case to bring them up to speed on the status of

15 the sale process.

16        Mr. DeAngelo would testify that not once during the

17 sale process was he contacted by the noteholders after the sale

18 process was under the way.  While they were invited at the

19 beginning of the process to sign a confidentiality agreement,

20 become a bidder, and come under the tent, so to speak, they did

21 not respond.

22        Mr. DeAngelo would testify that he contacted over 350

23 parties, including 90 strategic, 30 financial, plus an

24 additional 230 parties that were contacted via the PE-Nexus

25 Internet deal flow exchange site.  Each contact was accompanied

1   by marketing teaser, a summary of the bid procedures, and a

2   confidentiality agreement.

3         Mr. DeAngelo would testify that he prepared a

4   comprehensive data room for parties interested in pursuing the

5   opportunity, that contained contracts, financial,

6   organizational documents, management presentation and financial

7   projections, and that was made available to anyone who signed a

8   confidentiality agreement.

9         Mr. DeAngelo would testify that 79 parties responded

10  to the marketing teaser, 65 or so of which declined to proceed

11  because they felt that given the sale price there was no way

12  they can get to the number based upon what they knew of the

13  business, even without the access to the extensive due

14  diligence information.

15        Mr. DeAngelo would testify that 11 parties ultimately

16  signed non-disclosure agreements to access the on-line data

17  room, and, in fact, five potential bidders participated in

18  conference calls with management.  Some buyers were interested

19  in the debtor's software business, but Mr. DeAngelo would

20  testify that no buyers were interested in the service business.

21  And that at the end, while there was potential interest in the

22  assets, none of the buyers indicated they could come close to

23  the stalking horse bid of $12 million, let alone the total 20

24  million of the debt that was held by GRM.  And when Mr.

25  DeAngelo asked those parties to just submit some offer that

1  could be presented to GRM, each of the parties declined.

2          Mr. DeAngelo would submit that, ultimately, no bids

3  were received.  And as I've said, based upon his experience, no

4  additional time in the process would have yielded a different

5  result.  That is the end of my proffer for Mr. DeAngelo.

6          MR. DEMMY:  May I just consult --

7          THE COURT:  Sure.

8          MR. DEMMY:  -- for one moment, Your Honor?

9                      (Pause)

10         MR. POMERANTZ:  Your Honor, I will amend my proffer

11 of Mr. DeAngelo.  Mr. DeAngelo spoke to Mr. Jacobelli who is

12 appearing on -- or was -- on behalf of Mr. Downes.  He did not

13 have any discussions with any of Mr. Demmy's clients.  Mr.

14 Harris indicates that he had discussions with Mr. Reinhart

15 (phonetic).  He's not a noteholder, but there were different

16 people at various times representing different noteholders.

17 So, to the extent that the proffer indicated that all the

18 noteholders were solicited, that probably was not a correct

19 statement, but people representing various noteholders were

20 communicated with.

21         THE COURT:  Okay.  All right, I appreciate the

22 clarification.

23         MR. DEMMY:  And, Your Honor, with the same

24 reservations previously on having cross.

25         THE COURT:  Very good.  Thank you.  I'll accept the

1  proffer.

2          MR. POMERANTZ:  Your Honor, the only other point that

3  I would make is that we have filed certificates of service

4  indicating the service of the sale motion, the publication in

5  the LA Times and the USA Today.  The sale notice was served on

6  the entire master mailing list, on any party who had ever

7  executed a non-disclosure agreement with the company, and also

8  on a proprietary list of 250 parties that my firm maintains of

9  private equity funds and other people interested in distressed

10 assets, and those people in addition to the 350 people Mr.

11 DeAngelo solicited, none of them ultimately came forth with a

12 bid.

13          THE COURT:  Okay.  Mr. Detweiler?

14          MR. DETWEILER:  Yes, may it please the Court.  Your

15 Honor, Donald Detweiler, on behalf of the Official Committee.

16 Your Honor, I had already handed up to you an exhibits list in

17 support of the settlement motion and we would move in as

18 evidence the following documents that we would ask the Court to

19 take judicial notice of and may come up, ultimately, in

20 argument.

21          First, is Your Honor's final DIP financing order.

22 Second, is the October 12th, 2010, UCC-1 financing statement

23 filed by GRM.  Then, third, is the July 19th, 2011, financing

24 statement filed by GRM.  Fourth is the December 7th, 2011,

25 financing statement file by GRM.  Five is the August 23, 2011,

1  financing statement filed on behalf of certain of the junior
2  investors.  Sixth is the October 28th, 2011, financing
3  statement filed on behalf of certain other, as (indiscernible)
4  was saying, same junior investors.  And then, seventh is the
5  May 1, 2012, complaint filed by the Official Committee of
6  Unsecured Creditors against the junior investors.
7          And as Your Honor will see, that seeks not only to
8  recharacterize what we call the junior investors equity
9  contributions and Mr. Downes' equity contributions, basically
10 they're debt as equity contributions, it also say under 506(a)
11 that they're undersecured creditors and that they're unsecured.
12         THE COURT:  Well, on that, you're not actually
13 seeking to admit that into evidence.  What you're doing is
14 asking me to take notice of the fact that it's been filed.
15         MR. DETWEILER:  Just take notice of it that it --
16 there's a -- that it's been filed.  It's of record with the
17 Court and it's existing.
18         THE COURT:  Okay?  Mr. Horan?
19         MR. HORAN:  Let me clarify that, I think, all Your
20 Honor can take judicial notice of is the fact that it was filed
21 and it exists and that's it.  Thank you.
22         THE COURT:  Okay.  Agreed.  Thank you.
23         UNIDENTIFIED ATTORNEY:  That's it.
24         THE COURT:  All right, Mr. Gilhuly?
25         MR. GILHULY:  Your Honor, you may have already

1 admitted this, but we weren't specific so I wanted to make the

2 record clear that we filed a declaration of Chase Brogan on the

3 good faith issue and we'd ask that that would be admitted.

4          THE COURT:  Well, let me ask, my practice -- is Mr.

5 Brogan present in the courtroom?

6          MR. GILHULY:  Yes, he is.  He's back -- he's present

7 in the courtroom.

8          THE COURT:  All right.  My practice would be that if

9 anybody wishes the opportunity to cross examine, I would either

10 have you do a proffer or I would accept -- because I've

11 reviewed the affidavit, but I -- as with, you know, any

12 functional live testimony, I believe that I need to afford

13 parties an opportunity.  Is there any objection to admission of

14 the affidavit?

15          MR. DEMMY:  No objection.

16          THE COURT:  All right, very well.  It's admitted

17 then.  Thank you.

18          MR. GILHULY:  Thank you, Your Honor.

19          THE COURT:  Okay.  I believe the debtor closes its

20 case then?

21          MR. POMERANTZ:  Yes, Your Honor.

22          THE COURT:  All right.  The matter that's presently

23 before me right now is the sale motion.  The Committee motion,

24 I realize, is also on the agenda today, but that raises some

25 other issues that will -- that, I believe, would be the subject

1  of discussion but it's predicated on Court approval of the

2  sale, right?

3          UNIDENTIFIED ATTORNEY:  Correct.

4          THE COURT:  We in agreement there?  Okay.  I would

5  like a few minutes to look at my materials.  As I said, I've

6  taken under advisement, basically, the standing question, and I

7  believe that the merits of the dispute over the sale are also

8  fully presented before me.  Does anyone else have anything to

9  add before we take that break?  Mr. Horan?  Actually, I would

10 ask also do the objectors wish to be heard or do they have any

11 evidence and testimony?  The debtor has rested.  Okay.

12         MR. HORAN:  Your Honor, Thomas Horan --

13         THE COURT:  I wasn't expecting any.  I mean, I just

14 -- yes.

15         MR. HORAN:  It will shorten your afternoon, Your

16 Honor.

17         THE COURT:  No, no, no, that's all right.

18         MR. HORAN:  The -- I guess, I just want a little bit

19 of clarification, if we could, on how Your Honor's going to

20 approach this.  I don't think the settlement motion can be

21 viewed separately from the sale motion because the settlement

22 motion has to be disposed of.  You've got to deal with --

23         THE COURT:  Well, I think Mr. Detweiler hit the nail

24 on the head, which is the settlement motion travels with the

25 sale motion.  The issue that will be before the Court, assuming

1  the Court approves the sale, if it does, would be the question

2  of what happens to the money.

3          MR. HORAN:  Well, there's also a finding in there,

4  Your Honor, that the $500,000 is all attributable to --

5          THE COURT:  Right, that's --

6          MR. HORAN:  -- the avoidance action.  So, I think,

7  that Your Honor has to deal with that in the context of the

8  sale motion.

9          THE COURT:  Yes and no.

10          MR. HORAN:  Okay.

11          THE COURT:  I mean, I'm going to deal with them all

12  today, but the main thing I -- you know, what I don't want to

13  do is, I've heard from everybody, at least briefly, but

14  without, frankly, studying the issue on the question of

15  allocation and fairness.  I've seen the prompt submissions that

16  were in from the parties and you've pointed me to it, but I

17  want to deal with this in pieces.  I understand that it does

18  travel together.

19          MR. DEMMY:  Yes, Your Honor.  And, just apropos of

20  that remark by Mr. Horan, the debtors beg that question because

21  in the revised order there is a finding or a conclusion of law

22  --  I can't recall where --

23          THE COURT:  Right.

24          MR. DEMMY:  -- that deals with that allocation issue,

25  so --

1          THE COURT:  And I'm aware.

2          MR. DEMMY:  Okay.

3          THE COURT:  I'm aware that that issue is in there.  I

4  mean, I want -- but I want to make sure of what it is that I'm

5  being asked to do.  I think I understand it, but -- and I think

6  I understand the positions of the various parties.  The main

7  reason that I'm looking for a break right now is to consider

8  the standing question.  I think I understand the other legal

9  issues that are before me, and I think I understand the back

10  and forth with respect to the settlement motion and treatment

11  of the proceeds.  Mr. Detweiler, what did I miss?

12          MR. DETWEILER:  Your Honor, I apologize, but I think

13  --

14          THE COURT:  That's all right.

15          MR. DETWEILER:  -- given the evidence is closed,

16  there's adequate support for the finding in the order.  More

17  importantly, they're not presenting any evidence.  And I think

18  Your Honor also needs to take into consideration 363(p).  They

19  have the burden to show that they have an interest in the

20  assets, that they have specifically the entity asserting any

21  interest in property, has the burden of proof upon the issue of

22  validity, priority, and extent of such interest.  The

23  noteholders have failed to meet that burden of proof today with

24  respect to the allocation.  Certainly of the second 250,000,

25  which is avoidance, and with regard to the first, they failed

1  to meet their burden that they have any interest.  Thank you.

2          THE COURT:  Okay.  All right.

3          MR. DEMMY:  Your Honor, if I could just briefly

4  respond?  We made an argument based on the sale agreement,

5  which is in the record, so there is evidence on that point.

6          THE COURT:  Okay.  All right, I need a few minutes,

7  so don't go far.  Stand in recess.

8                    (Recess)

9          COURTROOM DEPUTY:  All rise.

10          THE COURT:  Please be seated.  Thank you for your

11  patience.  The matter before the Court is the debtor's motion

12  for an order approving and authorizing the sale of

13  substantially all of its assets, and for reasons that I will

14  share with you I will approve that motion.  I will also

15  overrule the objections and then we'll turn to the Committee

16  motion.

17          First, so that our record is complete, I've noted

18  previously that I believe that the debtor's case in chief and

19  its evidence submitted was presented largely on an uncontested

20  or unopposed basis, and I'm satisfied by the record before me

21  as to the sufficiency of the sale and marketing effort, the

22  integrity with which it was conducted, the sufficiency of the

23  effort to locate competing bids, and the -- again, the results

24  of the sale and auction process that led to the transaction

25  that's before me today, which is the GRM stalking horse.  None

1  of those issues are in dispute and I'm not going to make more

2  elaborate findings that I might make under other circumstances

3  where there were challenges.

4          The challenges here go to two things by the

5  objectors, and they are, first, the Court's ability to approve

6  and authorize a sale free and clear of liens under Section

7  363(f) and, second, some issues that I think have been resolved

8  and if I've missed them then I'd ask that the parties clarify

9  it, but I believe that the parties have clarified the issues

10 with respect to documentation on whether or not releases are

11 being granted, and, again, whether or not the -- what was it?

12 It was the releases, and the second piece was the --

13          UNIDENTIFIED ATTORNEY:  Waiver.

14          THE COURT:  -- the waiver of the claims.  And I

15 believe that the parties have identified documentation that's

16 satisfactory to them, so I don't think I need to rule upon

17 that.

18          The first question that's raised before me and was

19 the -- and it was most of the time that we talked today, was

20 the issue of standing.  And I'm going to find, for purposes of

21 this case, that the objectors do in fact have standing.

22          But, I want to share with you my observations.  I'm

23 not trying to send a message or anything else.  I think this is

24 a really interesting question and I really appreciate the input

25 from counsel on both sides.  And were it not that I had

1   concluded that I do not accept or that I would overrule on the

2   merits, the objections as they relate to Section 363(f), I

3   would devote more attention and time to the standing question,

4   because I think it's a very, very close call.

5            I struggle with the proposition, as I said, and as I

6   think I spoke with Mr. Gilhuly about this, about an issue where

7   the debtor -- where cases where the debtor is not a party to

8   the intercreditor agreement.  Here, the debtor is the party to

9   the intercreditor agreement, and the question is whether or not

10  the debtor could obtain the benefit of its contractual rights

11  and, frankly, the economic intention of the parties that, to my

12  lights, is fairly clear from the subordination agreement.  That

13  seems to me to be something of an open question.

14           There is case law out there on it and the parties

15  have directed me to a couple of cases and I think the parties

16  have also cited to the <u>Ion Media Networks</u> case from Judge Peck,

17  which I also think has a -- it enforced the intercreditor

18  agreement and it found that the party didn't have standing.

19  And Judge Peck made some specific findings with respect to

20  that, but he was relying on language in the intercreditor

21  agreement that was sub judice.

22           But, he found that giving effects to the plain

23  language of the agreement was consistent with the intention and

24  expectations of the parties, that it was not inconsistent with

25  demonstrable public policy interests where parties are waiving

1  things like the automatic stay or rights to vote on a plan or

2  otherwise exercise substantive rights created by the Bankruptcy

3  Code.

4       And so, there is a strong temptation that I have or

5  interest that I have in assessing this argument.  As I said, I

6  was struggling with the concept of standing, which I think is a

7  more nettlesome proposition than, perhaps, a more classic

8  contractual waiver issue.  It doesn't raise the same due

9  process issues that the Court -- that I would otherwise

10 struggle with.

11      And I think I would also note that part of the reason

12 for my ruling today, as I said, I am considering the objections

13 on their merits, it allows me -- and finding, therefore,

14 implicitly that there is standing, because I don't need to go

15 to that question.  Were I to rule on standing and dispose of

16 it, I don't know what a reviewing Court would do, and I also

17 don't know what ramifications that would make in this court for

18 me and for my colleagues.

19      I don't believe any of us have ruled dispositively on

20 the issue.  I don't think anybody -- if somebody had written

21 heavily on it, you would have told me.  And I don't need to

22 answer that question today, because I'm turning my attention

23 now, having found for our purposes of today that there is

24 standing by the affected -- by the junior creditors, I find

25 that the debtor has carried its burden under, at a minimum,

1 Bankruptcy Code Section 363(f)(3) and 363(f)(5).

2          Having said that much, I don't need then to reach the

3 question of whether or not the pendency of the Committee

4 objection gives rise to a bona fide dispute.  As I said, I

5 haven't reviewed that complaint.  I understand that it's

6 pending, but, again, there's a lot of case law about the extent

7 to which the Court should conduct an examination of the

8 sufficiency of that dispute.  And because I find under two

9 separate other statutory provisions, I don't need to reach

10 that.

11          As it relates to 363(f)(3), the Code is clear, I

12 think, that the Court can approve and authorize a sale free and

13 clear of liens where the property is sold for greater than the

14 value of the liens.  And I think that the Courts that have

15 construed and followed the <u>Beker</u> analysis have it right and it

16 thinks it's consistent with our practice that the value of

17 those liens is determined by reference to Section 506, and that

18 it is in fact the value of the collateral, not the face value

19 of the asserted lien.

20          And in a case such as this where I have the benefit

21 of a valuation exercise, which is what the sale process is, I'm

22 satisfied that the value of the liens has been determined and

23 that 363(f)(3) has in fact been met, and the Court has the

24 ability to approve and authorize that sale.

25          In addition, I also find under 363(f)(5) in this case

1  that the junior noteholders, as junior creditors, could be

2  compelled in a foreclosure sale to accept a money satisfaction

3  of their interest, and therefore 363(f)(5) has been met, and

4  the Court has the ability to authorize and approve the sale

5  free and clear of all liens, claims, and encumbrances.

6       The colloquy that we had with respect to the

7  additional relief and bells and whistles that come from a

8  bankruptcy proceeding, I don't think affects that analysis.

9  363(f)(5), I think, requires the Court to engage in a

10 hypothetical exercise of determining whether or not under other

11 circumstances an objecting creditor could be forced to accept a

12 certain result.  And here, I believe that that's met and I

13 don't, frankly, think that that's a very close call.

14      So, having found that the debtor has carried its

15 burden under the sole issue that was raised and having found,

16 for limited purposes of this hearing, that indeed there is

17 standing to object, I will rule on the merits of them and I

18 would be prepared to entertain an order.

19      With respect to the Committee motion, I am prepared

20 to approve the Committee motion, but I am not prepared to

21 approve or authorize the disbursement of the funds while there

22 is a pending objection or opposition from the affected

23 creditors as to the allocation.

24      I understand the issue and I think that the Committee

25 has articulated some pretty coherent arguments, and under other

1  circumstances that might be sufficient to be the end of the

2  day.  But, these issues have been raised only a few days before

3  the hearing.  I don't know whether or not -- or what further

4  proceedings would or should be necessary, but I don't believe

5  that the disbursement of the funds immediately is essential to

6  the survival or the orderly prosecution of the cases.

7         I will deal with this question promptly and as

8  promptly as the parties wish.  But, given that the debtor's

9  motion -- or the Committee motion, which I agreed I would hear

10 today, was filed on an expedited basis and this discrete issue

11 of what ultimately happens to the money that the Committee, I

12 think, successfully negotiated for, that question is one that

13 I'm not prepared to dispose of today.  And, again, I think the

14 principles of time and due process and fairness require that if

15 there are affected creditors that have an argument that they

16 wish to raise to the Court, I want to afford them the

17 opportunity to do so.

18         In so ruling, I want to be clear that delaying

19 briefly disposition of this is not a whack at the Committee for

20 the timing of its motion.  You know, I understand how these

21 cases run, how these negotiations evolve, and so I'm confident

22 that a motion was filed as soon as you had a deal, and that's

23 fine.  So, you know, I think that there was a little bit of a

24 back and forth.  I think more so on the timing of the Committee

25 filing of its complaint, but also a legitimate concern both by

1 Mr. Demmy and Mr. Horan about a sufficient opportunity to

2 address and assess the allocation issue.

3       I make no comment on that at this stage.  I

4 understand the Committee's arguments, but I wish the

5 opportunity to afford all parties a fair opportunity to be

6 heard on that and, again, I will do so at the convenience of

7 the parties.  But, it's my expectation that the transaction

8 itself would be able to move forward with appropriate

9 modifications to the form of the order that addressed that

10 issue.  As to the other objections, they are overruled.  Okay?

11 Mr. Pomerantz?

12       MR. POMERANTZ:  Your Honor, I would only ask that the

13 -- perhaps, we could schedule the date to resolve that issue

14 now because this deal will not close until the beginning of

15 June, but after it closes, there may not be any --

16       THE COURT:  That's fine.

17       MR. POMERANTZ:  -- liquidity of the estate, so --

18       THE COURT:  That's fine.  I mean, we have -- it's the

19 2nd of May, and I will hear you in May.  So, let me -- if we

20 need to set that date now, we can.  My practice usually would

21 be to let folks look at their own schedules and figure that

22 part out, but if we need to set that date right now.  But, I'll

23 hear you in May.

24       MR. GILHULY:  Your Honor --

25       THE COURT:  Mr. Gilhuly?

1          MR. GILHULY:  Yes, one clean-up matter.  I want to

2   give Your Honor a heads up.  Your Honor was aware that the

3   motion for assumption and assignment was filed and there were

4   cure objections.  We have -- that is the buyer, GR Match -- has

5   negotiated a number of cure amounts, consensually, amended

6   Number 2, which was filed, and I think you saw as a few parties

7   that have been cured.  We're going to be filing stipulations --

8          THE COURT:  Okay.

9          MR. GILHULY:  -- which all of the assumptions are

10  going to be consensual.  There were no objections.

11         THE COURT:  Sure.

12         MR. GILHULY:  But, the cure amounts have been getting

13  done and --

14         THE COURT:  Well, they get negotiated by the business

15  people.

16         MR. GILHULY:  Yes, they do.  And so, we're probably

17  just going to submit those as stipulation to Your Honor.  I

18  just wanted to make that clear to you.

19         THE COURT:  I think that's fine.  The -- I do want

20  them filed, but I'm not going to require a motion practice

21  relating to them.  What I would recommend, as I'm sure you're

22  going to do, is that you run them past the Committee, although

23  whether they have an economic stake in it or not is anybody's

24  guess, but --

25         MR. GILHULY:  I think, Your Honor, it's all good news

1  when we assume a contract.

2  THE COURT:  Agreed.

3  MR. GILHULY:  And so, I think we're going to do that.

4  We were thinking of asking for a hearing and then we said, you

5  know, we really don't need one.  There's --

6  THE COURT:  No, I don't think you do.

7  MR. GILHULY:  -- been no objection to assumption and

8  we have until the closing date to do this.  We intend on doing

9  it much more quickly.

10  THE COURT:  I mean, as a practical matter, I agree

11  with you that you don't need a hearing, because I'm not certain

12  that you need an order.  I'll give you one because I think

13  everybody would want one --

14  MR. GILHULY:  Yes.

15  THE COURT:  -- but proceeding by stipulation between

16  the parties, I mean, arguably, they could do that as a matter

17  of law contract if they wanted to.  The -- and so, you know, if

18  anything goes off the rails, I'll be here.  But, no, I'm not

19  going to stand on ceremony as it relates to that.

20  MR. GILHULY:  All right.  Your Honor, I just wanted

21  to give you a heads up so you knew what you were getting when

22  they showed up.

23  THE COURT:  No, that's fine.  And I guess the two

24  observations that I would make as it relates to the sale

25  process is, you know, if there are issues that arise, get me on

1 the phone.  As it relates to scheduling further proceedings to

2 deal with the allocation question, if we need to hear that in

3 May, I'll be available to do so and, you know, if -- do you

4 want to talk about that now or do you guys want to talk and get

5 back to me?  But --

6 　　　　　　UNIDENTIFIED ATTORNEY:  I guess we can get back to

7 you, okay?

8 　　　　　　THE COURT:  Yes.  You'll get -- I don't see any

9 problem with you getting a date in the month of May, and you're

10 talking about an early June closing?

11 　　　　　　UNIDENTIFIED ATTORNEY:  Yes.

12 　　　　　　THE COURT:  Okay.  All right.

13 　　　　　　MR. POMERANTZ:  Will Your Honor be writing an opinion

14 on the (indiscernible) issue?

15 　　　　　　THE COURT:  No.

16 　　　　　　　　　　　　(Laughter)

17 　　　　　　THE COURT:  Isn't that enough?  I am not.  Why do you

18 ask, just because it's an interesting question?

19 　　　　　　MR. POMERANTZ:  Well, it's an interesting question,

20 and given that this is a very important Court, to have an

21 opinion coming out of this Court, I think, would be helpful,

22 especially since it went --

23 　　　　　　UNIDENTIFIED ATTORNEY:  The right way.

24 　　　　　　MR. POMERANTZ:   -- the right way.

25 　　　　　　　　　　　　(Laughter)

1          THE COURT:  Well, talk to him.  He's -- well, you

2  know, I will say -- and, again, not to be flip -- the

3  argument's an interesting one, and the -- so, I will consider

4  that.  I do believe -- I've ruled.  There's no uncertainty, at

5  least from my point of view, and obviously the objectors have

6  their rights, appellate rights or otherwise, but I will

7  consider that.

8          But, again, as it relates to the standing question, I

9  thought it was a very interesting question and I do believe

10  that my goal, for purposes of today, was to address the

11  substance of the matters that were before me.  I, frankly,

12  heard them on the merits, and, where possible, I try to avoid

13  those sort of procedural defaults.  But, in a different

14  situation that may be a different result.  I don't know.  Okay.

15  Anything further?

16                    (No audible response)

17          THE COURT:  All right.  We'll stand in recess.  I'll

18  look for a revised form of order on the certification.

19          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

20          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

21          THE COURT:  Thanks very much, counsel.

22                    *  *  *  *  *

23

24

25

# C E R T I F I C A T I O N

We, KIMBERLY UPSHUR AND WENDY ANTOSIEWICZ, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Kimberly Upshur

KIMBERLY UPSHUR

/s/ Wendy Antosiewicz

WENDY ANTOSIEWICZ

J&J COURT TRANSCRIBERS, INC.              Date:  May 4, 2012